No. 23-1854

# In the United States Court of Appeals For the Fourth Circuit

D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick; TREVOR CHAPLICK; VIVIAN CHAPLICK; M.B., by his parents and guardians, James Bingham and Sheila Bingham; JAMES BINGHAM ; SHEILA BINGHAM; HEAR OUR VOICES, INC., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

FAIRFAX COUNTY SCHOOL BOARD; VIRGINIA DEPARTMENT OF EDUCATION; DR. MICHELLE REID, Superintendent of Fairfax County Public Schools; DR. LISA COONS, Virginia Superintendent of Public Instruction,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Eastern District of Virginia, Case No. 1:22-cv-1070, Hon. Michael S. Nachmanoff

## JOINT APPENDIX

JEANNE-MARIE SIDONIE RAYMOND BURKE
JULIA BOUGIE JUDKINS
  *Fairfax County Public Schools*
  *Suite 5600*
  *8115 Gatehouse Road*
  *Falls Church, VA*
  *(571) 423-1232*

*Counsel for Defendants-Appellees*
*Fairfax County School Board and*
*Dr. Michelle Reid*

WILLIAM R. H. MERRILL
  *Counsel of Record*
MICHAEL ADAMSON
  *Susman Godfrey LLP*
  *1000 Louisiana Street*
  *Suite 5100*
  *Houston, Texas 77002*
  *(713) 653-7865*
  *bmerrill@susmangodfrey.com*

*Counsel for Plaintiffs-Appellants*

Counsel Continues on Next Page

JACKIE LYNN WHITE, II ESQ.
FARNAZ FARKISH THOMPSON
BRIAN DAVID SCHALZBACH
   *McGuireWoods LLP*
   *Suite 1800*
   *1750 Tysons Boulevard*
   *Tysons Corner, VA 22102-3915*
   *(703) 712-5474*

*Counsel for Defendants-Appellees*
*Virginia Department of Education and*
*Dr. Lisa Coons*

ALAN M. GRIMALDI
ORAL D. POTTINGER
ERIC A. WHITE
   *Mayer Brown LLP*
   *1999 K Street NW*
   *Washington, DC 20006*
   *(202) 263-3000*

CRAIG T. MERRITT
R. BRAXTON HILL
   *MerrittHill, PLLC*
   *919 East Main Street*
   *Suite 1000*
   *Richmond, Virginia 23219*
   *(804) 916-1600*

ADERSON FRANCOIS
   *Georgetown Law*
   *Civil Rights Law Clinic*
   *600 New Jersey Avenue NW*
   *Washington, DC 20001*
   *(202) 662-9000*

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

**Page**

District Court Docket Sheet ..................................................................JA1

First Amended Complaint (Jan. 20, 2023) (Dkt. 43) .........................................JA11

    Exhibit A – Hr'g Officer Decisions from 2010–21 ...............................JA129

    Exhibit B – Hr'g Officer Decisions from 2003–09 ...............................JA131

    Exhibit C – Cumulative Hr'g Officer Decisions from 2003–21 ...........JA133

    Exhibit D – Hr'g Officer Invoice .........................................................JA135

    Exhibit E – Hr'g Officer Information & Ruling Record Summary .......JA142

    Exhibit F – Oct. 6, 2015 Ltr. from W. Reichardt to S. Gray .................JA146

Transcript from Hearing on Motion to Dismiss (May 4, 2023) .......................JA149

Order on Defendants' Motion to Dismiss (July 25, 2023) (Dkt. 90)...............JA216

Order on Defendants' Motion to Clarify (Aug. 1, 2023) (Dkt. 94)..................JA229

Notice of Appeal (Aug. 14, 2023) (Dkt. 95)....................................................JA230

i

**U.S. District Court**
**Eastern District of Virginia - (Alexandria)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-01070-MSN-IDD**

D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick et al v. Fairfax
County School Board et al
Assigned to: District Judge Michael S Nachmanoff
Referred to: Magistrate Judge Ivan D. Davis

   Case in other court:    4th Circuit, 23-01854

Cause: 20:1400 Civil Rights of Handicapped Child

Date Filed: 09/21/2022
Jury Demand: Plaintiff
Nature of Suit: 448 Civil Rights: Education
Jurisdiction: Federal Question

**Plaintiff**

**D.C.**
*by his parents and guardians, Trevor Chaplick and Vivian
Chaplick*

represented by

**Justin C. Kenney**
Susman Godfrey LLP (NA-TX)
1000 Louisiana Street
Suite 5100
Houston, TX 77002
**NA**
713-651-9366
Fax: 713-654-6666
Email: jkenney@susmangodfrey.com
*TERMINATED: 04/20/2023*
*PRO HAC VICE*

**Michael Brent Adamson**
Susman Godfrey L.L.P. (CA-NA)
1900 Avenue of The Stars
Suite 1400
Los Angeles, CA 90067
NA
310-789-3100
Fax: 310-789-3150
Email: madamson@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Randolph Merrill**
Susman Godfrey LLP (NA-TX)
1000 Louisiana Street
Suite 5100
Houston, TX 77002
**NA**
713-653-7865
Fax: 713-654-6666
Email: bmerrill@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rowland Braxton Hill , IV**
MerrittHill, PLLC
919 East Main Street
Suite 1000
Richmond, VA 23219
804-916-1602
Email: bhill@merrittfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JA1**

**Trevor Chaplick**          represented by    **Justin C. Kenney**
(See above for address)
*TERMINATED: 04/20/2023*
*PRO HAC VICE*

**Michael Brent Adamson**
Susman Godfrey L.L.P. (CA-NA)
1900 Avenue of The Stars
Suite 1400
Los Angeles, CA 90067
**NA**
310-789-3100
Fax: 310-789-3150
Email: madamson@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scarlett Collings**
Susman Godfrey LLP (NA-TX)
1000 Louisiana Street
Suite 5100
Houston, TX 77002
**NA**
713-651-9366
Fax: 713-654-6666
Email: scollings@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Randolph Merrill**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rowland Braxton Hill , IV**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vivian Chaplick**          represented by    **Justin C. Kenney**
(See above for address)
*TERMINATED: 04/20/2023*
*PRO HAC VICE*

**Michael Brent Adamson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scarlett Collings**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Randolph Merrill**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rowland Braxton Hill , IV**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JA2**

| | | |
|---|---|---|
| **Hear Our Voices, Inc.**<br>*on behalf of themselves and all others similarly situated* | represented by | **Justin C. Kenney**<br>(See above for address)<br>*TERMINATED: 04/20/2023*<br>*PRO HAC VICE* |
| | | **Michael Brent Adamson**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **William Randolph Merrill**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Rowland Braxton Hill , IV**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **James Bingham** | represented by | **Justin C. Kenney**<br>(See above for address)<br>*TERMINATED: 04/20/2023*<br>*PRO HAC VICE* |
| | | **Rowland Braxton Hill , IV**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **M.B.**<br>*by his parents and guardians, James Bingham and Sheila Bingham* | represented by | **Justin C. Kenney**<br>(See above for address)<br>*TERMINATED: 04/20/2023* |
| | | **Rowland Braxton Hill , IV**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Sheila Bingham** | represented by | **Justin C. Kenney**<br>(See above for address)<br>*TERMINATED: 04/20/2023*<br>*PRO HAC VICE* |
| | | **Rowland Braxton Hill , IV**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**JA3**

app.pacerpro.com/cases/16910008/print

**Fairfax County School Board**
*TERMINATED: 07/25/2023*

represented by  **Julia Bougie Judkins**
Fairfax County Public Schools
8115 Gatehouse Road
Ste 5th Floor
Falls Church, VA 22042
571-423-1035
Fax: 703-385-1555
Email: jbjudkins@FCPS.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeanne-Marie Sidonie Raymond Burke**
Fairfax County Public Schools
Office of Division Counsel
8115 Gatehouse Rd
Suite 5600
Falls Church, VA 22042
571-423-1232
Fax: 571-423-1257
Email: jsburke@fcps.edu
*ATTORNEY TO BE NOTICED*

**Defendant**

**Virginia Department Of Education**
*TERMINATED: 07/25/2023*

represented by  **Amy Elizabeth Hensley**
Office of the Attorney General (Richmond)
202 North 9th Street
Richmond, VA 23219
(804) 371-2267
Fax: (804) 371-2087
Email: hsc5te@virginia.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jackie White , II**
McGuireWoods LLP
1750 Tysons Boulevard
Suite 1800
Tysons, VA 22102
703-712-5474
Fax: 703-712-5206
Email: jwhite@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian David Schmalzbach**
McGuireWoods LLP (Richmond)
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-4746
Fax: (804) 698-2304
Email: bschmalzbach@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Farnaz Farkish Thompson**
McGuireWoods LLP
888 16th Street N.W.
Suite 500
Washington, DC 20006
202-857-2488
Fax: 202-828-3358
Email: fthompson@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Defendant**

JA4

app.pacerpro.com/cases/16910008/print

**Dr. Michelle Reid**
*Superintendent of Fairfax County Public Schools (in her official capacity)*

represented by **Julia Bougie Judkins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeanne-Marie Sidonie Raymond Burke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lisa Coons**

represented by **Amy Elizabeth Hensley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jackie White , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian David Schmalzbach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Farnaz Farkish Thompson**
(See above for address)
*ATTORNEY TO BE NOTICED*

| # | Docket Text | Date Filed |
|---|---|---|
| 1 | Complaint Plaintiffs' Original Class Action Complaint for Declaratory and Injunctive Relief and Damages ( Filing fee $ 402, receipt number AVAEDC-8579266.), filed by Vivian Chaplick, Trevor Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 2 | Civil Cover Sheet re 1 Complaint, by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 3 | MOTION to Seal the Administrative Record and Proceed Anonymously by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 4 | Memorandum in Support re 3 MOTION to Seal the Administrative Record and Proceed Anonymously filed by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 5 | Sealed Attachment/Exhibit(s) re 4 Memorandum in Support,. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
|  | Initial Case Assignment to District Judge Michael S Nachmanoff and Magistrate Judge Ivan D. Davis. (swil) (Entered: 09/21/2022) |  |
| 6 | Notice of Filing Sealing Motion LCvR5(C) by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc. re 5 Sealed Attachment/Exhibit(s), 3 MOTION to Seal the Administrative Record and Proceed Anonymously, 4 Memorandum in Support, (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 7 | NOTICE by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc. re 3 MOTION to Seal the Administrative Record and Proceed Anonymously of Waiver of Oral Argument (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 8 | Financial Interest Disclosure Statement (Local Rule 7.1) by Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 9 | Proposed Summons to Fairfax County School Board by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 10 | Proposed Summons to Jillian Balow, Superintendent of Public Instruction of Virginia by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 11 | Proposed Summons to Dr. Michelle Reid, Superintendent, Fairfax County Public Schools by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |

**JA5**

| # | Docket Text | Date Filed |
|---|---|---|
| 12 | Proposed Summons to Virginia Department of Education by Trevor Chaplick, Vivian Chaplick, D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick, Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/21/2022) | 09/21/2022 |
| 13 | Summons Issued as to Jillian Balow, Fairfax County School Board, Michelle Reid, Virginia Department Of Education, NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Summons Notice)(swil) (Entered: 09/23/2022) | 09/23/2022 |
| 14 | Motion to appear Pro Hac Vice by William R. H. Merrill and Certification of Local Counsel R. Braxton Hill, IV Filing fee $ 75, receipt number AVAEDC-8585398. by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/25/2022) | 09/25/2022 |
| 15 | Motion to appear Pro Hac Vice by Michael B. Adamson and Certification of Local Counsel R. Braxton Hill, IV Filing fee $ 75, receipt number AVAEDC-8585399. by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 09/25/2022) | 09/25/2022 |
| 16 | ORDER granting 15 Motion for Pro hac vice Appointed Michael Brent Adamson for Trevor Chaplick, Michael Brent Adamson for Vivian Chaplick,Michael Brent Adamson for D.C.,Michael Brent Adamson for Hear Our Voices, Inc. Signed by District Judge Michael S Nachmanoff on 9/28/2022. (nneb) (Entered: 09/29/2022) | 09/28/2022 |
| 17 | ORDER granting 14 Motion for Pro hac vice Appointed William R. H. Merrill for Trevor Chaplick, William R. H. Merrill for Vivian Chaplick, William R. H. Merrill for D.C., William R. H. Merrill for Hear Our Voices, Inc. Signed by District Judge Michael S Nachmanoff on 9/28/2022. (nneb) (Entered: 09/29/2022) | 09/28/2022 |
| 18 | NOTICE of Appearance by Julia Bougie Judkins on behalf of Fairfax County School Board, Michelle Reid (Judkins, Julia) (Entered: 10/06/2022) | 10/06/2022 |
| 19 | Financial Interest Disclosure Statement (Local Rule 7.1) by Fairfax County School Board, Michelle Reid. (Judkins, Julia) (Entered: 10/06/2022) | 10/06/2022 |
| 20 | WAIVER OF SERVICE Returned Executed by Fairfax County School Board. Fairfax County School Board waiver sent on 10/6/2022, answer due 12/5/2022. (Judkins, Julia) (Entered: 10/06/2022) | 10/06/2022 |
| 21 | WAIVER OF SERVICE Returned Executed by Michelle Reid. Michelle Reid waiver sent on 10/5/2022, answer due 12/5/2022. (Judkins, Julia) (Entered: 10/06/2022) | 10/06/2022 |
| 22 | NOTICE of Appearance by Jeanne-Marie Sidonie Raymond Burke on behalf of Fairfax County School Board, Michelle Reid (Burke, Jeanne-Marie) (Entered: 10/06/2022) | 10/06/2022 |
| 23 | WAIVER OF SERVICE Returned Executed by Vivian Chaplick, Trevor Chaplick, D.C., Hear Our Voices, Inc.. Jillian Balow waiver sent on 10/5/2022, answer due 12/5/2022. (Hill, Rowland) (Entered: 10/07/2022) | 10/07/2022 |
| 24 | WAIVER OF SERVICE Returned Executed by Vivian Chaplick, Trevor Chaplick, D.C., Hear Our Voices, Inc.. Virginia Department Of Education waiver sent on 10/5/2022, answer due 12/5/2022. (Hill, Rowland) (Entered: 10/07/2022) | 10/07/2022 |
| 25 | Consent MOTION for Extension of Time to Respond to Complaint by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Attachments: # 1 Proposed Order)(Hill, Rowland) Modified on 11/1/2022 (lcre, ). (Entered: 10/07/2022) | 10/07/2022 |
| 26 | NOTICE by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc. re 25 Consent MOTION for Extension of Time to Respond to Complaint - Consent Notice of Waiver of Hearing (Hill, Rowland) (Entered: 10/07/2022) | 10/07/2022 |
| 27 | Consent MOTION to Set Briefing Schedule by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 10/07/2022) | 10/07/2022 |
| 28 | NOTICE by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc. re 27 Consent MOTION to Set Briefing Schedule - Consent Notice of Waiver of Hearing (Hill, Rowland) (Entered: 10/07/2022) | 10/07/2022 |
| 29 | NOTICE of Appearance by Amy Elizabeth Hensley on behalf of Jillian Balow, Virginia Department Of Education (Hensley, Amy) (Entered: 10/07/2022) | 10/07/2022 |
| 30 | ORDER granting 27 Motion. Signed by District Judge Michael S Nachmanoff on 10/13/2022. (lcre, ) (Entered: 10/13/2022) | 10/13/2022 |
| 31 | Motion to appear Pro Hac Vice by Scarlett Collings and Certification of Local Counsel R. Braxton Hill, IV Filing fee $ 75, receipt number AVAEDC-8612822. by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 10/14/2022) | 10/14/2022 |
| 32 | ORDER granting 31 Motion for Pro hac vice Appointed Scarlett Collings for Trevor Chaplick, Scarlett Collings for Vivian Chaplick. (Entered: 11/15/2022) | 10/20/2022 |
| 33 | MOTION to Dismiss for Failure to State a Claim , MOTION to Dismiss for Lack of Jurisdiction by Fairfax County School Board, Michelle Reid. (Attachments: # 1 Proposed Order re Motion to Dismiss)(Judkins, Julia) (Entered: 12/16/2022) | 12/16/2022 |
| 34 | Memorandum in Support re 33 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction filed by Fairfax County School Board, Michelle Reid. (Judkins, Julia) (Entered: 12/16/2022) | 12/16/2022 |

JA6

| # | Docket Text | Date Filed |
|---|---|---|
| 35 | Notice of Hearing Date set for 03/10/2023 re 34 Memorandum in Support, 33 MOTION to Dismiss for Failure to State a Claim MOTION to Dismiss for Lack of Jurisdiction (Judkins, Julia) (Entered: 12/16/2022) | 12/16/2022 |
| 36 | MOTION to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) by Jillian Balow, Virginia Department Of Education. (Hensley, Amy) (Entered: 12/16/2022) | 12/16/2022 |
| 37 | Memorandum in Support re 36 MOTION to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) filed by Jillian Balow, Virginia Department Of Education. (Hensley, Amy) (Entered: 12/16/2022) | 12/16/2022 |
| 38 | Notice of Hearing Date re 36 MOTION to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) (Hensley, Amy) (Entered: 12/16/2022) | 12/16/2022 |
|  | Set Deadlines as to 33 MOTION to Dismiss for Failure to State a Claim, 36 MOTION to Dismiss. Motion Hearing set for 3/10/2023 at 10:00 AM in Alexandria Courtroom 600 before District Judge Michael S Nachmanoff. (jlan) (Entered: 12/19/2022) | 12/19/2022 |
| 39 | Consent MOTION Set Time for Filing Amended Complaint, Rule 12 Motions, and Related Briefs and Memorandum in Support by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 12/29/2022) | 12/29/2022 |
| 40 | NOTICE by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc. re 39 Consent MOTION Set Time for Filing Amended Complaint, Rule 12 Motions, and Related Briefs and Memorandum in Support - Waiver of Oral Argument (Hill, Rowland) (Entered: 12/29/2022) | 12/29/2022 |
| 41 | ORDER granting 39 Consent Motion Set Time for Filing Amended Complaint, Rule 12 Motions, and Related Briefs and Memorandum in Support (see Order for details). Signed by Magistrate Judge Ivan D. Davis on 1/6/2023. (swil) (Entered: 01/06/2023) | 01/06/2023 |
| 42 | Motion to appear Pro Hac Vice by Justin C. Kenney and Certification of Local Counsel R. Braxton Hill, IV Filing fee $ 75, receipt number AVAEDC-8761867. by Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc.. (Hill, Rowland) (Entered: 01/19/2023) | 01/19/2023 |
| 43 | AMENDED COMPLAINT against All Defendants, filed by Vivian Chaplick, Trevor Chaplick, D.C., Hear Our Voices, Inc., JAMES BINGHAM, M.B., SHEILA BINGHAM. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 44 | MOTION to Seal by JAMES BINGHAM, SHEILA BINGHAM, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 45 | Memorandum in Support re 44 MOTION to Seal the Administrative Record and Proceed Anonymously filed by JAMES BINGHAM, SHEILA BINGHAM, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 46 | Sealed Attachment/Exhibit(s) re 45 Memorandum in Support. (Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 47 | NOTICE by JAMES BINGHAM, SHEILA BINGHAM, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B. re 43 Amended Complaint, Certificate of Service (Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 48 | Notice of Filing Sealing Motion LCvR5(C) by JAMES BINGHAM, SHEILA BINGHAM, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B. re 46 Sealed Attachment/Exhibit(s), 44 MOTION to Seal , 45 Memorandum in Support (Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 49 | NOTICE by JAMES BINGHAM, SHEILA BINGHAM, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B. re 44 MOTION to Seal (Hill, Rowland) (Entered: 01/20/2023) | 01/20/2023 |
| 50 | ORDER granting 42 Motion for Pro hac vice Appointed Justin C. Kenney for James Bingham,Justin C. Kenney for Sheila Bingham,Justin C. Kenney for Trevor Chaplick,Justin C. Kenney for Vivian Chaplick,Justin C. Kenney for D.C.,Justin C. Kenney for Hear Our Voices, Inc.,Justin C. Kenney for M.B. Signed by District Judge Michael S Nachmanoff on 1/23/2023. (swil) (Entered: 01/24/2023) | 01/23/2023 |
| 51 | MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint, MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint by Fairfax County School Board, Michelle Reid. (Attachments: # 1 Proposed Order re FCSB Defs Motion to Dismiss First Amended Complaint)(Judkins, Julia) (Entered: 02/17/2023) | 02/17/2023 |
| 52 | Memorandum in Support re 51 MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint filed by Fairfax County School Board, Michelle Reid. (Judkins, Julia) (Entered: 02/17/2023) | 02/17/2023 |
| 53 | Notice of Hearing Date for Argument set for March 25, 2023 re 52 Memorandum in Support, 51 MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint (Judkins, Julia) (Entered: 02/17/2023) | 02/17/2023 |
| 54 | Notice of Hearing Date AMENDED set for March 24, 2023 re 52 Memorandum in Support, 51 MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint (Judkins, Julia) (Entered: 02/17/2023) | 02/17/2023 |

| # | Docket Text | Date Filed |
|---|---|---|
| 55 | NOTICE of Appearance by Jackie White, II on behalf of Jillian Balow, Virginia Department Of Education (White, Jackie) (Entered: 02/17/2023) | 02/17/2023 |
| 56 | NOTICE of Appearance by Farnaz Farkish Thompson on behalf of Jillian Balow, Virginia Department Of Education (Thompson, Farnaz) (Entered: 02/17/2023) | 02/17/2023 |
| 57 | NOTICE of Appearance by Brian David Schmalzbach on behalf of Jillian Balow, Virginia Department Of Education (Schmalzbach, Brian) (Entered: 02/17/2023) | 02/17/2023 |
| 58 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss for Failure to State a Claim by Jillian Balow, Virginia Department Of Education. (Attachments: # 1 Proposed Order Proposed Order)(White, Jackie) (Entered: 02/17/2023) | 02/17/2023 |
| 59 | Memorandum in Support re 58 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Jillian Balow, Virginia Department Of Education. (White, Jackie) (Entered: 02/17/2023) | 02/17/2023 |
| 60 | Notice of Hearing Date set for 3/24/2023 re 59 Memorandum in Support, 58 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim (White, Jackie) (Entered: 02/17/2023) | 02/17/2023 |
|  | Set Deadlines as to 58 MOTION to Dismiss and 51 MOTION to Dismiss. Motion Hearing set for 3/24/2023 at 10:00 AM in Alexandria Courtroom 600 before District Judge Michael S Nachmanoff. (jlan) (Entered: 02/21/2023) | 02/21/2023 |
| 61 | MOTION for Leave to File Excess Pages by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 02/23/2023) | 02/23/2023 |
| 62 | Waiver of re 61 MOTION for Leave to File Excess Pages by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B. (Hill, Rowland) (Entered: 02/23/2023) | 02/23/2023 |
| 63 | MOTION for Electronic Device Application , Motion for use of Courtroom Technology at March 24, 2023 Hearing by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 02/27/2023) | 02/27/2023 |
| 64 | ORDERED that Motion For Leave to Exceed the Page Limit (Dkt. No. 61) is GRANTED. In lieu of filing two separate briefs, Plaintiffs may file a single, consolidated opposition brief that addresses the arguments raised in Defendants' Motions to Dismiss (Dkt. Nos. 51, 58). That brief may not exceed fifty (50) pages, exclusive of affidavits and supporting documentation. Signed by District Judge Michael S Nachmanoff on 2/28/2023. (swil) (Entered: 02/28/2023) | 02/28/2023 |
|  | ***Motion Hearing terminated per DW in MSN chambers. (swil) (Entered: 02/28/2023) | 02/28/2023 |
| 65 | Opposition to 58 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim , 51 MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint filed by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 03/03/2023) | 03/03/2023 |
| 66 | Consent MOTION to Continue Hearing on Rule 12 Motions by Jillian Balow, Virginia Department Of Education. (Attachments: # 1 Proposed Order Proposed Order)(White, Jackie) (Entered: 03/09/2023) | 03/09/2023 |
| 67 | Waiver of re 66 Consent MOTION to Continue Hearing on Rule 12 Motions by Jillian Balow, Virginia Department Of Education (White, Jackie) (Entered: 03/09/2023) | 03/09/2023 |
| 68 | REPLY to Response to Motion re 51 MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint filed by Fairfax County School Board, Michelle Reid. (Judkins, Julia) (Entered: 03/17/2023) | 03/17/2023 |
| 69 | REPLY to Response to Motion re 58 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint filed by Jillian Balow, Virginia Department Of Education. (Attachments: # 1 Exhibit Exhibit A) (White, Jackie) (Entered: 03/17/2023) | 03/17/2023 |
| 70 | ORDERED that the Motion re 66 is GRANTED. ORDERED that the parties shall appear before the Court for a motions hearing at 2:00 p.m. on Thursday, May 4, 2023, and the deadline in the Courts prior order granting Consent Motion to Set Time for Filing Amended Complaint, Rule 12 Motions, and Related Briefs (Dkt. No. 41 ) is hereby VACATED. Motion Hearing reset for 5/4/2023 at 02:00 PM in Alexandria Courtroom 600 before District Judge Michael S Nachmanoff. Signed by District Judge Michael S Nachmanoff on 3/20/2023. (lcre, ) (Entered: 03/20/2023) | 03/20/2023 |
| 71 | MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Attachments: # 1 Exhibit, # 2 Proposed Order)(Hill, Rowland) (Entered: 04/04/2023) | 04/04/2023 |
| 72 | Memorandum in Support re 71 MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss filed by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 04/04/2023) | 04/04/2023 |
| 73 | Waiver of re 71 MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss by Hear Our Voices, Inc., M.B. (Hill, Rowland) (Entered: 04/04/2023) | 04/04/2023 |

JA8

| # | Docket Text | Date Filed |
|---|---|---|
| 74 | MOTION to Withdraw as Attorney Justin C. Kenney by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 04/18/2023) | 04/18/2023 |
| 75 | RESPONSE in Opposition re 71 MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss filed by Jillian Balow, Virginia Department Of Education. (Thompson, Farnaz) (Entered: 04/18/2023) | 04/18/2023 |
| 76 | Amended MOTION for Electronic Device Application (Replacing Docket Entry 63) by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 04/18/2023) | 04/18/2023 |
| 77 | ORDERED that the Motion is GRANTED. Justin C. Kenney's appearance is withdrawn in re 74 Motion to Withdraw as Attorney. Signed by Magistrate Judge Ivan D. Davis on 4/19/2023. (swil) (Entered: 04/20/2023) | 04/20/2023 |
| 78 | REPLY to Response to Motion re 71 MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss filed by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 04/20/2023) | 04/20/2023 |
| 79 | MOTION for Electronic Device Application by Jillian Balow, Virginia Department Of Education. (White, Jackie) (Entered: 04/20/2023) | 04/20/2023 |
| 80 | MOTION for Electronic Device Application by Jillian Balow, Virginia Department Of Education. (Thompson, Farnaz) (Entered: 04/20/2023) | 04/20/2023 |
| 81 | MOTION to Substitute Party by Jillian Balow, Virginia Department Of Education. (White, Jackie) (Entered: 04/24/2023) | 04/24/2023 |
| 82 | RESPONSE in Opposition re 71 MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss filed by Fairfax County School Board, Michelle Reid. (Judkins, Julia) (Entered: 04/27/2023) | 04/27/2023 |
| 83 | ORDERED that the Motion is GRANTED. Pursuant to Fed. R. Civ. P. 25(d), the Clerk is directed to substitute Defendant Jillian Balow with Lisa Coons, the current Secretary of Public Instruction in re 81 Motion to Substitute Party. Signed by Magistrate Judge Ivan D. Davis on 4/27/2023. (swil) (Entered: 04/27/2023) | 04/27/2023 |
| 84 | REPLY to Response to Motion re 71 MOTION for Leave to File Notice of Supplemental Authority in Further Opposition to Defs' Mtn to Dismiss filed by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Hill, Rowland) (Entered: 05/01/2023) | 05/01/2023 |
| 85 | ORDER granting 63 Motion for Electronic Device Application; granting 63 Motion for use of courtroom technology. Signed by District Judge Michael S Nachmanoff on 5/1/2023. (swil) (Entered: 05/02/2023) | 05/01/2023 |
| 86 | ORDER granting 79 Motion for Electronic Device Application. Signed by District Judge Michael S Nachmanoff on 5/1/2023. (swil) (Entered: 05/02/2023) | 05/01/2023 |
| 87 | ORDER granting 80 Motion for Electronic Device Application. Signed by District Judge Michael S Nachmanoff on 5/1/2023. (swil) (Entered: 05/02/2023) | 05/01/2023 |
| 88 | Minute Entry for proceedings held before District Judge Michael S Nachmanoff:Motion Hearing held on 5/4/2023. Appearances of counsel. MOTION to Dismiss for Lack of Jurisdiction /MOTION to Dismiss for Failure to State a Claim re 58 andMOTION to Dismiss for Failure to State a Claim Plaintiffs' First Amended Complaint MOTION to Dismiss for Lack of Jurisdiction Plaintiffs' First Amended Complaint re 51 argued and TAKEN UNDER ADVISEMENT. Order to follow. (Court Reporter D. Salters.)(lcre, ) (Entered: 05/05/2023) | 05/04/2023 |
| 89 | TRANSCRIPT of motion proceedings held on 5-4-23, before Judge Michael Nachmanoff, Court Reporter Diane Salters, Telephone number 301-338-8033. NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/12/2023. Redacted Transcript Deadline set for 7/11/2023. Release of Transcript Restriction set for 8/9/2023.(Salters, Diane) (Entered: 05/11/2023) | 05/11/2023 |
| 90 | MEMORANDUM OPINION and ORDER that Plaintiffs' Motion for Leave to File Supplemental Authority (Dkt. No. 71) is GRANTED; it is further ORDERED that Fairfax County School Board's Motion to Dismiss (Dkt. No. 51) is GRANTED; and it is further ORDERED that Virginia Department of Education's Motion to Dismiss (Dkt. No. 58) is GRANTED (see Order for further details). Signed by District Judge Michael S Nachmanoff on 7/25/2025. (swil) (Entered: 07/26/2023) | 07/25/2023 |
| 91 | MOTION Clarify July 25, 2023 Memorandum Opinion and Order re 90 Memorandum Opinion,, Order, by Lisa Coons, Virginia Department Of Education. (White, Jackie) (Entered: 07/28/2023) | 07/28/2023 |
| | Notice of Correction re 91 MOTION Clarify July 25, 2023 Memorandum Opinion and Order re 90 Memorandum Opinion,, Order. The filing user has been notified to file a Notice of Hearing or Notice of Waiver of Oral Argument (swil) (Entered: 07/31/2023) | 07/31/2023 |
| 92 | Waiver of re 91 MOTION Clarify July 25, 2023 Memorandum Opinion and Order re 90 Memorandum Opinion,, Order, by Lisa Coons, Virginia Department Of Education (White, Jackie) (Entered: 07/31/2023) | 07/31/2023 |

**JA9**

app.pacerpro.com/cases/16910008/print

| # | Docket Text | Date Filed |
|---|---|---|
| 93 | ORDERED that the Motion to Seal Administrative Record and Proceed Anonymously is GRANTED; and it is ORDERED that the administrative record in this matter shall be placed under permanent seal; and it is FURTHER ORDERED, that the parties shall refer to the student-plaintiffs using initials only in all filings; and it is FURTHER ORDERED that the parties shall redact the parents' addresses from all filings in re 44 MOTION to Seal (see Order for further details). Signed by District Judge Michael S Nachmanoff on 8/1/2023. (Dest, ) (Entered: 08/01/2023) | 08/01/2023 |
| 94 | ORDERED that Defendants' Motion to Clarify (Dkt. No. 91) is GRANTED; and it is further ORDERED that the Court's Memorandum Opinion and Order (Dkt. No. 90) is MODIFIED in accordance with this Order (see Order for further details). Signed by District Judge Michael S Nachmanoff on 8/1/2023. (Dest) (Entered: 08/01/2023) | 08/01/2023 |
| 95 | NOTICE OF APPEAL as to 94 Order on Motion for Miscellaneous Relief, 90 Memorandum Opinion,, Order, by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. Filing fee $ 505, receipt number AVAEDC-9074614. (Hill, Rowland) (Entered: 08/14/2023) | 08/14/2023 |
| 96 | Transmission of Notice of Appeal to US Court of Appeals re 95 Notice of Appeal, (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (swil) (Entered: 08/14/2023) | 08/14/2023 |
| 97 | USCA Case Number 23-1854 4th Circuit, Case Manager Kirsten Hancock for 95 Notice of Appeal, filed by Trevor Chaplick, Hear Our Voices, Inc., Sheila Bingham, James Bingham, M.B., D.C., Vivian Chaplick. (Dest) (Entered: 08/17/2023) | 08/16/2023 |
| 98 | MOTION to Substitute Exhibit F re 43 Amended Complaint, by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B.. (Attachments: # 1 Proposed Order)(Hill, Rowland) (Entered: 09/07/2023) | 09/07/2023 |
| 99 | Waiver of re 98 MOTION to Substitute Exhibit F re 43 Amended Complaint, - Waiver of Oral Argument by James Bingham, Sheila Bingham, Trevor Chaplick, Vivian Chaplick, D.C., Hear Our Voices, Inc., M.B. (Hill, Rowland) (Entered: 09/07/2023) | 09/07/2023 |

**JA10**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

**D.C.,** *by his parents and guardians,*
*Trevor Chaplick and Vivian Chaplick,*
**Trevor Chaplick,**
**Vivian Chaplick,**

**M.B.,** *by his parents and guardians,*
*James Bingham and Sheila Bingham,*
**James Bingham,**
**Sheila Bingham,**

**and**

**Hear Our Voices, Inc.** *on behalf of*
*themselves and all others similarly*
*situated*

       **Plaintiffs,**

**v.**

**Fairfax County School Board,**

**Dr. Michelle Reid, Superintendent of**
**Fairfax County Public Schools**
**(in her official capacity),**

**Virginia Department of Education,**

**and**

**Jillian Balow,**
**Superintendent of Public Instruction**
**of Virginia Department of Education**
**(in her official capacity)**

       **Defendants.**

Civil Action No. 1:22CV1070-MSN-IDD

**JURY TRIAL DEMANDED**

**JA11**

# Table of Contents

**Page**

I. Introduction ................................................................................................ 4

II. Parties ...................................................................................................... 11

III. Jurisdiction and Venue .......................................................................... 20

IV. Class Action Allegations ........................................................................ 21

V. The Background and Objectives of the IDEA ........................................ 25

VI. VDOE's Biased Hearing Officer System Deprives Parents and Special Needs Children of Their Right to a Fair and Impartial Due Process Hearing Under the IDEA ............................... 29

    A.    Evidence Revealed Through FOIA Requests  Ultimately Exposed the Travesty of VDOE's Rigged Due Process Hearing System ...................................................... 29

    B.    National Statistics Confirm VDOE Hearing Officers Rule Against Parents at Disproportionately Greater Rates Than Other Jurisdictions ..................................... 33

    C.    The Children Behind the Statistics: Named Plaintiffs D.C. and M.B. Experienced First-Hand VDOE's Biased Due Process Hearing System ...................................... 38

    D.    VDOE is Responsible for the Biased Hearing Officer System It Created and Condones .......................................................................................... 46

        1.    VDOE Hearing Officers Fail to Follow the Law ..................................... 46

        2.    VDOE Hearing Officers Are Not Impartial ............................................ 51

        3.    VDOE Stacks the Deck with Biased Hearing Officers .......................... 57

    E.    Parents and Children Have no Viable Alternative to Due Process Hearings .......... 57

    F.    VDOE's Ongoing and Systematic Practice of Rigging Due Process Hearings Makes it Futile to Seek Relief Through Due Process Hearings .......................................... 60

VII. VDOE and Virginia School Districts Systematically Fail to Evaluate Children with Disabilities ................................................................................................. 61

    A.    VDOE Permits Virginia LEAs to Exploit a Policy and Practice of Avoiding, Limiting and Delaying the Student Evaluations  Required Under the IDEA ........... 62

    B.    VDOE Sanctions and Supports Virginia LEAs' Policy and Practice of Refusing IEEs as Required under the IDEA ............................................................. 64

    C.    VDOE  Permits Virginia LEAs' Policy and Practice of Manipulating Student Evaluations and Assessments  to Avoid Providing Special Education Services ...... 66

    D.    VDOE's Student Evaluation Policies Violate the IDEA .......................... 71

VIII. VDOE Systematically Fails to Carry Out its Obligation to Oversee Virginia LEA Compliance with the IDEA .......................................................................... 74

    A.    VDOE is Required to Ensure Compliance with the IDEA ...................... 74

B.      VDOE's Faulty Oversight Enables FCPS and other Virginia LEAs to Regularly
        Ignore Their IDEA Obligations ................................................................... 75

    1.      VDOE Fails to Ensure that FCPS and Other LEAs Provide Families Complete and
    Accurate Student Records ............................................................................... 76

    2.      VDOE Fails to Require FCPS and other LEAs to Develop and Amend IEPs in
    Accordance with the IDEA .............................................................................. 79

    3.      VDOE Fails to Prevent FCPS' and other LEAs' Pattern and Practice of Making
    Misrepresentations During the IDEA Process .................................................. 86

    4.      VDOE's Use of IEP "Facilitators" Enables, Rather than Prevents, LEAs' Violations
    of the IDEA ...................................................................................................... 88

    5.      VDOE Fails to Ensure that FCPS and other LEAs Provide Children with the
    Services to Which They Are Entitled under the IDEA ...................................... 89

    6.      VDOE Fails to Prevent FCPS and other LEAs from Bullying Parents and Advocates
    When They Attempt to Exercise Their Rights under the IDEA ......................... 94

C.      VDOE's Systematic Failures Enable and Encourage FCPS and Other LEAs'
        Concerted and Ongoing Violations of the IDEA .......................................... 95

PRAYER FOR RELIEF ........................................................................................... 108

<u>**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs on behalf of themselves and others similarly situated, and by their undersigned counsel, bring this civil action for declaratory and injunctive relief, to remedy violations of the Constitution and laws of the United States of America resulting from actions undertaken by the Defendants under color of law.

<u>**I. Introduction**</u>

1.      The Individuals with Disabilities Education Act ("IDEA") and implementing regulations require Defendants to provide a "free appropriate public education" ("FAPE") to children identified as disabled, one of the most vulnerable groups in the country.  Instead, Defendants have established a rigged system designed to delay, limit and avoid providing appropriate services to eligible children within the Commonwealth of Virginia.  In doing so, Defendants have systemically violated for decades the federal, due process, and equal protection rights of disabled children in Virginia.  This abuse has been extensively documented by federal regulators and yet it continues to this day.

2.      Fairfax County Public Schools ("FCPS") and the Virginia Department of Education ("VDOE") have created this rigged system by employing many tactics including obstruction, burden, delay, concealment, bullying, and outright harassment that collectively are designed to prevent disabled students from obtaining the services to which they are entitled under the IDEA. FCPS is subject to multiple consent decrees as a result of its mistreatment of disabled students. And, VDOE is subject to ongoing orders from the United States Department of Education's Office of Special Education and Rehabilitative Services (OSEP) based on its multiple and repeated violations of the IDEA and similar laws.

3.      This Complaint provides an extensive description of representative violations of federal law carried out by Defendants against parents and disabled children in the Commonwealth of Virginia.  In many cases, these violations have been documented and confirmed in multiple investigations of Defendants by the U.S. Department of Education ("USDOE") spanning many years.  Plaintiffs' allegations against Defendants in this Complaint are organized to demonstrate how Defendants' concerted efforts to undermine the procedural safeguards of the IDEA have caused children in Fairfax County, and across the Commonwealth of Virginia, to be deprived of federally-mandated special education services in violation of their civil rights and rights under the IDEA.

4.      The pervasive and systemic violations start with Defendants engaging in various tactics to avoid and delay evaluating students with disabilities.  Such tactics include ignoring parents' repeated requests for evaluations, failing to conduct evaluations within the requisite time periods required by law, arbitrarily limiting the scope of evaluations, and refusing to pay for an Independent Educational Evaluation ("IEE") as required under the IDEA.

5.      If parents are fortunate enough to overcome these initial obstacles, the next barrier confronting them is an evaluation process that Defendants have designed with bias *against* a finding of disability.  For example, FCPS, acting under the supervision of VDOE, regularly *ignores,* rather than gathers, the functional, developmental, and academic information about eligible children.  Indeed, teachers and other participants in the IDEA process often are instructed to minimize evidence of students' disabilities, exaggerate their academic process, and conceal other relevant information, including the school district's failures to provide FAPE and other specific accommodations and services that are required under the IDEA.

6.      Parents who are aggrieved by this systematic denial of services to their children

have no viable means to pursue relief.  In theory, they have a federally-mandated right to seek a due process hearing to challenge these adverse decisions.  But, in practice, it is impossible for children and parents in Virginia to overcome the obstruction practiced by the Defendants.  If a family with a disabled child has enough resources to hire counsel and engage in a contentious, multi-year fight with the school district – only a very few have such resources – it can file a request for a due process hearing under the IDEA.  But, as school district officials repeatedly warn parents, the parents will lose.  This is because, contrary to the due process hearing right afforded by the IDEA, VDOE has developed a "kangaroo court system" replete with sham procedures, biased "adjudicators," and outcomes against the disabled students that are nothing more than foregone conclusions.

7.    VDOE's sham process begins and ends with its slate of biased, predisposed, and unqualified (so-called) due process hearing officers.  That slate has been carefully curated to ensure that only those hearing officers willing to play ball with VDOE and FCPS – and rule against parents the vast majority of the time – qualify for and remain on the list.  Under state law, VDOE is responsible for: certifying hearing officers to hear special education due process cases, determining the number of hearing officers who will be certified, reviewing Hearing officer actions, and reviewing and recertifying hearing officers on an annual basis.  VDOE is also responsible for training and compensating hearing officers.  These powers give VDOE near-absolute control over these hearing officers.  Using this power, VDOE carefully curated a select group of twenty-two (22) hearing officers who nearly always rule in favor of school districts and against parents.  Despite (or because of) the incredibly one-sided outcomes generated by these hearing officers, VDOE has repeatedly recertified these hearing officers.  VDOE also failed to add a new single hearing officer during the period from 2010 to July of 2021, ensuring that no one

except for VDOE's own tried-and-tested allies would adjudicate due process hearings. The result has been an entire generation of disabled children and their parents facing a near-insurmountable hurdle to obtaining a fair due process hearing.

8.      VDOE's concerted effort to develop its roster of biased hearing officers has borne bitter fruit. From 2010 through July 2021 less than 1% of parents who initiated a due process hearing under the IDEA in Northern Virginia received a favorable ruling granting the relief they requested. That is only 3 rulings in 395 cases in all of Northern Virginia, over more than 11 years. The results are not much better statewide in Virginia with a little over 1.5% of parents who initiated a due process hearing ultimately receiving a favorable ruling—only 13 such rulings in all 847 cases brought in Virginia over that same 11-year period. Shockingly, nearly two-thirds of these hearing officers have never ruled for a disabled child in a due process hearing in the last two decades. ***Worse, in Northern Virginia, 83% of hearing officers never once ruled in favor of parents from 2010 to July 2021.***

9.      Despite receiving numerous complaints about the biased hearing process, VDOE has refused to exercise its oversight authority to ensure that disabled students and their parents receive a fair and impartial due process hearing.

10.      Under VDOE's watch, its hearing officers have fostered a costly (albeit lucrative for themselves) and highly contentious dispute resolution system while repeatedly violating federal law. Such violations include:

   a. Backdating decisions to falsify compliance with federal and state laws,

   b. Engaging in *ex parte* communications with LEA[1] lawyers and personnel to

---

[1] An "LEA" is defined in the IDEA as a "Local Education Agency," which generally equates with the board or district overseeing local public schools. FCPS is an LEA.

the exclusion of parents,

c.    Ignoring and excluding evidence and open admissions that teachers and school administrators routinely manipulate and falsify academic records,

d.    Imposing unique and biased procedural burdens on parents and not schools,

e.    Rejecting expert testimony provided by parents on frivolous and false grounds,

f.    Attributing statements, claims and requests to parents that were never in fact made,

g.    Unilaterally delaying the proceedings and postponing deadlines without agreement from the parents or on motion from either party, and

h.    Misrepresenting special education law to bar parents from contesting substantive provisions of IEPs[2].

11.    To further ensure favorable outcomes, VDOE employs "hearing monitors" to attend all due process hearings. These hearing monitors report back to VDOE about the due process proceedings. There are currently two hearing monitors and, according to one hearing officer, one of these monitors engaged in multiple *ex parte* communications with this hearing officer to try to persuade him to disregard the parents' expert and rule in favor of the school district.[3]

---

[2] An "IEP" is the "Individualized Education Program" developed for a disabled child as required under the IDEA.

[3] VDOE also places VDOE monitors in IDEA mediations, to oversee the process and report back to VDOE. Like the due process hearing monitors, these VDOE mediation monitors often improperly interfere with the mediation process. The United States Department of Education's Office of Special Education Programs (OSEP) cited VDOE for its practice of placing VDOE representatives in IDEA mediations and instructed them to discontinue it. *See* Letter Dated June 23, 2020 from, Laurie VanderPloeg, Director, Office of Special Education Programs, to James

12.     The right to an impartial due process hearing is one of the most fundamental protections in the IDEA.  Without a fair and impartial hearing, the goals of the IDEA will not be met, and disabled children will continue to be left behind.  Further, a system tainted by biased hearing officers deters parents and others from fulfilling their role under the IDEA as education advocates for disabled children.  That is exactly what is happening in Virginia.

13.     In an attempt to hide their egregiously biased system and pervasive violations of the IDEA and other laws, Defendants have taken extreme measures to punish parents and advocates for attempting to challenge the unlawful machine.  Invited advocates for the disabled and counsel have been excluded from or forced to leave IEP preparation sessions by VDOE personnel and administrators, and when they have refused, they have been arrested and charged with trespassing.  Others have been subjected to costly and baseless civil litigation for attempting to uncover and expose Defendants' wrongdoing.

14.     VDOE and its LEAs have also wrongfully claimed that parents must use the Virginia Freedom of Information Act ("FOIA") to access information to which they are entitled under the IDEA.  Yet, when parents attempt to pursue FOIA requests, VDOE, as the gatekeeper of Virginia education information, makes the process so complicated, expensive, and otherwise burdensome that parents rarely can access the necessary information to uncover what has happened, and is happening, to their child.  Indeed, the methodical and ubiquitous policies and procedures employed to frustrate the procedural safeguards and substantive rights of disabled

---

Lane, then Superintendent of VDOE, *available at* https://www2.ed.gov/fund/data/report/idea/partbdmsrpts/dms-va-b-2020-letter.pdf (last accessed January 19, 2023).  OSEP indicated that having a VDOE representative present could influence the process and, on top of that, the VDOE representatives were improperly participating in the mediation process, rather than just observing.  In spite of the order from the USDOE, VDOE has, thus far, refused to remove their representatives from IDEA mediations.

students and their parents in Virginia, described in detail below, were not discovered, and could not have been discovered, until members of HOV spent tens of thousands of dollars and over a year's worth of time preparing detailed information requests, corresponding with VDOE's FOIA gatekeepers, sending multiple follow ups, and combing through mountains of data to uncover the truth.

15.    Defendants' concerted effort to undermine the procedural safeguards of the IDEA has caused a systemic breakdown in IDEA services across the Commonwealth of Virginia. Without effective oversight from VDOE, LEAs routinely violate various provisions of the IDEA and deprive vulnerable disabled children of the special education services to which they are entitled under federal law.  As a consequence, an entire population of children within the Commonwealth of Virginia is currently being denied access to the free public education guaranteed by the Constitution of Virginia.

16.    Named Plaintiffs M.B. and D.C. are children with sensory, emotional, physical, cognitive, developmental or language disabilities, and their parents, who tried to obtain special education and related services from FCPS, and to vindicate their rights through a due process hearing.  Despite their eligibility for such services, FCPS and VDOE have denied, delayed or otherwise deprived plaintiffs of access to these services through a concerted and systematic effort to avoid compliance with the IDEA.

17.    As fully set forth below, Named Plaintiffs seek—on behalf of themselves and all others similarly situated—a judicial declaration that Defendants' policies and procedures, resulting in the failures to provide FAPE, do not effectuate the congressional objectives articulated in the IDEA, satisfy the requirements of the IDEA, or meet the minimum requirements of procedural due process.  Plaintiffs also seek injunctive relief barring the continued use by VDOE and FCPS of

procedures that systematically deprive special needs students of their rights under the IDEA. Plaintiffs further seek an injunction which will require VDOE to finally carry out its federally-mandated oversight of FCPS and other Virginia LEAs which consistently fail to provide eligible children with FAPE. This action is the only means by which Plaintiffs, and the class they intend to represent, can seek relief necessary to address Defendants' ongoing systematic violations of their and other disabled students' rights under federal law.

## II. Parties

18.     D.C. ("D.C.") is a nineteen-year-old, educationally disabled student who at all times relevant to this action resided in Fairfax County, Virginia.

19.     Plaintiffs Trevor Chaplick and Vivian Chaplick are D.C.'s parents and guardians, with their primary residence in Fairfax County, Virginia, within this judicial district and division. They bring this action on D.C.'s behalf, in their own right, and on behalf of a class of similarly-situated individuals as alleged below.

20.     D.C. has faced significant challenges throughout his life, including Autism, Attention Deficit Hyperactivity Disorder-Primarily Hyperactive-Impulsive Type, Tourette's Syndrome, Encephalopathy, Adjustment Disorder with Anxiety and Disturbance of Conduct, and an Intellectual Disability of an undetermined severity, as well as severe gastrointestinal complications and sleep disturbance.

21.     D.C. engaged in daily aggressive behaviors since he was six years old. These behaviors include self-injury, such as head-banging, biting, hitting, and kicking, as well as emotional meltdowns, elopement, aggression and violence towards others, throwing items (glass, food, furniture), and damaging property. These behaviors have resulted in multiple hospitalizations to himself and others.

22.     FCPS originally found D.C. eligible in August 2008 for special education services

as a student with Autism and an Intellectual Disability and provided him with an IEP.

23.     Because of his profound disabilities and severe aggressive behavior and violence, D.C.'s parents petitioned FCPS for a residential educational placement in the Grafton Integrated Health Network's Integrated Residential/Education Program ("Grafton"), located in Winchester, Virginia.  Grafton is one of the only schools in Virginia that offers an integrated setting for residential and educational care of disabled children.

24.     This request for a residential placement was made after the parents consulted with, and D.C. had been examined by, medical professionals from some of the most prominent autism and general medical centers in the world, including The Children's Hospital in Maryland, the Discovery Center in New York, and Fairfax Innova Hospital in Virginia.

25.     Despite the overwhelming and largely undisputed clinical and expert evidence that residential placement was exactly what D.C. needed to receive a free appropriate public education ("FAPE"), FCPS dismissed and rejected all the parents' requests for a higher level of educational support, told them that D.C. was appropriately placed in his current public-school setting, and refused to approve a residential educational setting.

26.     Based on the advice of medical and educational professionals, the parents enrolled D.C. in Grafton in July 2014 at their own expense.

27.     On June 26, 2015, D.C.'s parents filed a complaint for a due process hearing challenging the school system's inexplicable placement of D.C. in a public-school setting.

28.     To the shock and dismay of D.C.'s parents, due process hearing officer Morgan Brooke-Devlin ruled that D.C. and his family were not entitled to any relief.  Although they did not know it at the time, this decision was only the beginning of a long and ongoing struggle between D.C. and his family and FCPS, marked by FCPS' continued resistance to provide

necessary educational services. FCPS treated D.C. and his family poorly at each turn, and reneged on its commitment for a residential placement at the first possible opportunity. These struggles mark an ongoing series of inexplicable denials of services and due process for D.C. and his family, which continue to this day.

29.    Plaintiff M.B. is a fifteen-year old, educationally disabled student who at all times relevant to this action resided in Fairfax County, Virginia. M.B. has been diagnosed with multiple learning disabilities, including Attention Deficit Hyperactivity Disorder ("ADHD"), dyslexia, and dyscalculia. On multiple assessments spanning Fifth to Eighth grade, M.B. scored well below his grade level in reading, mathematics, and various other areas of academic progress. M.B. also has challenges with his behavior and social skills. These behavioral issues have caused him to act out in academic settings.

30.    Plaintiffs James and Sheila Bingham are M.B.'s parents and guardians, with their primary residence in Fairfax County, Virginia within this judicial district and division. They bring this action on M.B.'s behalf, behalf, in their own right, and on behalf of a class of similarly-situated individuals as alleged below.

31.    During the Summer of 2013, FCPS determined that M.B. was eligible for special education and related services. At that time, a psychologist evaluated M.B. and concluded: "With intensive special education services under an IEP for his specific learning disabilities in the areas of reading, spelling, written language, fine motor, and speech, a specific remediation program for dyslexia, accommodations for ADHD, Combined Type, additional school supports to help him with organizational skills, and possibly medication, it is expected that [M.B.]'s learning disabilities and ADHD symptoms should be moderated and he should be better able to work up to his potential in school." Sadly, M.B. would not receive these needed services, and his potential would not be

reached for several years.

32.    From 2018 through 2021, M.B. struggled through a series of improper FCPS-mandated public school placements. During those years, M.B. showed no significant progress in reading, mathematics, and other measures of academic ability. He was also increasingly isolated from his peers and experienced escalating emotional and behavioral challenges. These struggles came to a head when, during the COVID-19 Pandemic, FCPS completely failed to implement his IEP and otherwise provide him with FAPE.

33.    In the Fall of 2021, after suffering through years of FCPS' failures to properly develop and implement IEPs for their son, M.B.'s parents placed M.B. at the Phillips School – a non-public day school. Phillips School developed its own IEP for M.B. which included several services which FCPS had failed to provide, including 1:1 support for completing assignments and behavioral services, which included weekly counseling to address M.B.'s social skills and emotional management.

34.    Once enrolled at the Phillips School, M.B. finally showed significant improvement in both his academics and his behavior. Nevertheless, FCPS continued to baselessly maintain that a public school setting, where M.B. had languished for years, was the proper placement for him.

35.    M.B.'s parents filed a due process appeal in January 2022, challenging FCPS' IEPs and placements for the 2019, 2020, and 2021 school years. M.B.'s parents and advocates presented testimony and evidence from multiple experts regarding M.B.'s challenges and needs, and how FCPS had failed to meet them. They also developed testimony regarding the inappropriateness of FCPS' proposed placement at the Burke School for the 2021 school year.

36.    Despite the evidence that M.B. had been deprived of FAPE, the hearing officer concluded that FCPS' IEPs and placements had been sufficient, and denied all relief to M.B. and

his parents.

37.     On August 15, 2022, M.B. and his parents brought an action in the United States

District Court for the Eastern District of Virginia challenging the hearing officer's adverse May

17, 2022 decision. *See M.B. et al. v. Fairfax County School Board*, Case No. 22-cv-00930. That

case remains pending.

38.     Organizational Plaintiff Hear Our Voices, Inc. ("HOV"), is a private, non-profit

member organization that is incorporated in Delaware. HOV was established to protect and

advocate for the rights of persons with disabilities and to safeguard the rights of individuals with

developmental disabilities, like D.C. and M.B. HOV has members that are residents of Virginia

and of Fairfax County. HOV's members include Trevor and Vivian Chaplick and Sheila and James

Bingham, as well as other residents of Virginia and Fairfax County.

39.     Organizational Plaintiff HOV has a mission of ending systemic mistreatment of

persons with disabilities, including in school. HOV brings this suit on behalf of its members and

in furtherance of its efforts and expenditure of resources in promoting its principal mission of

securing appropriate and equal educational services for students with disabilities, including efforts

focused on each of the procedures required by the IDEA, from the initial identification of students

with potential disabilities through the evaluation, IEP, mediation and the due process hearing and

appeal process, including ensuring the right to a fair due process hearing before an impartial

hearing officer as required by federal law. HOV works with parents, teachers, advocates, attorneys

and other constituents to further these goals, including through assistance, advocacy and legislative

efforts.

40.     The violations by VDOE and FCPS of the United States Constitution and the IDEA

("Defendants' Wrongful Actions") have required HOV to divert its two principal resources, time

and money, away from several of its core efforts and toward efforts designed to address the harm caused by Defendants' Wrongful Actions.

41.    For example, one of HOV's core efforts is legislative analysis and review for potential expansion. Having started to form a legislative drafting committee to address disability issues on a multi-state and national level, HOV had to put those efforts on hold to address the current situation in Virginia. HOV's plans included drafting national and state-specific legislation to improve the rights of disabled students under the IDEA and related state legislation and regulations.

42.    HOV had also initiated plans to meet with key officials in-person to discuss some of the issues that need to be addressed in special education law, including potential legislation to address these issues. Another core effort HOV was beginning to explore was expanding work with parents and other constituents to improve educational services available to parents related to the IDEA processes and to work with local organizations to provide enhanced resources and workshops to parents who are unsatisfied with a school's treatment of their disabled child.

43.    HOV's efforts also were to include seeking commitments from law schools to open (or re-open) disability rights clinics and working with volunteer lawyers' organizations to provide such services. One of HOV's founders had also started to create a toolkit for parents in all states to use when dealing with inadequate treatment of disabled students and the failure of state and local educational agencies to meet their obligations under state and federal law. For example, the toolkit includes a FOIA demand template and was to include other draft template documents . It was also going to include a roster of special education experts to assist with issues arising in the implementation of IEPs. However, like HOV's other efforts, this project has gone unfinished because of the need to address more immediate issues in Virginia. Because of the issues in

Virginia, HOV has been forced to put virtually all of its core efforts on hold in order to focus its resources on the more immediate and insidious issues in Virginia, rather than spending its time and money on its other projects.

44.    As a result of the concerns over VDOE and FCPS' ubiquitous failures, HOV has had to focus its efforts on the following activities, which would not be necessary, but for the Defendants Wrongful Actions:

a.    Talking to parents who have reached out (from Virginia), walking them through their options, offering them suggestions regarding various and potential next steps (a significant investment of time);

b.    Reaching out to regulators (e.g., the Department of Justice and the Office of Civil Rights of the U.S. Department of Education), and other organizations about the problems in Virginia specifically;

c.    Spending numerous hours investigating the special needs education problems in Virginia;

d.    Hiring counsel to prepare and continue to pursue over many months Virginia FOIA requests – costing significant time and money – to expose the Defendants' Wrongful Actions;

e.    Preparing for interviews with the press about the problems in Virginia and drafting op-eds on the problems with Virginia;

f.    Diverting resources away from national legislative efforts to efforts in Virginia.

45.    HOV also has representational standing to sue on behalf of its members for each claim it brings because (i) at least multiple identified members would otherwise have Article III

standing to sue in their own right, (ii) the interests at stake are germane to its purpose, and (iii) neither the claims asserted nor the relief requested requires participation of individual members in the lawsuit.

46.     HOV has several members who satisfy the first prong of the associational standing test, including D.C.'s parents, M.B.'s parents and multiple other parents who have suffered from the wrongful conduct described in this complaint.  Several of these individuals were members of HOV at the time that the First Amended Complaint was filed.  They include individuals whose children were denied or delayed the education and services required by the IDEA, at every stage of the IDEA and Virginia statutory process.  This includes: (1) individuals who requested evaluations that were denied and delayed, (2) individuals whose IEPs were not implemented correctly or otherwise followed, (3) individuals who were denied the right to a fair and impartial due process hearing as well as other procedural safeguards, (4) individuals who submitted complaints to VDOE that were either not investigated at all or inadequately investigated by a biased VDOE employee, (5) individuals who either were denied their children's educational records or were provided false and incomplete information, such as manipulated  educational records, false statements and testimony, padded grades, and misrepresentations about student capabilities, and (6) individuals who were refused access to information or from whom information was concealed, in spite of appropriate requests under the Virginia FOIA.

47.     In addition, the interests at stake in this case clearly implicate the purposes of HOV, which was established to "achiev[e] a better education and life for disabled and special needs children and their families."  Central to its mission is to "protect . . . the rights of children with special needs and disabilities, including under the federal civil rights laws and [the IDEA]" and to "end the systemic mistreatment in schools of disabled and special needs children."  Nothing could

be more germane to those purposes than a lawsuit challenging Defendants' mistreatment of special needs children and their families.

48.     And, neither the claims asserted nor the relief requested require the participation of HOV's members.  This lawsuit seeks declaratory and injunctive relief against the Defendants, which does not require the participation of HOV members to implement.

49.     Based on the foregoing and the facts described below, Plaintiff HOV has both direct organizational standing and representational standing, through their members who have been unjustifiably denied the substantive rights and procedural safeguards afforded by the IDEA.

50.     Defendant Fairfax County School Board (the "Board") is the governing body of FCPS, a school division of the Commonwealth of Virginia.  The Board directs, controls, and supervises the operation and administration of all schools, programs, and activities within FCPS and is organized under the laws of Virginia.  Va. Code Ann. § 22.1-71.  FCPS is the tenth largest school system in the country, and it receives federal funds under the IDEA, 20 U.S.C. §§ 1400 *et seq*.  FCPS serves over 187,000 students each year.  In the 2019–2020 school year, FCPS' approved budget for the school operating fund totaled $2.9 billion.  FCPS has a staff of over 24,000 employees.

51.     Defendant Dr. Michelle Reid is the FCPS Superintendent.  She was elected by the Board and appointed effective July 1, 2022.  Dr. Reid is responsible for working in conjunction with the Board and for overseeing the daily operations of FCPS, including overseeing its student IEP process, allocation of resources, training of employees, and methods of data collection.  Dr. Reid is the FCPS official responsible for ensuring that FCPS' policies, practices, and procedures comply with the IDEA and other federal laws.

52.     Defendant Virginia Department of Education ("VDOE") is an executive

department of the Commonwealth of Virginia established by and operating under the laws of the Commonwealth of Virginia. *See* Va. Code §§ 2.2-208, 22.1-8, *et. seq.* VDOE is subject to the IDEA and is responsible for ensuring Virginia's and its local school systems' compliance with the provisions of the IDEA.

53.     Defendant Jillian Balow, the Virginia Superintendent of Public Instruction, serves as the executive officer of VDOE and manages its internal and external operations. In that capacity, Defendant Balow is responsible for overseeing the implementation of the IDEA in the Commonwealth of Virginia. Dr. Balow is the VDOE official responsible for ensuring that VDOE's policies, practices, and procedures comply with the IDEA and other federal laws.

### III. Jurisdiction and Venue

54.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action includes claims brought pursuant to 42 U.S.C. §1983 to challenge actions undertaken by Defendants under color of the laws of the Commonwealth of Virginia that deprive Plaintiffs of rights conferred by the Fourteenth Amendment to the Constitution of the United States, as well as claims brought pursuant to 20 U.S.C. §1405 for violations of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*

55.     The declaratory relief sought in this Complaint is authorized by 28 U.S.C. §§ 2201 and 2202.

56.     This Court may exercise personal jurisdiction over each Defendant, as each is located and has offices within this judicial district.

57.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391, in that each Defendant is located and has its principal office within this judicial district, and the events giving rise to the claims occurred within this judicial district and division.

## IV. Class Action Allegations

58.     Plaintiffs D.C., M.B., Trevor Chaplick, Vivian Chaplick, Sheila Bingham, James

Bingham, and HOV bring this action on behalf of themselves and on behalf of two classes of

similarly-situated individuals under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

59.     The first proposed Class consists of "All students with disabilities aged 3 to 21 and

their parents residing in the Commonwealth of Virginia who are eligible for special education and

related services and have sought dispute resolution services[4] from VDOE under the IDEA between

January 1, 2013 and the present." (The "VDOE Class").

60.     The second proposed Class consists of "All current students with disabilities aged

3 to 21 residing in Fairfax County who have requested or received an evaluation for special

education and related services, under the IDEA and their parents." (The "FCPS Class").

61.     Each Class at least includes hundreds of Class members, such that joinder of all

Class members in the prosecution of this action is impracticable. The identities and addresses of

class members can be readily ascertained from the records maintained by Defendants.

62.     Named Plaintiffs' claims are typical of the claims of all VDOE Class members

because they have sought special education services in the Commonwealth of Virginia, including

procedural safeguards, and were subjected to the same unfair dispute resolution procedures.

63.     Named Plaintiffs' claims are likewise typical of the claims of all FCPS Class

members because they are currently seeking to obtain from FCPS special education services, and

have been subjected to systematic and pervasive FCPS violations of the IDEA, including failure

by FCPS to conduct full and individual initial evaluations and reevaluations to determine if the

---

[4] The phrase "dispute resolution services" is defined to include special education mediation, due
process proceedings, and special education complaints.

child is a child with a disability and the nature and extent of such disability pursuant to the requirements of the IDEA, and to develop and implement appropriate IEPs in compliance with the IDEA, as well as FCPS interference with the procedural safeguards afforded under the IDEA, including fair and impartial due process hearings.  Consequently, Named Plaintiffs have suffered the same statutory and constitutional violations as the FCPS Class.

64.    Named Plaintiffs will fairly and adequately represent the interests of each of the Classes because they have suffered and continue to suffer under the same biased system and they suffer the same or similar violations as other Class members, they have no conflicts with any Class member, and they have retained sophisticated and competent counsel experienced in prosecuting class actions and other complex litigation.

65.    There are numerous questions of law and fact common to the VDOE Class— including but not limited to the following:

> a.    Whether VDOE and its Superintendent of Public Instruction have displayed a firm purpose to circumvent the IDEA and existing regulations in order to frustrate the legal rights of Named Plaintiffs and the VDOE Class in violation of their rights under the Constitution of the United States,
>
> b.    Whether VDOE and its Superintendent of Public Instruction have failed to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability and to ensure that all Virginia LEAs conduct comprehensive evaluations and reevaluations of any child suspected of having a disability,
>
> c.    Whether VDOE and its Superintendent of Public Instruction have failed to ensure Virginia LEAs authorize and pay for an appropriate independent

educational evaluation ("IEE") when requested by a parent, unless the LEA has promptly initiated an appropriate Due Process hearing,

d.    Whether VDOE and its Superintendent of Public Instruction have failed to require Virginia teachers, education administrators, and any other Virginia education employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress as required by the IDEA.

e.    Whether VDOE and its Superintendent of Public Instruction have failed to provide to childrens' parents the complete and unaltered records of their child's academic, emotional, and behavioral progress,

f.    Whether VDOE and its Superintendent of Public Instruction have failed to adequately monitor the compliance of local school districts with federal law and regulations under the IDEA,

g.    Whether VDOE and its Superintendent of Public Instruction are failing to adequately investigate complaints regarding the failure of local school districts to provide a free appropriate public education to all children with disabilities, and to otherwise comply with federal law and regulations that protect children with disabilities,

h.    Whether VDOE and its Superintendent of Public Instruction are failing to implement an impartial special education due process hearing system to resolve disputes between parents and local educational agencies as required by federal law and regulations,

i.    Whether VDOE and its Superintendent of Public Instruction are failing to

adequately implement and enforce procedural safeguards afforded to children with disabilities and their parents, including ensuring that every hearing officer is qualified and impartial,

66.     There are also numerous questions of law and fact common to the FCPS Class—including but not limited to the following:

     a.    Whether FCPS and its Superintended of Public Instruction have displayed a firm purpose to circumvent existing federal law and regulations and consistently frustrate the legal rights of Named Plaintiffs and the FCPS Class in violation of their Constitutional rights,

     b.    Whether FCPS and its Superintendent of Public Schools are failing to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

     c.    Whether FCPS and its Superintendent of Public Schools are concealing information pertinent to the development of the IEP and reevaluation process,

     d.    Whether FCPS and its Superintendent of Public Schools are using inflated grades and false indicia of progress in order to manipulate the IEP and reevaluation process,

     e.    Whether FCPS and its Superintendent of Public Schools are failing to require teachers, administrators, and other FCPS employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress as required by the IDEA,

     f.    Whether FCPS and its Superintendent of Public Schools are failing, upon

request, to immediately provide to childrens parents the complete and unaltered records of their child's academic, emotional, and behavioral progress,

g.     Whether FCPS and its Superintendent of Public Schools are failing to authorize and pay for appropriate independent educational evaluations ("IEE") when requested by a parent, when FCPS has not promptly initiated an appropriate Due Process hearing,

h.     Whether FCPS and its Superintendent of Public Schools, in an attempt to circumvent existing federal law and regulations, are systematically and consistently delaying implementation of the IEP and procedural safeguards,

i.     Whether FCPS and its Superintendent of Public Schools are systematically using the IDEA's procedural safeguards in a manner that unnecessarily and drastically increases the costs to parents, and

j.     Whether FCPS and its Superintendent of Public Schools are engaging in bullying and threats of retaliation to frustrate the legal rights afforded under the IDEA.

67.     The Defendants' actions apply generally to the Classes, so that final injunctive and declaratory relief are appropriate for each of the Classes.

## V. The Background and Objectives of the IDEA

68.     Congress enacted the IDEA to guarantee children with disabilities an education that meets their unique needs and prepares them for further education, employment, and independent living, and to make parents of children with disabilities full partners in how their children are educated and protected.

69.     Together with its precursors, the Education for All Handicapped Children Act and

the Americans with Disabilities Act, the IDEA represented an evolution in society's treatment of people with disabilities, away from seeing them as medical anomalies to be cured, pitied, or tolerated, and toward acceptance of individual differences as part of the human experience. At the core of the IDEA and other disability-rights statutes is respect for human diversity, eradication of discriminatory practices, and opportunity for inclusion and participation in public life.

70.    The IDEA grants students a substantive right to a free appropriate public education ("FAPE") (defined at 20 U.S.C. § 1401(9)), achieved primarily through the development of an individualized education program, suited to their particular needs ("IEP") (defined at 20 U.S.C. § 1401(14)). Under the IDEA, school associations receiving funds are required to identify, evaluate, and supply special education services to children with disabilities in order to ensure a free appropriate public education. In addition to their substantive obligations, school associations are required to provide procedural safeguards such as impartial due process proceedings to ensure that access to FAPE is not lost.

71.    Under the IDEA, a state or local level agency must "conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 20 U.S.C. § 1414(a)(1). "[A] parent of a child . . . may initiate a request for an initial evaluation to determine if the child is a child with a disability." *Id.* at § 1414(a)(1)(B). "Such initial evaluation shall consist of procedures . . . (I) to determine whether a child is a child with a disability . . . (II) to determine the educational needs of such child." *Id.* at § 1414(a)(C)(i).

72.    The IDEA requires that each IEP take account of the child's particular needs, measure the child's current levels of academic achievement, and commit to a list of measurable goals for the child, elaborating on the specific set of services the child will receive, and describing how and to what extent the child will participate in educational programs with nondisabled

children.

73.     The IDEA also grants procedural rights.   Serving not only to guarantee the substantive rights accorded by the Act, the IDEA's procedural rights, in and of themselves, form the substance of IDEA.  It requires school districts to provide parents both with notice and consent to participate in the creation of their child's IEP.  Both federal and Virginia law require the development and revision of IEPs to be a cooperative, deliberative process involving the child's parent(s), teachers and counselors.

74.     Parents with reason to believe that the IEP proposed by their school district does not meet the IDEA's standard of providing their child with an appropriate education may initiate a due process hearing.

75.     The due process hearing is a critical feature of the IDEA.  It is ordinarily the only process through which children with disabilities and their parents can challenge a school district's refusal to provide services or accommodations necessary to ensure that a disabled child receives a free appropriate public education guaranteed by the IDEA.  Without a fair and impartial hearing process, school districts would be free to ignore requests for services and accommodations, with little consequence.

76.     To ensure that the due process hearing is fair and impartial, it is critical that the hearing officer presiding over the due process hearing be knowledgeable, impartial, objective, and free of bias.  If hearing officers always, or nearly always, rule in favor of the school district and against the disabled child, that virtually eliminates the ability of disabled children and their parents to obtain the services and accommodations guaranteed under the IDEA when schools refuse to provide them.  Facing near-certain failure also deters parents from initiating legitimate challenges, resigning instead to the sad truth that whatever the school district says goes, notwithstanding

parental concerns.  This is a serious problem, as school district interests often are not aligned with those of disabled students.

77.    Although there is technically a right of appeal from an adverse hearing officer ruling, the significant cost of that process (on top of the cost of the due process hearing itself), and the substantial deference given to hearing officers makes the appellate process financially and practically impossible for nearly all disabled children and their parents.  Without a fair and impartial due process hearing, the rights guaranteed under the IDEA are left entirely to the whim of the local school district.[5]

78.    The IDEA requires that "[e]ach State that receives funds under this chapter shall . . . ensure that any State rules, regulations, and policies relating to this chapter conform to the purposes of this chapter."  20 U.S.C. § 1407 (a)(1).  This includes the IDEA's requirement that parents have the opportunity for a fair due process hearing before a knowledgeable and impartial hearing officer.

79.    The IDEA has a substantial, measurable impact on the Commonwealth of Virginia's capacity to provide FAPE to all children living within its borders.  For the 2022 to 2023 time period, Virginia received federal funding under Part B of the IDEA in the amount of approximately $289 million.  Of that, approximately $39 million was allocated to Fairfax County.  However, these funds come with strings attached.  Virginia and Fairfax County's continued ability to expend IDEA funds hinges on their compliance with numerous provisions of the IDEA and related federal regulations.  *See* 20 U.S.C. § 1411.  In Virginia, responsibility for ensuring such compliance rests largely in the hands of Defendant VDOE and LEAs like Defendant FCPS.

---

[5] As explained in detail below, USDOE has caught FCPS and VDOE repeatedly violating the provisions of the IDEA, to the substantial detriment of Fairfax County's and Virginia's disabled community.

80.     Disturbingly, and as described in the proceeding sections, Defendants have failed and continue to fail to comply with their obligations at each stage of the process required by the IDEA.

### VI. VDOE's Biased Hearing Officer System Deprives Parents and Special Needs Children of Their Right to a Fair and Impartial Due Process Hearing Under the IDEA

81.     Under the IDEA, a due process hearing is a fundamental safeguard for ensuring children receive FAPE.  The IDEA expressly guarantees the parents of eligible children "an opportunity for an impartial due process hearing" before a knowledgeable and impartial hearing officer.  *See* 20 U.S.C. § 1415(f).

82.     Contrary to this unambiguous obligation, VDOE's administration of its due process hearings, according to LEAs' own employees, all but ensures that special needs families who assert a proper complaint will lose.  Preparing their challenge to FCPS' decisions concerning their child, D.C.'s parents were warned by an FCPS social worker not to even bother with the due process hearing procedures because they "would lose."  D.C.'s parents pressed ahead with a "due process" hearing anyway, believing the social worker's warning to be exaggerated.  However, the FCPS social worker knew something D.C.'s parents could not have known until *after* losing their hearing and *after* months of parsing VDOE data obtained via Virginia Freedom of Information Act ("FOIA") requests:  Parents and disabled students in Virginia almost ***always*** lose their due process hearings.

### A.    Evidence Revealed Through FOIA Requests  Ultimately Exposed the Travesty of VDOE's Rigged Due Process Hearing System

83.     Following the behavior and ruling by hearing officer Morgan Brooke-Devlin as discussed below, the parents of D.C. commenced their investigation of the Virginia hearing officer system on July 16, 2021, by submitting through counsel a Virginia FOIA request to James Lane, the Superintendent of VDOE.  Their FOIA request sought relevant records between January 1,

2010[6] up to the date of the FOIA request.  The parents expended significant legal and out-of-pocket costs, and, after meeting consistent resistance from VDOE, were forced to send multiple FOIA requests and negotiate through counsel for over a year, to obtain relevant records from VDOE.

84.     The documents obtained in the parents' FOIA requests included documents previously not made public and include, but are not limited to, the official Decisions Log for hearing officers as maintained by the Executive Secretary for the Virginia Supreme Court.[7]  This log is a manual ledger that, to the parents' knowledge, has never been digitized, analyzed, or otherwise disclosed to the public until the parents of D.C. undertook this task, at significant personal expense and effort.[8]  The results are now known and summarized in this Complaint as set forth herein in Exhibit A, Exhibit B, and Exhibit C.

85.     In the eleven-year period between 2010 and 2021, 847 due process claims were filed in the Commonwealth of Virginia to seek an adjudication of rights under the IDEA.  Of those 847 cases, only 13 resulted in a ruling granting the relief requested by a disabled student or the

---

[6] The parents subsequently requested on June 29, 2022 additional documents from VDOE going back to January 1, 2000.

[7] While VDOE does publish on its website redacted hearing officer decisions (going back to 2003), this information is not practically useful for parents wanting to know aggregate outcomes or statistics,      which      VDOE      does      not      publish.      *See* https://www.doe.virginia.gov/special_ed/resolving_disputes/due_process/hearing_officer_decisi ons/2020-21/index.shtml.   D.C.'s parents were only able to obtain the accumulated decision history maintained on the Hearing Officer Decision Log from their FOIA requests.

[8] D.C.'s parents undertook a significant amount of personal time to manually enter into a spreadsheet the results from all hearing officer decisions from 2003 through 2021, and to then categorize and analyze such results by judicial region.  The results from 2003 through 2021 are summarized herein in Exhibit A (2010 through 2021), Exhibit B (2003 through 2009), and Exhibit C (cumulative hearing officer decisions from 2003 through 2021).  As discussed below, the parents ultimately entered 1,391 hearing officer cases over a twenty-year period and analyzed the results. *See* Exhibit A, Exhibit B and Exhibit C.

student's parent.  That is less than 1.5% in the entire state of Virginia.  The numbers in Northern

Virginia are even more stark and disappointing.  In Northern Virginia,[9] only 3 rulings out of 395

cases filed in this eleven-year period ultimately resulted in a ruling in favor of the disabled student

or the student's parents.  This represents less than one percent (specifically 0.76%) of the total due

process hearing cases filed by such families.  *See* Exhibit A.

86.     Moreover, out of the twenty-two (22) hearing officers eligible to serve during the

last decade, only four (4) have ruled in favor of a disabled student or family more than once.  See

Exhibit A.

87.      Fourteen (14) hearing officers, representing sixty-four percent (64%) of all eligible

hearing officers, have never ruled fully in favor of a disabled student or family in a due process

hearing during this entire 20-year period.  *See* Exhibit C.

88.     In Northern Virginia, the statistics are even more shocking.  Eighty-three percent

(83%) of the hearing officers have never ruled in favor of a disabled student or family in a due

process hearing between 2010 and 2021 in almost 400 cases.  *See* Exhibit A.

89.     The lack of rulings in favor of  special needs children is a problem that has existed

for at least twenty (20) years, which is as far back as VDOE has kept individual hearing officer

decisions in the Decisions Log made available to D.C.'s parents.  Specifically, since 2003, hearing

officers in Virginia have only ruled 25 times fully in favor of disabled children out of 1,391 cases

---

[9] The Office of the Executive Secretary of the Virginia Supreme Court ("OES") organizes the
Commonwealth into six (6) geographic regions.  Northern Virginia is identified as Region II and
encompasses six (6) counties: Fairfax, Arlington, Loudon, Prince William, Fauquier, and
Rappahannock Counties.  Hearing officers were classified as serving in either Northern Virginia
or outside of Northern Virginia in Exhibits A through C based on their business address set forth
in the Special Education Hearing Officer listing published in June 2021 by VDOE that was
delivered to the parents in response to their FOIA requests.

representing only 1.8% of the total aggregate cases overseen by these hearing officers. Over this same twenty-year period, hearing officers in Northern Virginia have only ruled fully in favor of disabled children in 7 cases out of 578 cases. *See* Exhibit C.

90.    The same core group of twenty-two (22) hearing officers responsible for these decisions has been virtually unchanged over the last two decades which represents two generations of disabled children seeking a better education under the IDEA. *See* Exhibit A, Exhibit B, and Exhibit C.

91.    The table attached as Exhibit A to this Complaint and excerpted below in Figure 1 shows the percentages of each category of resolution for the entire Commonwealth of Virginia and for Northern Virginia (Region II) during the last decade:

**Hearing Officer Ruling Results for the Period from 2010 through July 2021**

| Key Statistics | Northern Virginia | | Virginia | |
|---|---|---|---|---|
| | Officers | Pct | Officers | Pct |
| Number of Hearing Officers with Zero Rulings for Parents | 10 | 83.33% | 14 | 63.64% |
| Outcomes of Cases Initiated | Cases | Pct | Cases | Pct |
| Withdrawn | 191 | 48.35% | 433 | 51.12% |
| Settled | 68 | 17.22% | 115 | 13.58% |
| Dismissed or in Ruling in Favor of Schools | 127 | 32.15% | 266 | 31.40% |
| Partial Decision for Parents and School District | 6 | 1.52% | 20 | 2.36% |
| Ruled in Favor of Parents | 3 | 0.76% | 13 | 1.53% |
| Total Cases | 395 | 100% | 847 | 100% |

92.    As this table shows, the parental success rate, by any measure, is astoundingly

low.[10]   As described in more detail below,[11] prominent studies have shown that the national average parental success rate is approximately 30% in due process cases in states throughout the country.

**B.    National Statistics Confirm VDOE Hearing Officers Rule Against Parents at Disproportionately Greater Rates Than Other Jurisdictions**

93.    The U.S. Department of Education does not require states to publish aggregate hearing officer statistics.  And states, like Virginia, do not provide easy access to such aggregate statistics.  Consequently, VDOE hearing officers have operated in a zone of low transparency with little public awareness of their aggregate ruling record.

94.    Virginia's hearing officer ruling record is atrocious relative to national and state-by-state statistics.  Such statistical results are the natural and intended consequence of Virginia's practices of consistently certifying as hearing officers only those with a proven track record of favoring school districts over parents.

95.    To identify comparable ruling statistics for benchmarks against Virginia, D.C.'s parents spent a significant amount of time researching studies of hearing officer decisions in other states.

---

[10] Though a significant percentage of the filed cases were withdrawn by parents, the reason for each of these withdrawn cases is unknown.  Considering the significant time and cost of pursuing a due process hearing, against the minimal chance of success,  many parents just give up.  Parental deterrence seems to be the ultimate victory for Virginia's flawed and biased system.

[11] See the section below entitled "VDOE Hearing Officers Rule Against Parents at Disproportionately Greater Rates Than Other Jurisdictions" for an extensive compilation of studies of the parental success rate in due process hearings in other states in the country.  As discussed below, the studies by all measures demonstrate that Virginia's hearing officer system is an extreme outlier in the percentage of rulings against parents.

96.     A few national studies have analyzed hearing officer statistics. [12]  One of the recent, national studies of hearing officer decision statistics across multiple states was conducted in the Gershwin-Mueller and Carranza study, which analyzed 575 due process cases under the IDEA that occurred in 41 states from 2005 to 2006.  In such hearings, the school districts prevailed 58.6% of the time, and the parents prevailed 30.4% of the time, with 10.4% of the cases involving a split decision in which the school district or the parents obtained partial relief. [13]

97.     An earlier, national study conducted during the time frame of 1975 to 1995 found a roughly similar parental win percentage of 28% before hearing officers in IDEA cases. [14]

98.     For purposes of comparing Virginia to individual states, both the General Accounting Office and various researchers have confirmed that at least 80%, if not more, of all due process hearings occur in the following states: New York, California, Texas, New Jersey, Pennsylvania, Maryland, the District of Columbia, Massachusetts, and Illinois. [15]  All states in the

---

[12] *See Perry A. Zirkel & Cathy A Skidmore, National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio State J. on Disp. Resol. 529–31 (2014).

[13] Tracey Gershwin Mueller & Francisco Carranza, *An Examination of Special Education Due Process Hearings*, 22 J. Disability Policy Studies, 131, 137 (2011).  The study analyzed petitioner, disability, dispute and outcome including hearings of specific learning disabilities (26%), autism (20%), and health impairments (15%).  In such study, parents initiated 85% of the hearings under the IDEA.

[14] Perry A. Zirkel & James Newcomer, *An Analysis of Judicial Outcomes of Special Education Cases*, 65 Exceptional Child. 469, 473 n. 23, 475 (1999); *see also* Perry A. Zirkel & Cathy A. Skidmore, *National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio State J. on Disp. Resol. 525, 532 n.30 (2014) (discussing such national study of hearing officer statistics).

[15] Tracey Gershwin-Mueller & Francisco Carranza, *An Examination of Special Education Due Process Hearings*, 22 J. Disability Policy Studies, 131, 132 (2011).

country, other than six, place the burden of proof on the party requesting the due process hearing,[16]

and the vast majority of due process hearings are requested by parents.[17]

99.    California has the largest population of special-needs students in any state in the

country.[18]  A study of due process cases in California found that parents prevailed in 34.6% of

these cases.[19]  The same study found similar parental win statistics by parents in Ohio, where

parents prevailed in 32.7% of due process hearing cases.[20]

---

[16] In 2005, the Supreme Court ruled that the party requesting a due process hearing bears the burden of proof under the IDEA unless a state enacts legislation to the contrary.  *See Schaffer v. Weast*, 546 U.S. 49, 61–62 (2005); s*ee also* Bailey Sanders & Jane Wettach, *Insights Into Due Process Reform: A Nationwide Survey of Special Education Attorneys* (October 16, 2021), Conn. Pub. Interest Law J., Vol. 20, 2021 at 245, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3944061 ("The majority of states have declined (despite pressure from parents and advocates) to pass such legislation.  Because the vast majority of due process cases are initiated by parents, they typically bear the burden in the states that have not specifically shifted it to school districts.").  Only the following six states place the burden of proof on the school district: Connecticut, Delaware, Florida, New Jersey, Nevada and New York.  *See* Sanders & Wettach, supra at 245.

[17] *See also* Bailey Sanders & Jane Wettach, *Insights into Due Process Reform: A Nationwide Survey of Special Education Attorneys* (October 16, 2021), Conn. Public Interest L. J., Vol. 20, 2021 at 245, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3944061.

[18] Andrew A. Feinstein, Michele Kule-Korgood & Joseph B. Tulman, *Are There Too Many Due Process Cases? An Examination of Jurisdictions with Relatively High Rates of Special Education Hearings*, 18 U.D.C.L. Rev. 249, 255 (2015).  For example, during the 2011–12 school year, California had 688,346 special education students followed by New York State which had 450,794 special education students.  *See id.* at n.42.  While the New York City Department of Education is the largest school district in the country, Los Angeles is the second largest, with approximately 640,000 students in over 900 schools. *See id.* at 266 n.44.

[19] Ruth Colker, *Disabled Education: A Critical Analysis of the Individuals with Disabilities Education Act* 187–88 (N.Y.U. Press 2013).  Of the 101 decisions subject to the study between May 2, 2010 and June 20, 2011, the most frequent disabilities were: autism (30%), emotional disturbance (19%), speech and language impairments (17%), Other Health Impairment (OHI) (15%), learning disabilities (13%), and mental retardation/cognitive impairment (9%).  *See id.* at 188.

[20] *Id.* at 148–49.  Professor Colker noted that Ohio has a two-level administrative process for due process complaints.  The first stage is before an independent hearing officer and the second stage

100.    In Pennsylvania, a study of hearing officer decisions available through the Pennsylvania Office for Dispute Resolutions (ODR) showed that parents prevailed 58.75% of the time in due process hearings when they were represented by counsel.[21]  Similarly, in a study of 343 IDEA cases in Illinois, parents who were represented by counsel prevailed in 50.4% of such due process cases.[22]

101.    Researchers examined 139 special education due process hearings that occurred between 2011 and 2015 in Texas.  Districts prevailed in 72% of such due process cases, and parents prevailed in 28.06% of such cases.  In a study of 258 due process cases in Massachusetts held over eight years from 2005 through 2013, school districts prevailed on all issues 62.5% of the time, parents prevailed 27.2% of the time, and a mixed decision was issued in 10.3% of the cases.[23]

102.    Two studies of Iowa hearing officer rulings found a parental win rate similar to the

---

is before a state-level review officer.  Only after exhausting these two stages can a party appeal a decision to a state or federal court.  In her study, parents won 42.8% of the sufficiency decisions and such cases then proceeded to a review by the independent hearing officer.  The above parental win percentage of 32.7% involved fifty-five cases during 2002 to 2006 before first-level hearing officers.

[21] Kevin Hoagland-Hanson, *Getting Their Due (Process): Parents and Lawyers in Special Education Due Process Hearings in Pennsylvania*, 163 U. Pa. L. Rev. 1805, 1802 (2015).  The author of this publication examined 526 hearing officer decisions from the Pennsylvania ODR issued between February 2008 and September 2013.  In such cases, counsel represented parents in roughly three-quarters of all hearings and experienced a 58.75% success rate of rulings in their favor.  Pro se parents involved in the remaining quarter of such cases had a much lower rate of success prevailing only 16.28% of the time.  The combined rate of parental success in due process cases during such period was 48.24% taking into account the lower rate of success of pro se parents.

[22] *Id.* at 1819.  Like Pennsylvania, parents who proceeded without counsel only succeeded in 16.8% of such cases, which brought the composite parental success rate in due process hearings in Illinois to 38.3%.

[23] Blackwell, W.H. & Blackwell, V.V., *A Longitudinal Study of Special Education Due Process Hearings in Massachusetts: Issues, Representation, and Student Characteristics* (2015), available at https://journals.sagepub.com/doi/full/10.1177/2158244015577669.

national average of approximately 30%. The first study analyzed 50 hearing officer decisions in Iowa from July 1989 to June 2001. The parental rate win was 34% in that study.[24] The second study examined hearing officer decisions in Iowa from 1978 to 2005. The parental win rate was 32% in that study.[25]

103.     One of the lowest percentages identified other than in Virginia was in Maryland. Reporters from the Baltimore Sun investigated parental win percentages in due process hearings conducted under the IDEA from 2014 through 2018. In an article titled "Why Would We Even Try," excerpted below as Figure 3, the Baltimore Sun reported that parents prevailed in approximately 15% of the researched cases, based on data from the Maryland State Department of Education and Kennedy Krieger Institute Project HEAL[26]:

---

[24] Kristen Rickey, *Special Education Due Process Hearings: Students Characteristics, Issues, and Decisions*, 14 J. Disability Pol'y Stud. 46, 46 (2003); *see also* Perry A. Zirkel & Cathy A. Skidmore, *National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio St J. on Disp. Resol. 525, 535–36 (discussing the Rickey study).

[25] Perry A. Zirkel, Zorka Karanxha, & Anastasia D'Angelo, *Creeping Judicialization in Special Education Hearings?: An Exploratory Study*, 27 J. Nat'l Ass'n Admin. L. 27, 37 (2007). *See also* Perry A. Zirkel & Cathy A. Skidmore, *National Trends in the Frequency and Outcomes of Hearing and Review Officer Decisions under the IDEA: An Empirical Analysis*, 29 Ohio St J. on Disp. Resol. 525, at 535–36 (discussing such study).

[26] Talia Richman, *Why Would We Even Try?  Parents of Disabled Students Almost Never Win in Fights Against Maryland Districts*, Baltimore Sun (May 2, 2019), *available at* https://www.baltimoresun.com/news/investigations/bs-md-due-process-hearings-20190502-story.html.

Sun Investigates

## 'Why would we even try?' Parents of disabled students almost never win in fights against Maryland districts

By Talia Richman
Baltimore Sun
.
May 02, 2019 at 11:40 am

It's rare for the parents of students with disabilities to prevail in legal battles against Maryland school districts. In the past five years, they've lost more than 85 percent of the time, state education department documents show, even after investing tens of thousands of dollars and countless hours in pursuit of a better education for their children.

Advocates, families and attorneys say the trend is alarming and discourages people from fighting for the rights kids are guaranteed under federal law.

104.    As troubling as the Maryland data is, its parental success rate is substantially higher than Virginia's during the same period.  Virginia's parental success rate is a glaring outlier when compared to other states.  It is the product of a system in which—by design—almost two-thirds of VDOE hearing officers never ruled in favor of a special needs child in a due process hearing over a nearly 20-year period.  The Virginia due process hearing outcomes are the result of a deliberate, long-standing effort to reward and institutionalize a system of crony hearing officers, while blocking out new hearing officers who are potentially neutral and unbiased.

**C.    The Children Behind the Statistics: Named Plaintiffs D.C. and M.B. Experienced First-Hand VDOE's Biased Due Process Hearing System**

105.    VDOE goes to great lengths to make sure that due process hearings in Virginia are a fait accompli.  Both D.C. and M.B., and their parents, have suffered at the hands of VDOE's inevitable injustice.

D.C.'s Due Process Hearing

106.    During D.C.'s 2015 due process hearing before hearing officer Morgan Brooke-Devlin, D.C.'s parents presented extensive evidence including numerous reputable medical, psychological, and educational experts who uniformly testified that D.C. would not make meaningful educational progress and would be a physical risk to himself and others, unless he

were in a residential placement with integrated educational services, like Grafton.

107.    Officials from FCPS conceded in an open, pre-trial hearing that D.C.'s family had presented the largest volume and highest quality of proof demonstrating the severity of D.C.'s disabilities and support for a residential placement—including in the form of institutional and medical expert witness affidavits—that had ever been presented in the history of Fairfax County. Mr. Chaplick testified before Ms. Brooke-Devlin in D.C.'s 2015 due process hearing that FCPS officials acknowledged the extensiveness and quality of evidence supporting D.C.'s disabilities and case for a residential placement. Years later, this was corroborated by Grafton officials in a 2020 IEP meeting, who conceded in front of FCPS that D.C. "is one of, if not the, hardest case of autism and adverse behaviors that Grafton has treated in the school's history." D.C.'s disabilities and behaviors are profound and extreme and have been documented by some of the most respected clinicians in the disability area. And yet FCPS still fought his parents with litigation and refused to consider a residential placement in D.C.'s original IEP. FCPS also lowballed D.C.'s parents in pretrial negotiations with a settlement offer that would only pay for a fraction of D.C.'s educational costs and none of his residential costs.

108.    As discussed below, the "unusually high number" of parental complaints to the U.S. Department of Education is evidence of VDOE's and LEAs' (like FCPS) overly aggressive posture towards parents.

109.    After the due process hearing, D.C.'s parents were shocked when the presiding hearing officer, Morgan Brooke-Devlin, issued a decision on September 9, 2015, finding in favor of the school system and denying the parents' requested relief for residential placement.

110.    Bill Reichhardt, counsel for D.C., and one of the most experienced special needs litigators in the Commonwealth of Virginia at the time, was so outraged by the hearing officer's

bias and irrational decision that he wrote a multiple-page letter dated October 6, 2015 to Sheila Gray who oversaw the Office of Dispute Resolution and Administrative Services of VDOE.  A copy of the Reichardt letter is attached as Exhibit F.

111.    In his letter, Reichhardt stated that "during my 20 years of law practice in the area of special education I have never experienced such a biased and legally misinformed opinion from a hearing officer as was apparent in this case."  He noted specifically the hearing officer's lack of knowledge of the law and her willingness to misconstrue or ignore evidence.  The practical effect of her ruling was to invalidate key provisions of federal  law regarding D.C.'s rights under the IDEA.

112.    In his letter, Reichhardt requested that Ms. Brooke-Devlin "not be appointed in any further Due Process actions."

113.    Neither Mr. Reichhardt nor the Chaplick family ever received an acknowledgement or reply to Reichhardt's letter from VDOE or confirmation that VDOE investigated these concerns and took appropriate action against Ms. Brooke-Devlin.  To Plaintiffs' knowledge VDOE took no action in response to this letter.

114.    In the aftermath of the decision, the Chaplicks reluctantly entered into a settlement agreement with FCPS, in which the school system supported the day portion only of D.C.'s educational placement at Grafton.[27]  The Chaplicks did not know, at the time they entered into this settlement agreement, that Brooke-Devlin—like over 80% of the hearing officers in Northern

---

[27] On December 8, 2015, and a result of the deficient system in Fairfax County and the state of Virginia, the Chaplicks entered into a Settlement Agreement with FCPS, covering the time period through December 18, 2016.  As a result, the Chaplicks' and D.C.'s claims against FCPS, relating to D.C., do not include the time period prior to December 19, 2016.

Virginia—had never ruled in favor of a special needs family.  For years thereafter, D.C.'s residential costs at Grafton were paid for through a combination of insurance and his parents' own personal funds.

115.    During the COVID-19 pandemic, Grafton began to press D.C.'s parents to transfer D.C. to an adult group home not operated by Grafton.  On September 1, 2020, D.C.'s parents, through counsel, again requested that FCPS support D.C.'s program and residential placement at Grafton, stressing that his needs had long qualified him for a residential placement.

116.    FCPS convened IEP meetings with the Chaplicks and staff members from Grafton to discuss the parents' request and to update D.C.'s IEP.  The meetings were held virtually and were chaired by Adam Cahuantzi, at the time the Acting Coordinator for Due Process and Eligibility for all Fairfax County Schools.

117.    After only an hour and a half of discussion of placement, Mr. Cahuantzi announced that FCPS recommended the continuation of D.C.'s day placement at Grafton, and peremptorily refused his parents' request for a residential placement.

118.    The school system justified its rushed decision by pointing to the alleged progress D.C. had shown through the day placement at Grafton.  FCPS refused to acknowledge that D.C. had been living as a full-time resident at Grafton, and that the financial support of family and insurers, denied years earlier by FCPS, had substantially contributed to the progress he was achieving at Grafton.

119.    D.C.'s parents challenged the rejection by the IEP team and pursued additional IEP meetings with FCPS.

120.    D.C.'s parents requested that Mr. Cahuantzi recuse himself and that a new IEP team chairperson be appointed to replace Mr. Cahuantzi.  The parents explained that Mr. Cahuantzi had

been delaying and restricting IEP discussions and decisions, had not treated them as equal IEP team participants, and in general did not have D.C.'s best interests at heart.  In response to the parents' requests, Mr. Cahuantzi indicated that he would take their request for recusal under consideration "as the person authorized by Fairfax County to be in charge of all residential placements."

121.    However, in the two months following the meeting there was no response to the parents' recusal request.

122.    Given this second, successive rejection of their requests, D.C.'s parents commenced another due process hearing against FCPS on February 12, 2021.  They again alleged that FCPS had denied D.C. the FAPE to which he is entitled under the IDEA, by failing to propose an appropriate residential program and placement for the 2020–21 school year.  Citing the recent holding of the Supreme Court of the United States in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S.Ct. 988 (2017), they emphasized that FCPS had failed to provide a cogent and responsive explanation for its refusal to propose a residential program.

123.    After serving FCPS with a formal request for a due process hearing, in February 2021, D.C.'s parents and their counsel were advised that the very same hearing officer who had ignored the law and ruled against them in their 2015 due process hearing, Morgan Brooke-Devlin, had been appointed to serve as the hearing officer overseeing D.C.'s new due process hearing.

124.    The parents immediately expressed concern as to this hearing officer's ability to be fair, impartial, and objective, in light of the issues experienced and the complaints filed against Ms. Brooke-Devlin in 2015.  Counsel for D.C.'s family made an oral motion for Ms. Brooke-Devlin to recuse herself based on her prior involvement with D.C. and his family.  Ms. Brooke-Devlin summarily denied the request.

125.   After Ms. Brooke-Devlin denied the recusal motion, D.C.'s parents directed their counsel, Michael Eig and Paula Rosenstock, to investigate the ruling record of Ms. Brooke-Devlin as a hearing officer based on publicly available information.

126.   The investigation revealed that Ms. Brooke-Devlin has been a hearing officer in Virginia since 1993.  Over this twenty-eight-year period, counsel were unable to identify a single due process case in which Ms. Brooke-Devlin had ruled in favor of the family of a disabled or special needs student.

127.   Counsel for D.C. promptly prepared and submitted to Ms. Brooke-Devlin a petition to disqualify her under 28 U.S.C. § 455 and Va. Code § 2.2-4024.1, also citing the hearing officer Deskbook published by the OES.  Counsel argued based on this authority that Ms. Brooke-Devlin was unable to serve as an impartial hearing officer because of her prior knowledge of, and objectionable conduct towards, the petitioners.

128.   In the motion, counsel further argued that a hearing officer should never accept a case that could create a conflict of interest or create the appearance of a conflict of interest. Counsel referenced both the conflict arising from the previous 2015 due process hearing and its aftermath, including the Reichhardt letter, and the fact that she had apparently never ruled in favor of a disabled student.

129.   In response to the motion, counsel for FCPS failed to refute the claims regarding Ms. Brooke-Devlin's lack of rulings in favor of disabled students and failed to produce a single case in which Ms. Brooke-Devlin ruled for a student or parents.  Nor did Ms. Brooke-Devlin deny during the hearing that she had never ruled in favor of a disabled or special needs child.

130.   Counsel for D.C. requested and paid for the prehearing call, in which the motion for disqualification was argued and discussed, to be recorded and transcribed.  The hearing

transcript reflects Ms. Brooke-Devlin's open hostility toward counsel for D.C., including interrupting and repeatedly cutting off such counsel when he tried to speak.

131.    Ms. Brooke-Devlin issued a peremptory ruling against D.C.'s motion to disqualify. She provided no rationale for her decision other than to assert that the parents "failed to meet their burden of proof." In addition, she issued an order that the parties must move forward immediately with their case before her as hearing officer.

***M.B.'s Due Process Hearing***

132.    M.B was likewise forced to take part in a due process hearing which could only ever have resulted in one outcome – denial of the special education services he so badly needs.

133.    Over the course of seven days between March 9 and March 25, 2022, M.B.'s parents and advocates presented testimony regarding M.B.'s challenges and needs, and how FCPS had failed to meet them.

134.    Multiple experts in the fields of special education and M.B.'s particular disorders testified to M.B.'s lack of progress while placed in public school by FCPS. Indeed, in some respects, M.B.'s assessments showed that he had regressed under FCPS' placement from Fifth through Seventh Grade.

135.    An expert in school administration also opined that FCPS' recommendation that M.B. be placed at the Burke School was inappropriate, and that the Phillips School was the least restrictive environment appropriate for M.B,'s educational needs.

136.    FCPS witnesses and documents also demonstrated that not all of the goals set out in M.B.'s IEP were met during school closures caused by the COVID-19 Pandemic. Among other things, teachers stopped implementing reading services for M.B. and ceased collecting data with regard to his academic and behavioral progress.

137.   M.B.'s counsel also elicited testimony from FCPS teachers and administrators regarding the inappropriateness of his placement at the Burke School.  Among other things, they acknowledged that no representative from the Burke School had been present at M.B.'s November 2021 IEP meeting to speak to the differences between the services offered at the Burke School and the Phillips School.  FCPS administrators also acknowledged that their goal was to place M.B. at a public school, rather than accept the private placement at Phillips.

138.   Despite the evidence that M.B. was being deprived of FAPE, the hearing officer concluded that FCPS' IEPs and placements had been sufficient, placement at the Phillips School was inappropriate, and M.B, and his family were not entitled to any relief,

139.   In a May 17, 2022 decision, M.B.'s hearing officer exhibited bias against M.B. and made numerous errors which skewed the outcome in favor of FCPS, including:

   a.   Discounting parents' evidence that M.B.'s grades and progress had been inaccurately tracked and inflated by FCPS;

   b.   Discounting standardized testing scores which, the hearing officer acknowledged, "indicat[ed] the child's reading and math either stalled or regressed from the 5th grade to the 7th grade;" and

   c.   Erroneously concluding that FCPS complied with the IDEA during the COVID-19 Pandemic  on the grounds that "[d]ue to the TLP's voluntary nature, there was no denial of FAPE because the LEA did not implement the child's IEP."

140.   In essence, VDOE's failure to provide a fair and impartial due process hearing was a foregone conclusion, and there was nothing M.B.'s parents could do to remedy his denial of FAPE.  Consequently, they were forced to pay, and continue to pay, for the special education

services M.B. needs. Through VDOE has failed to provide FAPE, M.B. receives an appropriate

education – but not the free and public one the IDEA requires Defendants to provide.

**D.    VDOE is Responsible for the Biased Hearing Officer System It Created and Condones**

141.    For the IDEA to function as intended, due process hearing officers must be

qualified and unbiased.    Under federal law, VDOE is responsible for the supervision and

monitoring of due process hearing officers. *See* 20 U.S.C. §§ 1412(a)(11)(A) and 1416(a); *See also*

20 U.S.C. § 1232d(b)(3)(A); *See also* 34 C.F.R. § 300.149(a). This includes responsibility for the

evaluation, continued eligibility, and disqualification of special education hearing officers. *See*

8VAC 20-81-210.D.3.c.    In considering whether a special education hearing officer will be

certified or recertified, VDOE must consider whether due process hearing officers engage in:

(1) Untimely decision-making, or failing to render decision within regulatory time frames;
(2) Unprofessional demeanor;
(3) Inability to conduct an orderly hearing;
(4) Inability to conduct a hearing in conformity with the federal and state laws and regulations regarding special education;
(5) Improper ex parte contacts;
(6) Violations of due process requirements;
(7) Mental or physical incapacity;
(8) Unjustified refusal to accept assignments;
(9) Failure to complete training requirements as outlined by the Virginia Department of Education;
(10) Professional disciplinary action; or
(11) Issuing a decision that contains:
    (a) Inaccurate appeal rights of the parents; or
    (b) No controlling case or statutory authority to support the findings.[28]

**1.    VDOE Hearing Officers Fail to Follow the Law**

142.    In contravention of its oversight duties under federal law, VDOE enables and

empowers hearing officers who do not comply with the IDEA. No matter how many violations

---

[28] *See id.*

they commit, hearing officers who consistently rule in favor of schools are retained by VDOE. When parents, lawyers and advocates bring serious hearing officer violations to light, VDOE ignores or disregards them, fails to adequately investigate them, disclaims any direct authority over the hearing officers, and denies any need to censor or remove the culprit. Besides disregarding substantive disability rights and school law, hearing officers refuse to comply with IDEA-imposed decision deadlines, openly rely on false testimony from Virginia LEAs to rule against parents, and routinely disregard parents' expert witnesses.

***Chronic Delay in Submitting Decisions***

143.    One of the most common ways hearing officers ignore the requirements of the IDEA, other than disregarding special education law, is to blatantly violate decision deadlines. A hearing officer is required to render a decision within 45-calendar days of the expiration of the resolution period. *See* 34 C.F.R. § 300.515(a). Any extension to the 45-calendar day deadline can only be granted if requested by a party. *See* 34 C.F.R. § 300.515(c). And even then, such an extension is only authorized if it serves the best interest of the child. VDOE hearing officers have lost sight of the fact that, to a child, time is critical. For years hearing officers have failed to resolve proceedings timely, and VDOE does nothing to rectify the problem. According to one former hearing officer, unilateral motions to extend hearing deadlines were common among hearing officers; VDOE never reprimanded hearing officers for such delays.

144.    In response to numerous complaints, OSEP conducted an investigation into the VDOE in September 2020, and concluded that the state was not exercising its general supervisory and monitoring responsibilities in accordance with 20 U.S.C. §§ 1412(a)(11)(A) and 1416(a) and 20 U.S.C. § 1232d(b)(3)(A) and 34 C.F.R. §§ 300.149(a) and 300.149(b) and 300.600(a) and (d)(2). Specifically, OSEP concluded that VDOE did not ensure and document that LEAs track

the implementation of the timelines for the resolution process for due process complaints filed by parents.

145.    As a result of the investigation, VDOE gently reminded hearing officers to comply with deadlines and other timelines established by law.  In practice, nothing has changed.  Hearing officers continue to *sua sponte* push off deadlines without agreement from the parties in flagrant disregard of what the delay means to the children whose welfare and education they are certified by VDOE to protect.

146.    In addition to the "unilateral motions" for delay that are used routinely by hearing officers, others blatantly lie about their failure to meet required decision-deadlines, and VDOE does nothing to cure the violations.  For example, in a 2022 case arising out of Chesterfield County, hearing officer Sarah Smith Freeman back-dated her untimely, substantively-revised decision, to make it appear as though she had delivered her decision on time. Though the parents' lawyer caught the hearing officer in her lie about the untimely decision, the delay truncated the parents' appellate timetable by two weeks (the length of the back-dating) because VDOE refused to intervene with the hearing officer or take any corrective measures.

147.    Disturbed by Freeman's blatant misrepresentations, parent's counsel contacted Patrica Haymes, the Director of VDOE's Office of Dispute Resolution.  Haymes expressed token sympathies but ultimately refused to resolve the issue. Haymes stated that hearing officers are "autonomous" and that VDOE's role is simply to provide "oversight."  From this, parent's counsel concluded that Haymes had no authority to require Freeman to correct the document. Haymes also stated that, "to be on the safe side," counsel should consider April 15 as the operative date for appeal purposes.  VDOE would do nothing and the parents were penalized by the improper shortening of their appeal deadline by more than two weeks.

*Unbridled Reliance on False Testimony from Schools*

148.    Another way VDOE hearing officers disregard the IDEA is to rely on blatantly false testimony from Virginia LEA officials to routinely deny parents the special education services their children need.  Fundamental to the exercise of due process is trust in the fact-finding mission, which necessarily assumes an effort to distinguish truth from falsehood with a goal of accepting only the truth.  That is not the mission of VDOE's due process proceedings, and truth is not a goal set by the hearing officers.  VDOE certifies and recertifies hearing officers who blatantly accept and rely on false testimony and patently inadmissible evidence proffered by the Virginia LEAs, while almost always ruling against children and their parents.

149.    For example, during D.C.'s due process hearing, FCPS presented false testimony that D.C. could read books and count to 50 when he could do neither.  When school officials observed testing of D.C. by Grafton, prior to their due process hearing testimony, they witnessed that D.C. could only count to 2 and could not decode words.  Nevertheless, the school officials testified to the contrary during the hearing, and the hearing officer uncritically accepted the testimony, despite it being demonstrably false.  Based at least in part on this false testimony, the hearing officer denied D.C.'s request for a residential placement at Grafton..

150.    During another due process hearing in 2022 between Chesterfield County Public Schools and the parents of a special needs student, the child's math teacher, testified that (a) his student never turned in any math work, and (b) the math teacher had never communicated with the child's parents.  The math teacher made these statements despite numerous email communications with the parents and academic records showing that the child had submitted work.  The parents' lawyer was able to access the child's school records that controverted entirely the math teacher's testimony.  Nevertheless, the parents lost the hearing, and their child was denied the special

education services they were seeking in the complaint.

151.    The falsehoods hearing officers routinely accept and rely on is not limited to a single math teacher misrepresenting school assignments and parent emails.  Virginia LEAs have implemented policies and practices that require teachers to inflate grades and ignore assignments, which covers up the need for greater special education services.  For example, teacher Elizabeth Houston admitted during a due process hearing that she routinely does not include incomplete work or missing assignments when calculating grades for special needs students, and she never gives grades below 50% even when a student fails to submit any work, because school policy forbids it.  The VDOE hearing officer heard directly from Houston that the student's grade in her class was grossly inflated and reflected false progress, yet the parents left the hearing without obtaining any relief or changes to their child's education program.

152.    A special education coordinator explained in testimony before a hearing officer that a Virginia LEA principal advised her to make after-the-fact changes to service logs and teacher notes.  The coordinator also explained to the hearing officer that she was responsible for making edits to the logs and notes in an attempt to show the child was "making progress" under her current education program.  The hearing officer concluded the student was "making progress," despite being told by the coordinator that the records of progress were a sham, and, she denied the parents' request for additional services for their child.

### *Policy of Excluding Parents' Expert Witness Testimony*

153.    VDOE hearing officers' pretextual exclusion or discounting of parents' experts is also a widespread problem.  The IDEA expressly authorizes the use of expert witnesses.  Parents and advocates report that hearing officers will routinely exclude parents' qualified expert witnesses – but not the school district expert witnesses – for nonsensical reasons, including because the

expert witness resides in a different state.

154.    In the same due process hearing arising out of Chesterfield County Public Schools discussed *supra* at ¶¶ 150–52, a hearing officer rejected the parent's proffered expert as lacking Virginia special education licensing credentials.  To the contrary, this witness testified that she was presently a certified special education teacher who had taught virtually for FCPS the preceding year.  This same witness also testified that she had offered expert testimony in **over sixty** prior due process hearings.

155.    This three-tiered injustice – inexcusable delay of decisions, chronic reliance on LEAs' false and misleading testimony and baseless rejection of parents' expert witnesses erodes the crucial due process safeguard in the IDEA.

## 2.    VDOE Hearing Officers Are Not Impartial

156.    In addition to allowing the conflicts of interests and bias of hearing officers to go unheeded, VDOE also plays a more direct role in tilting the outcomes of due process hearings in favor of its LEAs.

### Ex Parte Communications with VDOE Representatives and LEAs

157.    VDOE's policies and practices facilitate *ex parte* communications among hearing officers, local education agencies, and VDOE.

158.    VDOE employs two "monitors" named Brian K. Miller and Reginald B. Frazier to attend due process hearings as a VDOE representative.  The "monitors," sometimes referred to as "VDOE evaluators," are hired by VDOE to attend all due process hearings.[29]   They are also

---

[29] According to VDOE's July 21, 2021 request for proposal for "Evaluators and Appeal Reviewers," these evaluators play a role in how VDOE carries out its "responsibility" of oversight for the management of all hearings, evaluating the hearing officers' management of due process hearings."  The RFP on to state that "the VDOE, through its hearing officer evaluators, is

included in VDOE's list of hearing officers. The presence of these VDOE evaluators in due process proceedings, coupled with their *ex parte* communications, improperly influences hearing officers to rule in favor of school districts and against parents.

159.    Parents and advocates have complained that VDOE evaluators display favoritism towards schools, engage in secret conversations with hearing officers, and try to influence the outcome of due process hearings. A former hearing officer reported that one of the VDOE "monitors" advised him in several *ex parte* discussions to disregard expert testimony offered by parents. This former hearing officer stated that the unsolicited requests were made during multiple scheduling calls in which none of the other parties were present. He also indicated that the VDOE evaluator "knew he wasn't supposed to say that." The former hearing officer ultimately declined to follow the VDOE monitor's "advice" and ruled largely in favor of the parents and against the school district. This was the first time in two decades that this hearing officer had ruled against a school district. Two months after issuing his ruling, VDOE removed the hearing officer from its list.

160.    In a June 2020 email exchange, hearing officer Brooke-Devlin reached out to Dawn Schaefer of FCPS indicating that she would be available for a due process hearing in the near term, but she would need Ms. Schaefer *to delay the assignment* so Brooke-Devlin could be free to handle it.[30] Delay in the hearing officer's appointment can be detrimental to the child because it delays the challenge to the lack of FAPE , but Brooke-Devlin asked FCPS to delay her appointment "as

---

responsible for providing guidance in managing hearings effectively, efficiently, and within regulated mandates."

[30] *See Why did HO Morgan Brooke-Devlin Work Out of the Office of Blankinship & Keith During a Due Process Hearing?*, *available at* https://specialeducationaction.com/why-did-ho-morgan-brooke-devlin-work-out-of-the-office-of-blankinship-keith-during-a-due-process-hearing/ (last accessed January 20, 2023).

long as you can." FCPS, which was the local education association responding to the due process complaint at issue in the email, delayed the hearing officer appointment for the maximum time possible—five days—and then appointed Brooke-Devlin via letter dated June 9, 2020. Brooke-Devlin then reached out to Kathryn Jones of VDOE to express gratitude for the "special accommodations" she was provided by FCPS on scheduling.

161.    Although VDOE and FCPS should not be coordinating selection of the hearing officer responsible for adjudicating claims against FCPS, it appears from the June 9, 2020 e-mail and subsequent follow-up that VDOE and its LEAs are, in fact, making such appointments together.[31]

162.    The same June 2020 e-mail also demonstrates that, at the time she sent the e-mail, Brooke-Devlin was working from the office of FCPS' outside counsel, while conducting another due process hearing. This is the same outside counsel that FCPS would eventually retain to handle the same due process hearing for which FCPS was appointing Brooke-Devlin.

163.    VDOE is charged with reviewing hearing officer performance annually, based on many factors, expressly including whether hearing officers are involved in improper *ex parte* communications. Despite repeated complaints about Brooke-Devlin, VDOE has done nothing to investigate or discipline her.

164.    In another instance arising out of Loudoun County Public Schools, the Loudoun notified the hearing officer that it was making the appointment, even though the LEA was party to the dispute the hearing officer was being appointed to decide. Loudoun County also invited the

---

[31] This concerted conduct is inconsistent with the Virginia Administrative Code, 8VC20-81-210(H)(1)(a), which requires the Supreme Court of Virginia to make hearing officer appointments, and it underscores why *ex parte* communications are prohibited: They frustrate the very impartiality required to ensure a fair due process proceeding.

hearing officer to send it the fee bills – rather than VDOE – for payment processing.  Allowing a LEA, as one party to the dispute, to have control over the compensation of hearing officers reflects the lack of impartiality that frustrates the IDEA's due process hearings in Virginia.  VDOE, its local school districts, their counsel, and hearing officers collaborate closely, especially given their long-standing relationships and history working together on behalf of the same side, to achieve their common goal of truncating the IDEA's procedural safeguards.

165.    In a due process hearing case arising out of Arlington Public Schools, a Washington DC based attorney represented parents in a due process hearing overseen by Peter B. Vaden. In addition to serving as a Virginia-based hearing officer, Vaden served as a Washington DC based hearing officer. The attorney was familiar with Vaden and was present in numerous Washington DC based due-process hearings in which Vaden was the appointed hearing officer.

166.    According to the parents' attorney, Vaden displayed unusual behavior throughout the course of the Virginia due process hearing, was highly deferential to a "VDOE representative" present throughout the process, and seemed inappropriately reliant on his guidance. The attorney estimates that in DC, Vaden rules in favor of parents thirty to fifty percent of the time, but the same cannot be said for Virginia.

***Conflicts of Interest and Open Hostility***

167.    VDOE is responsible for certifying and recertifying hearing officers, and it has taken steps to ensure that hearing officers have a direct and substantial pecuniary interest that affects their impartiality.  This regulatory structure creates conflicts of interests and financial incentives that undermine the integrity and impartiality of the due process hearing system in Virginia.  Hearing officers appointed, reviewed, and compensated by VDOE, on behalf of its LEAs, have demonstrated over many years and in many cases that they are not reliably neutral and

impartial.

168.    Serving as a VDOE hearing officer with an active docket of due process cases from 2003-2006, James T. Lloyd received substantial fees from VDOE during his 6-year tenure, not once ruling in favor of a special needs child.  In 2006, Lloyd entered into a public consent decree including the revocation of his law license after he was caught stealing money from a client's trust account.

169.    The fees can be particularly significant for attorneys who are solo practitioners or work at small firms.  Based on publicly available information, as summarized in Exhibit E, eighteen (18) of the twenty-two (22) hearing officers who served between 2010 and 2021 worked as solo practitioners, and all hearing officers based outside of Northern Virginia worked as solo practitioners.  The remaining four (4) work for very small firms that have only two members or partners.

170.    By targeting solo practitioners and lawyers who work at very small firms, VDOE has guaranteed itself to be the hand that feeds.  And hearing officers are taught not to bite it – because VDOE has an economic stake in the outcome of each due process hearing.  The less money spent on special education services as a result of decisions in favor of parents, the more money VDOE retains in its own annual budget.  The system is designed in a way that stokes conflicts of interests, and VDOE has no natural incentive to improve it.

171.    Instead, VDOE certifies the solo practitioners and small-firm lawyers, trains them in a manner that ensures favorable outcomes, pays them generously, appoints them (accommodating their schedules, as requested, even if it means a delay of due process), and then recertifies the same crop, with the promise of a continuous pipeline of work, steady stream of net income, and no risk of negative consequences. This is powerful financial incentive and temptation

for the hearing officers to stay captive, especially when combined with VDOE's over-arching control over the due process proceedings.

172.    VDOE is not the only Defendant that uses financial incentives to pressure its hearing officers to rule against parents.  LEA lawyers have likewise wielded the threat of financial harm to ensure that due process hearings result in a victory for their LEA clients.

173.    In May 2011, a hearing officer accused three attorneys representing the school board in a due process hearing of making implied financial threats against him.  Specifically, the hearing officer claimed that the LEA lawyers indicated that they would cause problems with his billing and compensation if he did not rule in favor of the school board.  The hearing officer wrote that "(The threat of causing billing issues) has been done before in other cases by this law firm." Those same lawyers represented multiple Virginia LEAs during this time period.

174.    Hearing officers also seek to maintain and benefit from their close relationships with LEA lawyers.  In 2004, a hearing officer was disqualified from a due process hearing by the Supreme Court of Virginia after he enlisted a school board's attorney to help prepare his response to the parents' request for disqualification.

175.    Hearing officers' school bias has a tangible, corrupting effect on children's access to FAPE.  In a due process hearing  arising out of Chesterfield County Public Schools,  the school's attorney claimed not to have received a particular piece of evidence, a recording, from the parents. In response, parents' counsel proffered an affidavit establishing that the attorney had opened an electronic file containing the recording, which demonstrated the school's counsel had, in fact, received the evidence.  In an email exchange among both sets of attorneys and the assigned hearing officer, the hearing officer "concluded"  that counsel for the school did not technically "receive" the recording by the requisite deadline for its consideration because the password protecting the

file containing the recording, ostensibly, did not work.  The hearing officer added that the password had not worked for her  or the school's counsel.  Prior to this email exchange, neither the hearing officer nor the school's counsel alerted the parents to a password problem.  If they had, parents' counsel easily could have supplied a new password, and the recording would have been accessible to both the school's counsel and the hearing officer.  Instead, both the school and the hearing officer set the parents up to fail, which is exactly what the hearing officer decided when she denied the requested services.

3.    **VDOE Stacks the Deck with Biased Hearing Officers**

176.    One of the most significant impacts VDOE has on the systematic denial of due process is the unimpeded control over the certification, training, compensation, and removal of hearing officers.

177.    Between the late 1990s and 2009, VDOE paired down the list of hearing officers from over 100 to a carefully-curated list of twenty-two (22) hearing officers who almost never ruled in favor of disabled children or their parents.  Then, for more than a decade from 2010 into 2021, VDOE has declined to add or remove a single hearing officer.  In other words, VDOE manages to stack the deck and then close the door to new hearing officers.

E.    **Parents and Children Have no Viable Alternative to Due Process Hearings**

178.    In theory, parents and children could challenge violations of the IDEA by filing a special education complaint with VDOE.  As described by VDOE: "A complaint is generally an expression of some disagreement with a procedure or a process regarding special education programs, procedures or services.  A formal complaint is considered a request that this division investigate an alleged violation of a right of a parent and/or child with disabilities who is eligible, or believed to be eligible, for certain services based on federal and state laws and regulations

governing special education."[32]

179.    However, in practice, the VDOE special education complaint procedure offers no real relief.  This alternative process, and the resulting investigation by VDOE, is merely another means by which VDOE delays and ultimately denies providing FAPE to children.

180.    The systematic failures of VDOE's state complaint system are so severe that they have caught the attention of the United States Department of Education ("USDOE").  As discussed further *infra*, in May 2020, the USDOE issued a differentiated monitoring and support letter which highlighted, among other issues, deficiencies in VDOE's state complaint system.  As of a September 1, 2022 follow-on letter, USDOE remained concerned that Virginia "is not addressing the complaints it receives in a timely manner."  Indeed, VDOE produced to USDOE a log of incoming communications and how they were handled, which outlines that ***of approximately 1,843 communications received, VDOE reported only 29 outcomes.***

181.    Parents who do get a response from VDOE find themselves stuck in yet another rigged VDOE process.  VDOE officials tasked with investigating complaints have demonstrated significant bias in favor of LEAs like FCPS, and against parents and children seeking services.  Among other things, VDOE officials have willfully misconstrued families' complaints in order to avoid investigating the alleged misconduct and –  after investigating conduct different than the conduct alleged –  find that no violations have occurred.  And even in those rare instances where hearing officers do identify a violation, they have failed to take necessary corrective action.

---

[32] "Special Education Complaints," available at https://www.doe.virginia.gov/programs-services/special-education/resolving-disputes/resolving-disputes (last accessed January 11, 2023).

182.    In one instance in Arlington Public Schools (APS), a family brought a state VDOE complaint challenging that the denial of FAPE to their child during the COVID-19 Pandemic.  The parents had requested placement at a private school which offered the in-person education their child needed for the duration of COVID-19 public school closures.  Their child faced significant academic and emotional challenges with distance learning.  APS rejected these requests for a change of placement and likewise rejected in-person learning.  Denial of in-person learning had drastic consequences for the child, including hospitalization for suicidal ideation brought on by a deterioration of his autism.  During VDOE's complaint process, the VDOE official "investigating" the complaint repeatedly displayed bias against the family and in favor of APS, including by:

a.    Engaging in *ex parte* communications with APS representatives and denying the parents' request to take part in such communications, even though the VDOE representative instructed the parents to include APS on all of their communications with VDOE;

b.    Adopting APS's false account of the student's return to "in-person" learning despite the contradictory contemporaneous evidence provided by the parents;

c.    Ultimately concluding in an April 2022 Letter of Findings that APS was in compliance because it made a "good faith effort" to implement the child's IEP(s), which is not the standard under the IDEA.

183.    When the parents expressed their dismay that the hearing officer had uncritically accepted APS's narrative of events, despite unequivocal contrary evidence, the VDOE officer claimed that she was not a decider of fact, and if they wanted an adjudicator to make a credibility determination, they would need to file for a due process hearing.

184.    Unbeknownst to the parents, this same VDOE representative also had *ex parte*

communications with APS in April 2022 concerning the IEP for the parents' other child, who also has recognized disabilities. APS's IDEA compliance officer reported in an internal email to other APS employees that the hearing officer recommended that *APS consider taking the family to a due process hearing* to challenge an IEP that APS had already put in place for that child.

185. In other words, VDOE's hearing officer was acting not as an impartial adjudicator for the IDEA system, as required under federal law, but as an advocate for the school district, advising them to take action against the parents by filing a due process hearing. This is part of VDOE's and the Virginia LEAs' substitute system of delaying and denying services.

186. VDOE's systematic failure to properly implement the state complaint process further deprives children and their families of the protections afforded by the IDEA.

**F.    VDOE's Ongoing and Systematic Practice of Rigging Due Process Hearings Makes it Futile to Seek Relief Through Due Process Hearings**

187. Defendants' carefully cultivated system designed to bias its hearing officers—much of which is ostensibly conducted in accordance with state law—cannot be remedied by way of a due process hearing overseen by the very hearing officers, LEAs, and VDOE whose conduct is at issue.

188. Even assuming that a hearing officer could fairly adjudicate a parent's claim that VDOE is depriving them and their child of rights under the IDEA, that officer could not provide the kind of systemic solution that is both badly needed and sought through this Complaint. Given the systemic nature of Plaintiffs' allegations and requests for relief, it would be futile for them to pursue these claims through a state administrative process.

189. Pursuing relief from VDOE or FCPS is futile. The manifestation of bias and ill-will toward the petitioners and their attorneys falls below the standards required under federal statutes and regulations governing the conduct of due process hearings in IDEA cases. Hearing

officers' records of seldom, if ever ruling in favor of a family, demonstrates that D.C. and M.B. were not the only people who suffered at the hands of a hearing officer who evidenced no interest in neutrality.

190.    Moreover, any parent who would seek to appeal a due process hearing officer's adverse decision, no matter how biased and erroneous, would face an uphill battle.  Hearing officers and their decisions enjoy a presumption of impartiality under the IDEA, despite the evidence that, in Virginia, such a presumption is not grounded in fact.  Nevertheless, this unwarranted presumption provides yet another barrier that makes the administrative route futile.

191.    Thus, these allegations of structural shortcomings that resulted in the systemic denial of impartial hearings are appropriately addressed in this litigation, not before a Virginia hearing officer.  Defendants' biased hearing-officer requires this Court's intervention in order to ensure Virginia children with disabilities the FAPE guaranteed by the IDEA.

## VII. VDOE and Virginia School Districts Systematically Fail to Evaluate Children with Disabilities

192.    The IDEA requires that VDOE and Virginia School Districts evaluate any student who is suspected to have a disability.  VDOE is also required to oversee and monitor these school districts to ensure they are complying with their obligations under the IDEA.

193.    Under the IDEA, state education agencies, like VDOE, and LEAs are responsible for evaluating any child suspected to have a disability.  *See* 34 C.F.R. § 300.111(c).  "conduct[ing] a full and individual initial evaluation" before providing special education and related services to a child with a disability.  20 U.S.C §1414(a)(1)(A).  Such evaluations must "(A) use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent," "(B) not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or

determining an appropriate educational program for the child," and "(C) use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors."

194.    A parent also has a right to an independent educational evaluation (IEE) at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to certain conditions.  *See* 34 C.F.R. § 300.502.  If a parent requests an IEE at public expense, the school district must, without unnecessary delay, either: (1) Initiate Due Process Procedures under 34 C.F.R. § 300.507 through 300.513 to show that its evaluation is appropriate; or (2) Ensure that an IEE is provided at public expense, unless the school district shows that the evaluation obtained by the parent does not meet agency criteria.  34 C.F.R. § 300.502(b).  If a parent requests an independent educational evaluation, the school district may not unreasonably delay either providing the IEE at public expense or filing a due process complaint to defend the public evaluations.

**A.    VDOE Permits Virginia LEAs to Exploit a Policy and Practice of Avoiding, Limiting and Delaying the Student Evaluations  Required Under the IDEA**

195.    FCPS has repeatedly and systematically denied students FAPE by improperly denying, limiting and delaying evaluations.  In the circumstances in which Defendants agree to evaluations, it often takes months or even years for Defendants to grant such requests and actually perform or authorize the evaluations.  When evaluations or IEEs reveal serious issues and deficits in a child's learning, FCPS administrators will often downplay or completely ignore the results to bar additional accommodations and private placements.

196.    In FCPS, a former teacher reports that during her tenure at FCPS, educators were repeatedly instructed not to write "dyslexia" in IEP documents.  The teacher further indicated that FCPS asserts that there is a difference between "educational models" and "medical models" for

evaluations.  On this basis, FCPS often rejects the findings of independent evaluations and trains its educators to put medical diagnoses to the side and give higher deference to school diagnoses. This former teacher also reports that FCPS does not collect baseline data in evaluations that include all five components of reading, leading to highly distorted and inaccurate data sets.

197.    As one example of FCPS' policy in practice, FCPS denied a child an evaluation three times between first and sixth grade.  Frustrated with the school, the child's parent paid for an independent evaluation in sixth grade.  Among other things, the child was reading on a third-grade level and had numerous other low or borderline impaired scores.  When the parent presented the results of the evaluation to the school, the school psychologist told her orally (but not in writing) that he would not accept the outside expert evaluation, claiming that the evaluation was "anecdotal" and that he would have to perform his own evaluation.  The parent discovered later on, through a FERPA request, that the principal of the school told the psychologist not to respond to the parent in writing.

198.    The school ultimately performed their own evaluation.  While the evaluation revealed that the child had areas of need, it was not comprehensive.  After expressing her concerns about the non-comprehensive nature of the evaluation, the school principal responded that "We only test for eligibility."  This is inconsistent with the requirements of the IDEA and its enforcing regulations, which require LEAs to utilize a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child," such that "the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  *See* 34 CR 300.304.

199.    From seventh to tenth grade, the parent continued to press for a more complete

evaluation that would comply with the requirements of the IDEA. Unsatisfied with FCPS' repeated failures, the parent requested independent evaluations. In tenth grade and eleventh grade, the child was independently evaluated, and speech language deficiencies and visual processing issues were identified. FCPS had successfully avoided and delayed a complete evaluation of this child for nearly the entire period of this child's primary education.

200.    And this child is not alone. As the gatekeeper of special education services, FCPS routinely denies and delays initial evaluations and reevaluations, essentially waiting out the children because eventually, they age out of eligibility for services. FCPS uses a variety of excuses to justify the delay or outright denial of an initial evaluations. In another case, FCPS refused to conduct an initial evaluation of a child suspected to have autism, ADHD, and dyslexia. FCPS claimed the child was performing on grade level obviating the need for an evaluation. To provide additional support for their assessment, one of the child's teachers presented an example of the child's writing work that could not have been completed without extensive coaching. This was done to justify the denial of the parents' evaluation requests.

201.    These are just a few examples of FCPS' ongoing practice of delaying and denying the complete evaluations to which disabled students are entitled under the IDEA.

**B.    VDOE Sanctions and Supports Virginia LEAs' Policy and Practice of Refusing IEEs as Required under the IDEA**

202.    VDOE is obligated under the IDEA and related regulations to ensure that FCPS and other LEAs are complying with their obligation to provide an IEE at public expense unless the relevant LEA has initiated a due process hearing. 20 U.S.C. § 1414. VDOE has repeatedly ignored its oversight obligation. More than simply turning a blind eye, VDOE took the position, documented in Virginia Regulations, that school districts do not have to provide an IEE at public expense, unless the school district has previously conducted its own evaluation of the child on the

same specific issue and the parent disagreed with the results.[33]  Under VDOE's application of the IDEA, Virginia school districts could refuse to conduct an evaluation in the first place, in violation of its legal obligation to do so, and then refuse to provide an IEE at public expense, creating an almost absolute barrier to FAPE.

203.    On June 23, 2020, the US DOE's Office of Special Education Programs (OSEP) cited VDOE for its violation of these provisions of the IDEA.  *See* OSEP June 2020 Letter, at 14-17.  The DOE ordered VDOE to change the regulation, comply with the IDEA, and ensure that Virginia LEAs do not limit a parent's right to obtain an IEE at public expense.  In response, VDOE defiantly made a one-word change to the regulation but failed to require the implementation of that change by the LEAs and even failed to notify the LEAs of the change.

204.    In a chart attached to a follow-up letter to VDOE's Superintendent of Public Instruction dated February 8, 2022, the Director of OSEP noted:

> The State had to submit to OSEP a copy of a memorandum that the State has issued to all LEAs, parent advocacy groups, and other interested parties instructing LEAs to comply with 20 U.S.C. 1415(b)(1) and 34 C.F.R. § 300.502(b) by also providing an IEE at public expense in areas where the LEA previously has not conducted its own evaluation, unless the LEA has demonstrated, through a due process hearing decision, that its evaluation is appropriate; and advising that the State will be revising Virginia Administrative Code 8VAC20-81-170(B)(2)(a) and (e), to, at a minimum, remove the word "component" following the word "evaluation"…***The Memorandum submitted did not ensure compliance with the required action because the memorandum only relayed the language of the statute and regulation*** found at 20 U.S.C. §1415(b)(1) and 34 C.F.R. 300.502(b)]".  The memorandum did not mention the specific issue or practice of an LEA not granting IEEs in areas where the LEA had not previously conducted their own evaluations.

---

[33]  *See* Letter Dated June 23, 2020 from, Laurie VanderPloeg, Director, Office of Special Education Programs, to James Lane, then Superintendent of VDOE, *available at* https://www2.ed.gov/fund/data/report/idea/partbdmsrpts/dms-va-b-2020-letter.pdf (last accessed January 19, 2023).

*See* DOE OSEP Findings and Required Actions, at 14.[34]

205.    VDOE's failures to fulfill its oversight obligations under the IDEA has facilitated FCPS' pattern and practice of delaying and denying evaluations and refusing IEEs.

**C.    VDOE Permits Virginia LEAs' Policy and Practice of Manipulating Student Evaluations and Assessments to Avoid Providing Special Education Services**

206.    Virginia LEAs routinely prevent parents and children from receiving the services to which they are entitled under the IDEA by generating and relying upon false records and testimony regarding children's education, services, and academic progress.  For example, FCPS and other Virginia LEAs have a policy and practice of manipulating student academic records, including grade inflation, for the sake of arguing that the child is "making progress" under an existing education program.  These falsehoods prevent parents from detecting when children need to be evaluated for disability services and when schools have failed to properly implement IEPs. This inaccurate information also prevents parents from collaborating with schools to find solutions that have a better chance of providing FAPE to their children.

207.    FCPS routinely inflates the grades of children who have IEPs to further paint a false picture of progress.

208.    In one instance, M.B. was given an 85% score on an English test, even though he had only answered 7 out of 20 questions correctly.  When the Binghams sought clarification of this grade, they were informed that it was FCPS' practice to start grading at 50% and add points for correct answers from that artificially inflated baseline.  In other words, although M.B. only answered 35% of the questions correctly, FCPS pretended as though he had answered an additional

---

[34] *See* "U.S. Dept. of Education Finds Virginia at Fault for Continued Noncompliance", available at https://specialeducationaction.com/u-s-dept-of-education-finds-virginia-at-fault-for-continued-noncompliance/

10 of the questions correctly and gave him a score of 85% on this evaluation.  In another case, M.B. was awarded "A" grades on assignments for which he only completed one out of five necessary slides.  And, on other occasions, he was given "A" grades while teachers were simultaneously documenting that M.B. was not participating or completing his work for much of the school day.

209.    To effectuate its grade inflation practice, FCPS' tactics include false representations in student IEP's, combined with coached-teacher affirmations, that  students are "making progress," when there is no legitimate  support for these statements.  FCPS makes patently false statements to parents in IEPs and in due process hearings.  As discussed *supra*, during D.C.'s due process hearing, FCPS presented false testimony that D.C. could read books and count to 50 when, in reality, he could do neither.  Prior to their testimony in D.C.'s due process hearing, school officials observed D.C. being tested at Grafton, and they witnessed that he could only count to 2 and could not decode words.  Their false testimony was brought into stark relief when school officials, in the years following,  signed off on IEPs for D.C. that have never described – to this day – any such capabilities in math or reading.  Remarkably, nowhere in D.C.'s latest proposed IEP is there any mention at all of D.C.'s reading and math skill levels; nor are there any stated goals for D.C. to pursue with respect to reading or basic math skills.  FCPS has completely abandoned any attempt to teach D.C. how to read, write, or county even though D.C. has another two years to attend Grafton for his education.  FCPS' testimony regarding D.C.'s "progress" at his due process hearing was unequivocally false.

210.    Virginia LEAs' policies and  practices of exaggerating the progress made by children with IEPs enable them to falsely claim they are meeting a child's IEP goals, when often, the child has not actually been making the progress the school touts.  Were the child's progress (or

lack thereof) accurately described, the school could be required to provide additional services, potentially at greater cost, in order to comply with the IDEA.

211.   The obvious effects of these insidious practices is evidenced by the experiences of a Prince William County eligible child who was routinely fed correct answers on classroom assessments by teachers and special education aids.  Though the special needs child received an "A" in the IEP-assigned sixth grade math class, the child was unable to independently complete second-grade math problems.

212.   FCPS is not the only Virginia LEA that employs grade inflation and similar tactics to make it appear as though children are making progress, when in reality they are not.  As one example, Prince William County teachers and aids have repeatedly steered a disabled child towards the correct answers on tests, which has resulted in that child receiving artificially high grades.   Consequently, this child received an "A" in their Sixth-Grade math class while simultaneously requiring assistance to complete math problems at a Second-Grade level.

213.   FCPS and other LEAs' pattern and practice of exaggerating the progress made by children with IEPs enables FCPS to falsely claim that it is meeting IEP goals, when in reality, it is falling well short of its obligations under the IDEA.

214.   FCPS also systematically fails to disclose challenges faced by eligible students in a school setting.   Because of the errors, omissions, and falsehoods included in children's evaluations, parents do not have a real "opportunity to inspect and review all education records with respect to — (1) The identification, evaluation, and educational placement of the child; and (2) The provision of FAPE to the child," as required by the IDEA and its enforcing regulations. 34 C.F.R. § 300.501.

215.   M.B. is one of the children impacted by FCPS and VDOE's failures to create and

maintain accurate records of his progress.  As M.B.'s parents eventually learned, M.B.'s teachers failed to grade or even administer some of his assignments.  And, they inflated his performance on several occasions.  During a 2022 due process hearing, they also learned that M.B.'s special education teacher had no certification nor training as a behavior specialist, a critical requirement to assess and support M.B.'s need.  And, at times, she was forced to attempt to collect behavioral data for M.B.'s Functional Behavioral Assessments while simultaneously instructing M.B.'s multi-disability classroom.  FCPS thus put M.B. in a situation where it could not, and did not, gather the data necessary to identify, assess, and respond to his behavioral needs.

216.    At a January 31, 2020 IEP meeting, the FCPS team recognized that M.B.'s teachers had failed to accurately record his progress.  Notes from that meeting reflect that FCPS recommended "going back and look at the previous level tests, *score ungraded tests*, and re-teach until masters," as well as "additional coaching sessions for staff implementing this program."  Nevertheless, inaccurate reports regarding M.B.'s progress would be repeated in subsequent IEPs.

217.    These are just a few examples of FCPS employees misrepresenting, falsifying and concealing information related to disabled children within their schools.  This practice is widespread at FCPS and other Virginia LEAs.

218.    On information and belief, Virginia LEA employees are also trained to not create records or disclose information regarding LEAs' failures to comply with the IDEA.  Among other things, LEA employees are advised to instruct teachers and other employees not to create written records of concerns that the IDEA requirements are not being met.

219.    For example, in one such training document, a lawyer for Reed Smith (who was outside counsel for several Virginia LEAs at the time) instructed trainees not to failures to provide

FAPE and failures to implement IEPs in writing.[35]  This training indicated in quotes what "not-to-say" in special education meetings and then gave instructions for how to handle these situations, including by not documenting these issues in writing:

    a.    **Dear Special Education Director: I have just learned that the student's IEP has not been implemented for the past six months. What do I do? Frustrated Teacher."** "This type of statement is not a good one to put in writing.  It is a good statement to address orally with the administration and to discuss strategies for the provision of compensatory education services."

    b.    **"Dear Special Education Director: I do not believe that this student is making progress and am writing this e-mail to document my concerns. Sincerely, Puzzled Teacher."** . . . "Do not document in writing the failure to provide FAPE."

As demonstrated above, Virginia LEAs' counsel have established written training in which they instruct LEA employees to avoid documenting information which would show that the LEA is not meeting its obligations under the IDEA"[36]

    220.    FCPS' and other LEAs' policy of exaggerating children's progress, including

---

[35] *See* Mehfoud, Kathleen, "Things Not to Say at Special Education Meetings," (Last Accessed January 7, 2023), *available at*, https://wyominginstructionalnetwork.com/wp-content/uploads/2018/05/Things-Not-to-Say-in-Special-Education-Meetings.pdf.  Mehfoud drafted this document as an attorney at Reed Smith, who at the time was outside counsel for numerous Virginia LEAs.  On information and belief, Virginia school officials received this document as part of IDEA trainings.  A similar training prepared by Mehfoud, while at Reed Smith, called "More Things not to Say in Special Education Meetings" was presented to the Virginia School Board Association.  *See* "More Things not to Say in Special Education Meetings", *available at* https://kipdf.com/updated-more-things-not-to-say-in-special-education-meetings_5aca6d611723dd38f4c9617e.html (Last Accessed January 16, 2023).

[36] *See id.*

through grade inflation, makes it all the more difficult to identify and rectify their violations of the IDEA and the Constitution of the United States. These practices skew the administrative record at any due process hearing and on appeal from any adverse hearing officer decision. Defendants' manipulation of children's academic and behavioral records violates the IDEA and adds to the futility of raising a challenge to FCPS' and other LEAs' conduct through a due process hearing.

221.    VDOE itself goes to great lengths to hide relevant information and records related to Due Process hearings and other administrative procedures. Among other things, they have obstructed parents and advocates efforts to access documents and information concerning disabled children both by unduly burdensome FOIA procedures and otherwise.[37]

222.    This pattern and practice of manipulating student records and barring access to the same thus hinders families' efforts to challenge Defendants' conduct by making it impossible to discover that their rights have been violated until well after the fact, if ever.

**D.    VDOE's Student Evaluation Policies Violate the IDEA**

223.    VDOE's failure to comply with the IDEA is not limited to the rigged due process hearing officer system. Rather, VDOE is both itself depriving children and families of services to which they are entitled under the IDEA, and failing to prevent LEAs from across the Commonwealth of Virginia from depriving children and families of federally-mandated services as well.

224.    Despite the clear mandate under the IDEA that a "[s]tate educational agency, other State agency, or local educational agency *shall* conduct a full and individual initial evaluation," to determine if "a child is a child with a disability," 20 U.S.C. § 1414(a), VDOE has implemented an

---

[37] FOIA issues are discussed in greater detail *infra* at the section titled "VDOE has Failed to Require LEAs to Provide Parents with Records to Which They are Entitled under the IDEA."

express policy and procedure that frustrates the very purpose of the IDEA to ensure FAPE by

placing illegitimate eligibility requirements on the right to receive an initial evaluation. Under

VDOE policy, eligibility for an initial evaluation, which is a non-discretionary right under the

IDEA, must first be authorized through VDOE's "special education process," which requires a

"referral for evaluation"[38] before an initial evaluation will be conducted. In Virginia, a request for

evaluation can come from any source or individual, including a parent; however, the special

education process reflects the path illustrated in Figure 2:



225.    However, nothing in the IDEA contemplates the committee process that must

precede an initial evaluation in Virginia. Once the initial evaluation request is made, it is either

referred to another special education committee for consideration, approved, or rejected with

---

[38] *See* Supplemental Guidance for Evaluation and Eligibility *available at*, www.doe.virginia.gov/programs-services/special-education/evaluation-and-eligibility (last accessed January 7, 2023).

notice sent to the parents. VDOE does not have the legal right to put in place a gatekeeping policy and practice that denies an initial evaluation under the IDEA, and this policy is inadequate to meet VDOE's statutory obligation to ensure that students with disability-related behaviors receive a free appropriate public education.

226.   Independently, VDOE's systematic failure to comply with the IDEA's non-discretionary requirement to conduct initial evaluations is detrimental to the provision of FAPE, and in combination with its failure to require Virginia LEAs to approve independent education evaluations ("IEEs") pursuant to 34 C.F.R. § 300.502, VDOE's systematic failures preclude Virginia children from accessing the special education they so desperately need.

227.   Parents have the right to an IEE at public expense unless the public education agency files a due process complaint to show an IEE is not necessary. *See* 34 C.F.R. § 300.502. Very few Virginia LEAs file their own due process complaints, which would require them to carry an affirmative burden of proof in the process, so parents should regularly be afforded the right to an IEE. VDOE's application of IEE regulations is, however, inconsistent with federal law because it restricts parents' rights to an IEE at public expense to those choice areas in an initial evaluation or reevaluation in which the education agency had previously evaluated the child.

228.   So, for example, when a Virginia LEA fails or refuses to do a comprehensive initial evaluation in a manner that addresses multiple suspected disabilities, and instead, decides to conduct only a partial evaluation, Virginia parents are denied their right to an IEE because the Virginia LEA failed in the first place to conduct the complete evaluation. The Virginia LEA system of blocking access to an IEE, which is an important procedural safeguard for disabled children and their parents, while simultaneously controlling access to initial evaluations, frustrates the IDEA's fundamental mandate to "ensure that children with disabilities residing in [Virginia]

… and who are in need of special education and related services, are identified, located, and evaluated." 34 C.F.R. § 300.111.  Without proper identification and evaluation, Virginia special needs children are completely cut off from FAPE.

### VIII. VDOE Systematically Fails to Carry Out its Obligation to Oversee Virginia LEA Compliance with the IDEA

**A.    VDOE is Required to Ensure Compliance with the IDEA**

229.    As the state education agency for the Commonwealth of Virginia, VDOE is obligated to ensure that the Virginia LEAs comply with the requirements of the IDEA.  *See* 20 U.S.C. § 1416(f).  For years, VDOE has failed to effectively monitor the LEAs to ensure Virginia educators are making FAPE available to all eligible students pursuant to the IDEA.

230.    VDOE uses three components to evaluate LEA compliance with the IDEA:

a.    On-site "comprehensive" reviews:  VDOE conducts a risk assessment to select local educational agencies (LEAs) for on-site visits.

b.    Desk Audits: Desk audits are conducted of all LEAs annually to collect SPP/APR compliance indicator data.

c.    Dispute Resolution: State complaints, mediation, and due process hearings are used to address allegations of noncompliance.

231.    These oversight tools are woefully insufficient to ensure that Virginia LEAs comply with the IDEA.  For example, VDOE has reported that it only conducts on-site monitoring of 4 to 6 of its 132 LEAs annually.  This means that VDOE, which is required to maintain continuous oversight to ensure that the various LEAs comply with the IDEA, *is in fact doing an on-site comprehensive review of each school district, on average, once every 22 to 33 years.*  Moreover, VDOE effectively relies on LEAs' own self-reporting and self-evaluation to perform the "risk

assessment" to determine which LEAs require an on-site visit.[39]  VDOE's dispute resolution monitoring method is patently inadequate as well, as demonstrated by Virginia LEAs' systematic noncompliance with the procedural safeguards required by section 1415 of the IDEA.

**B.    VDOE's Faulty Oversight Enables FCPS and other Virginia LEAs to Regularly Ignore Their IDEA Obligations**

232.    VDOE's faulty compliance mechanisms have been broadly criticized by parents, advocates, and, most notably, by USDOE, as woefully inadequate to ensure that LEAs' comply with the IDEA.  In a June 2020 letter and enclosed Differentiated Monitoring and Support Report, USDOE stated that it "had received communications from numerous parents and advocates alleging that the Virginia Department of Education (VDOE) was not fulfilling its general supervisory responsibilities under IDEA Part B."[40]  During the resulting investigation, USDOE confirmed parents' accounts that "VDOE does not have procedures in place, outside of formal dispute resolution procedures, to identify whether noncompliance has occurred, even in situations where it appears that the State was provided with credible information about potential noncompliance . . . ."[41]  Moreover, USDOE noted:  "*[G]iven that the State does not appear to have any other mechanism for including, in its monitoring system, the ability to consider and address credible allegations of LEA noncompliance, the State is not reasonably exercising its*

---

[39]VDOE's characterization of its LEA oversight and compliance process as "risk assessment" underscores that it is designed to fail.  The purpose of the oversight requirement is to ensure that Virginia special needs children are afforded their legally protected and humane right to FAPE, not to gauge the risk of VDOE and its LEAs being sued.

[40] Letter Dated June 23, 2020 from, Laurie VanderPloeg, Director, Office of Special Education Programs, to James Lane, then Superintendent of VDOE, *available at* https://www2.ed.gov/fund/data/report/idea/partbdmsrpts/dms-va-b-2020-letter.pdf (last accessed January 19, 2023).

[41] *Id.*(emphasis added)

*general supervisory and monitoring responsibilities to ensure LEA compliance consistent with the requirements in IDEA*."[42]  Notwithstanding USDOE's admonition to VDOE that it must "revise its general supervision and monitoring system to include procedures and practices that are reasonably designed, as appropriate, to consider and address credible allegations of LEA noncompliance in a timely manner,"[43] VDOE's compliance monitoring system remains deficient.

233.    VDOE's pervasive lack of oversight has real world consequences for Named Plaintiffs and the classes they seek to represent.

234.    As explained in the proceeding sections, LEAs across the Commonwealth of Virginia take advantage of VDOE's negligible oversight to violate the rights of children with disabilities and their families under the IDEA.  VDOE has failed to correct systemic, policy-driven violations of the IDEA in Virginia schools.

1.    <u>**VDOE Fails to Ensure that FCPS and Other LEAs Provide Families Complete and Accurate Student Records**</u>

235.    The IDEA requires disclosure of student records upon parental request: "Each participating agency must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part."  *See* 34 C.F.R. § 300.613; *see also* 20 U.S.C. §1415(b).

236.    LEAs in the Commonwealth of Virginia do not comply with this most fundamental obligation, and VDOE does nothing to deter or rectify the noncompliance.

237.    As a standard means of addressing parents' record requests, some LEAs have gone so far as to adopt a policy of complete refusal followed by an instruction to use the Virginia FOIA

---

[42] *Id.*

[43] *Id.*

process to access their child's education records.

238.    Rather than admonish LEAs for refusing to provide parents with access to their students' records, VDOE has abetted this practice by making efforts to seek records under Virginia's FOIA as exhausting, expensive, and fruitless as possible.

### Virginia's FOIA

239.    The Virginia FOIA provides access to *government* information from the public record.  Pursuant to a FOIA request, agencies like VDOE are required to disclose information relevant to their functions,  formal or informal procedures, and their rules of procedure.  5 U.S.C. § 552(a); *see also* Virginia Code §2.2-3704.  FOIA requests are governed by detailed administrative rules and procedures.  Individual student records are not typically (or legally) required to be accessed through a FOIA record request.

### VDOE Makes a Burdensome FOIA Process Worse

240.    Under the IDEA parents are entitled to access their child's complete and accurate education records from the child's LEA, but when the LEA fails and refuses to comply with federal law and instead forces parents to go through a FOIA request, VDOE further obstructs parents' efforts to obtain records by making the FOIA process considerably more laborious and difficult than is warranted.  VDOE drastically impedes the FOIA process by delaying responses, claiming (falsely) a lack of responsive information, demanding large payment deposits before collecting and producing documents, charging cost-prohibitive amounts to produce even partial records, withholding relevant information on bogus privilege grounds, and misrepresenting their legal obligations to provide information.

241.    In response to a 2022 FOIA request regarding Virginia IEPs and hearing officers, VDOE demanded the requestor pay $25,000 for production of the requested materials, and before

VDOE would begin to search and gather any responsive documents, it demanded a $12,500 deposit.  Ultimately VDOE  returned the $12,500 deposit check to the requester because the actual cost for the FOIA production was $2,000, less than 1/10th of the initial charge  Similarly, in response to a FOIA request for VDOE reports on due process hearings and other information relating to the IEP and hearing officer process, VDOE demanded $43,000.  VDOE insisted on a $21,000 deposit before it would even begin to collect the documents.

242.    In another round of FOIA requests concerning the hiring and training of hearing officers, VDOE responded that it could not produce such documents because VDOE does not hire or employ hearing officers.  VDOE is responsible for determining hearing officers' qualifications, certifying them, recertifying them each year, and training them.  *See* 8VAC20-81-210. [44]

243.    After one due process hearing, a FOIA request was made for all notes from before and during the hearing, but VDOE denied any such materials existed, although the requested notes were witnessed, in public, during a due process hearing.

244.    Even when material is produced by VDOE or LEAs, it is often provided in an illegible document format or heavily, and inexplicably, redacted to the point of non-disclosure. An example of such improper redaction by an LEA is excerpted below:

---

[44] .VDOE's Annual Report of the Dispute Resolution Systems and Administrative Services specifically addresses, among other things, VDOE's training of hearing officers, recertification of hearing officers, and officer performance.



Please be aware that email correspondence is subject to the Virginia Freedom of Information Act (FOIA) and may be made public if someone requests it – even if you have asked that your message be kept confidential. If you have received this email in error, please notify the sender immediately and delete the email. The receipt by any unauthorized person does not constitute a waiver of any applicable protections.



***By Making FOIA Requests Overly Burdensome, VDOE Helps its LEAs Conceal Records***

245.    LEAs' efforts to route parents' requests for their child's education records through an unduly burdensome FOIA process not only amounts to a violation of the IDEA, it enables VDOE to assist LEAs in their efforts to conceal the complete and accurate education records of special needs children while covering up VDOE's other failures to comply with the IDEA.

**2.    VDOE Fails to Require FCPS and other LEAs to Develop and Amend IEPs in Accordance with the IDEA**

246.    As part of its obligations under the IDEA, the Commonwealth of Virginia is also required to ensure that LEAs carry out their duties with respect to the development and amendment of IEPs. *See, e.g.,* 20 U.S.C. § 1412(a)(4).  In Virginia, that oversight responsibility rests with VDOE.  More specifically, VDOE is required to "ensure that each local school division develops

an IEP for each child with a disability served by that local school division. . . .” VAC20-81-20(2). VDOE has failed in its oversight.

247.    LEAs are required to “have in effect, for each child with a disability within its jurisdiction, an IEP” at the beginning of the school year.  34 C.F.R. § 300.323(a); *see also* 20 U.S.C. § 1414(2)(A).  They are likewise responsible for assembling an IEP team for each child with a disability that must include the child’s parents, one or more of the child’s educators, and a qualified and knowledgeable representative of the school district. *See* 34 C.F.R. § 300.321(a).  In some circumstances, the team may also include additional individuals who can interpret the instructional implications of evaluation results and other individuals “who have knowledge and special expertise regarding the child.” *Id.*

248.    Each student’s IEP team is tasked with developing the child’s IEP based on considerations of:

“a. The strengths of the child;

b. The concerns of the parent for enhancing the education of their child;

c. The results of the initial or most recent evaluation of the child; and

d. The academic, developmental, and functional needs of the child.”

34 C.F.R. § 300.324(a).  In addition, LEAs must ensure that the IEP team reviews the child’s IEP periodically, but not less than annually, to determine whether the annual goals are being achieved and to revise its provisions, as appropriate.”  *See* 34 C.F.R. § 300.324(b).  In addition, “[e]ach public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate.”  34 C.F.R. § 300.322.  A collaborative IEP process among parents, educators, and other informed stakeholders is set out in the IDEA.

### *IEPs are Improperly Treated as Adversarial*

249.    In practice, IEPs often are not the product of a consensus-driven deliberative process among the members of a child's IEP Team, but, instead, school administrators often drive the IEP process towards their predetermined outcome that results in the denial of services the child needs in order to benefit from FAPE.

250.    As a matter of general policy, school personnel are instructed to treat the IEP process as an adversarial dispute.  Before parents can raise any substantive objection to their child's education program, the LEAs hire teams of lawyers to draft the child's IEP, coach teachers and other educators how and when to speak, and how to behave during IEP Team meetings to avoid divulging information the LEAs would consider too risky or adverse to their own interests.

### *FCPS' Mistreatment of M.B and his Parents*

251.    On August 21, 2018, M.B.'s parents met with FCPS to establish a new IEP.  M.B.'s parents requested that the IEP team consider placement at a specific FCPS special education program called a Comprehensive Service Site ("CSS"), which is located at the Armstrong School.  At the time, this would have been the most an appropriate placement for M.B.  But during the IEP Team meeting, the LEA-based team inexplicably would not consider CSS placement for M.B.

252.    When M.B.'s parents toured the CSS site at Armstrong, a school administrator reiterated that M.B. would not be placed at the CSS.  Unlike the IEP Team members, the administrator was upfront about the reason why:  there were already several children in M.B.'s grade at CSS, and the administrator did not want M.B.'s placement there to affect the development of the other children.  The preferred IEP placement for M.B. did not have capacity, but the LEA would not be honest about the circumstances or make appropriate accommodations for M.B. in CSS.  Instead, FCPS determined the appropriate IEP was to keep M.B. in his then-current school

where he did not enjoy the benefits of FAPE.

253.    M.B.'s parents continued to request modification of his IEP so that he could be placed at a CSS location in Spring and Fall of 2019.  Despite mounting evidence of M.B.'s worsening academic and behavioral challenges, FCPS denied that IEP modification.

254.    During the IEP team meeting on May 26, 2020, M.B.'s parents requested that FCPS consider a private or multi-agency placement outside of FCPS where M.B. would have access to much needed services beyond what his current school or CSS provided and a small group setting that could address his behavioral and academic needs.  FCPS rejected their request.  Instead, it recommended that M.B. be placed in a CSS setting, despite having rejected his parents' earlier request for such a placement.  FCPS did not consider M.B.'s individual academic and behavioral needs in making this decision.  Rather, it simply did "not believe that all options had been exhausted in FCPS."

255.    Following FCPS' multiple refusals to properly place M.B. in a setting where he would receive FAPE, his parents opted for private placement placed him at the Phillips School.

256.    On November 4, 2021, the FCPS IEP team again met to consider M.B.'s placement. Ignoring M.B.'s most recent assessments from the Phillips School, including M.B.'s demonstrable and recorded progress in that setting, FCPS arbitrarily concluded the Phillips School was not necessary.  Rather, the FCPS IEP team continued to recommend placement at the Burke CSS – despite the fact that FCPS had long resisted a CSS placement.  Again, this decision was not based on an individualized assessment of M.B.'s needs, but because the school was public, the least expensive, and available..

257.    In other words, from 2018 to 2021 FCPS, resisted providing M.B. with the services and academic setting which he required for FAPE, and only relented in offering additional services

when those services were no longer adequate to meet his needs. This pattern and practice of denial and delay typifies Defendants' system for depriving children and families of their rights under the IDEA. LEAs' failures to properly develop IEPs, and VDOE's failure to provide the oversight necessary to prevent such failures.

*FCPS' Mistreatment of D.C. and His Parents*

258.   In 2020, FCPS convened an IEP meeting to discuss the Chaplicks' request to modify D.C.'s IEP. FCPS' then-Acting Coordinator for Due Process and Eligibility for all Fairfax County Schools, Adam Cahuantzi, chaired the sessions. After no more than an hour and a half of discussing D.C.'s placement, Mr. Cahuantzi announced the end of consideration and FCPS' recommendation to continue day-placement, only, at Grafton – peremptorily refusing the parents' request for a residential placement. FCPS' abrupt end to the IEP modification meeting, stone-wall refusal to engage with D.C.'s parents, and disinterest in giving due consideration to the requested placement, in light of D.C.'s well-documented needs, did not comply with the IDEA. Despite its awareness of D.C.'s painful predicament and FCPS' refusal to engage, VDOE would do nothing to enforce FCPS' obligation to provide a fair and appropriate IEP.

259.   LEAs are required to follow a prescribed process when revising a child's IEP outside of an IEP team meeting: "In making changes to a child's IEP after the annual IEP team meeting for the school year, the parent and the local educational agency may agree not to convene an IEP team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP." *See* 20 U.S.C. § 1414(d)(3)(D).

260.   Nevertheless, FCPS unilaterally imposes changes to children's IEPs without holding an ordinary IEP meeting or obtaining parental consent. For example, on April 9, 2021, the Fairfax County Community Services Board ("CSB") notified D.C.'s parents that D.C. was

eligible to be awarded DD Waiver funds to provide certain residential services but did not include coverage of D.C.'s residential costs.  Over the next six months, the family took the requisite actions to qualify D.C. for DD Waiver, including identifying and reaching out to ResCare, a provider of adult group homes.

261.    ResCare had an opening in an adult group home in Winchester.  This Winchester group home would (i) allow D.C. to continue attending Grafton for his education if he had an appropriate service to take him to and from his home to school, and (ii) provide the same level of care and support on a 24-hour basis that Grafton had been providing D.C.

262.    On August 4, 2021, after fighting the parents so hard for over eight years on their residential placement request for D.C., FCPS agreed that D.C. required a residential placement and placed him at Grafton, the school where he had been residing and receiving his education for the last seven years.  Relying on FCPS' decision that D.C. would be entitled to a residential placement to cover his residential costs, because the DD Waiver program did not cover D.C.'s room and board costs at the ResCare group home, D.C.'s parents made arrangements to move D.C.

263.    On September 16, 2021, the parents notified FCPS that D.C. would be moving on October 7, 2021, to his new group home that would be partially funded by the DD Waiver.  D.C.'s parents asked FCPS if another IEP meeting was necessary to formalize the change in location.  Despite the impending move date, FCPS did not respond.  On September 29, D.C.'s parents' counsel again raised this question with FCPS, asking where things stood and if they needed to meet again to address the change in location.

264.    FCPS did not respond until nearly three weeks after D.C.'s parents' original inquiry.  At 7:56 pm on Tuesday evening October 5, 2021, without notice or meaningful explanation and less than 48 hours before the move was scheduled to occur, FCPS sent an email

to the family informing the parents that D.C.'s placement was being changed without his parents' consent from a residential to a day program. FCPS stated, in a letter attached to the October 5 email:

265.    On September 7, 2021, the IEP team was informed that D.C.'s parents are in process of transitioning D.C. to an adult group home through his Community Living Waiver, with a tentative move-in of October 7, 2021. Once D.C. moves into this group home, FCPS will no longer be able to implement the IEP as agreed-upon and D.C. will access Grafton as a day school student. The group home, ResCare, is not associated with Grafton's residential program."

266.    FCPS did not respond to D.C's parents' or their counsel's inquiry about whether a new IEP was necessary to effectuate the move. FCPS instead simply decided that a location change was unnecessary for D.C. Although FCPS did not respond to the Chaplick's inquiry in that letter, FCPS sent another email later that day, refusing to hold an IEP meeting to address this issue and stating, "[a]n IEP meeting is not necessary at this time."

267.    D.C.'s parents through counsel immediately objected to FCPS' refusal to approve D.C.'s change in location. In a letter dated October 12, 2021, addressed to outside counsel for FCPS, the parents stated that such unilateral action taken by FCPS was in violation of D.C.'s current IEP and a violation of the IDEA and D.C.'s federal rights.

268.    In response to FCPS' false assertion that D.C.'s residential placement was being paid for by the DD Waiver, the family countered in a separate email that (i) the DD Waiver was only paying for certain services and was not paying for D.C.'s residential costs, and (ii) nothing had changed in D.C.'s circumstances other than moving from the Grafton group home to an adult group home managed by ResCare, with both locations in Winchester so that D.C. could continue attending Grafton for his education.

269.    D.C.'s family moved him into the ResCare group home because they believed the move was in his best long-term interest.  To date, FCPS has not responded substantively to the October 12, 2021 letter from the family's attorneys, and FCPS has provided no explanation for its refusal to hold an IEP meeting before unilaterally changing D.C.'s IEP from a residential to day placement.  Likewise, VDOE has failed to provide any assistance and continues to fail in the necessary oversight to ensure LEAs like FCPS are properly developing IEPs through the IEP meeting process.  Cf. 34 C.F.R. § 300.600.

### 3.    VDOE Fails to Prevent FCPS' and other LEAs' Pattern and Practice of Making Misrepresentations During the IDEA Process

270.    LEA lawyers and administrators also train and instruct LEA employees to give parents a false impression of how their children's IEPs are developed.  On information and belief, Virginia teachers and school officials are routinely coached on "things not to say at special education meetings." [45]

271.    For example, IEP team members are coached to conceal the fact that LEA administrators have ongoing involvement in decisions to deny private school placements, while simultaneously disavowing any decision-making authority about private school placement.  LEA employees are instructed not to say:  "We cannot make a decision about a private school placement unless someone from central office is present."[46]  IEP team members are trained to instead deflect and delay by saying:  "The IEP team has the authority to make the placement decision but before

---

[45] According to one school district's board minutes, a presentation titled "More Things Not to Say at Special Education Meetings" was presented at the 2013 Virginia School Board Association School Law Conference.  A powerpoint version of a presentation of the same name, authored by School Law attorney Kathleen Mehfoud of Reed Smith (counsel to several Virginia school districts), was located at https://kipdf.com/updated-more-things-not-to-say-in-special-education-meetings_5aca6d611723dd38f4c9617e.html (Last Accessed January 16, 2023).

[46] *See id.*

we decide whether a private school placement is needed, we would like to obtain more information about the private program.  Let's schedule a follow up IEP meeting."[47]

272.    LEA employees have also been instructed to conceal their lack of qualifications necessary to develop and implement IEPs.  LEA lawyers advise employees not to expressly acknowledge that they "don't have the necessary training" or "have not worked with this type of condition before."[48]  Rather, LEA lawyers have scripted a party line for Virginia educators, suggesting that they tell parents that they are "qualified to work with your child and am continually receiving additional training."[49]

273.    The concealment and coaching from LEA lawyers and administrators is designed to minimize liability risk for Virginia LEAs (and VDOE) and maximize uncertainty and clarity for parents.  They instruct LEA employees *not* to tell parents when the schools are failing to  provide appropriate services, and they coach educators to minimize the roles of administrators, when in reality, LEA administrators are the ones driving the process.  LEA lawyers explicitly advise LEA employees not to document incidents that expose a failure to provide an eligible child with FAPE – particularly via email communications.  LEA lawyers suggest that such acts or omissions should be relayed, if at all, only in an oral communication with school administrators.[50]

274.    Another document prepared by LEA lawyers and presented to LEA employees explains: "Often the administrator will say 'no' [to requested special education services] in order

---

[47] *See id.*

[48] *See id.*

[49] *See id*.

[50] *See id.*

to end up with an appropriate IEP and protect the school division."[51]   Protection of "school divisions" is not within the mission of the IDEA, and this "explanation" from Virginia LEAs acknowledges that their goal is to avoid providing services where possible.

275.    Further reflecting the Virginia education system's self-protection mission, LEA lawyers and administrators also coach employees on when and how to reject requests for special education services.  In a document titled "How To Say 'No' the Legal Way,"[52] Virginia educators are supplied scripted phrases to use during IEP team meetings to give false impressions of concern and compliance, such as: "The request will infringe in an improper way on the day-to-day decision making of the teacher or in the administration of the school," and "There are professional concerns about the request and granting the request is against your better judgment."[53]   In reality, there is no "legal way" to deny an eligible child services that are needed to provide FAPE, but VDOE turns a blind eye while its LEAs try to get away with doing just that.

### 4.    VDOE's Use of IEP "Facilitators" Enables, Rather than Prevents, LEAs' Violations of the IDEA

276.    VDOE has failed to provide the necessary oversight to ensure that LEAs like FCPS are properly developing IEPs through the IEP meeting process.  *Cf.* 34 C.F.R. § 300.600.  In at least some respects, VDOE has facilitated LEAs' efforts to cut children and parents out of the collaborative IEP development process envisioned by the IDEA.

277.    VDOE has established a system of IEP Facilitators who are available to "assist

---

[51] Mehfoud, Kathleen, "How to say 'no' the legal way," (Last Accessed January 7, 2023), *available at*,   https://wyominginstructionalnetwork.com/wp-content/uploads/2018/05/Saying-_No_-in-a-Legal-Manner-by-Mehfoud.pdf.   On information and belief, Virginia educators received this document as part of IDEA trainings.

[52] *See id.*

[53] *See id.*

keeping the IEP meeting on track with regard to content and progress." [54]  According to VDOE, these facilitators are supposed to be "substantively neutral, impartial" and  serve as "[a]n advocate for the IEP process."[55]

278.    However, VDOE IEP Facilitators have instead demonstrated bias in favor of LEAs and against parents seeking services.  On information and belief, in some instances, IEP Facilitators have pressured parents to accept IEPs that do not provide FAPE.  IEP Facilitators has also held *ex parte* communications with LEA employees about specific IEP recommendations.

279.    VDOE's use of IEP Facilitators does not fulfill its oversight obligation or otherwise ensure IEP-process compliance. Instead, it is another means by which the IEP development process is used to curtail the provision of services required by the IDEA.

5.    **VDOE Fails to Ensure that FCPS and other LEAs Provide Children with the Services to Which They Are Entitled under the IDEA**

280.    Once an IEP has been developed, FCPS and other LEAs continue to resist providing services to eligible children by failing to properly implement that IEP.  VDOE fails to provide the necessary oversight to prevent these failures, and indeed facilitates them by depriving parents viable avenues of relief through adequate due process hearings.  This glaring failure to enforce Virginia LEA implementation of student IEPs was highlighted, though not begun, during the Pandemic.

281.    On March 13, 2020, FCPS schools closed due to the COVID-19 pandemic.  M.B.'s IEP team met and developed a temporary learning plan (TLP) for the remainder of the school year. M.B.'s TLP addressed only four goals in distance learning (out of fifteen goals on his IEP), and

---

[54]  Facilitated IEPS," *available at* https://www.doe.virginia.gov/programs-services/special-education/resolving-disputes/facilitated-ieps (last accessed January 7, 2023).

[55] *Id.*

otherwise reduced M.B.'s services for math and language arts to 120 minutes per day, which could include anything from telephone contact, emails, pre-recorded videos, and videoconferencing sessions.  The TLP was woefully inadequate to provide M.B. with FAPE.

282.    M.B. by no means is the only child impacted by FCPS' failures during the COVID-19 Pandemic.  On November 30, 2022, the U.S. Department of Education's Office for Civil Rights announced resolution of an investigation into FCPS' provision of services to children with disabilities during the COVID-19 Pandemic.[56]  It found that FCPS "failed to provide thousands of students with services identified in the students' Individualized Education Programs (IEPs) and 504 plans during remote learning."[57]

283.    OCR's findings hauntingly parallel many of the allegations in this Complaint, including:

    a.    That FCPS ignored existing IEPs in favor of newly developed "Temporary Learning Plans" in the form of one-page letters to parents that FCPS conceded to OCR would not contain the same level of services and accommodations as such students' IEPs and would not meet their educational needs;

    b.    "Categorical reduc[tion] and/or limited . . .  services and special education that students were entitled to receive through their IEPs" based on considerations other than the students' individual educational needs (e.g.

---

[56] "U.S. Department of Education's Office for Civil Rights Announces Resolution of Investigation into Fairfax County Public Schools in Virginia, Related to the Needs of Students with Disabilities During the COVID-19 Pandemic," November 30, 2022, *available a*t https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-resolution-investigation-fairfax-county-public-schools-virginia-related-needs-students-disabilities-during-covid-19-pandemic (last accessed January 8, 2023).

[57] *Id.*

"FAPE *in light of the circumstances*" in the context of remote learning and the pandemic).

c.     That FCPS lowered thresholds for testing performance against standards agreed to in students' IEPs, and not only concealed such actions, but misinformed the public that "it did not expect the materials covered that year to change."[58]

d.     Failure to develop and implement a plan adequate to remedy the instances in which students with disabilities were not provided FAPE during remote learning, and failure to track such violations so necessary compensatory services could be delivered in the future.[59]

e.     That FCPS inaccurately informed staff that the school division was not required to provide compensatory education to students with disabilities who did not receive FAPE during the COVID-19 pandemic because the school division was "not at fault."[60]

---

[58] *Id.  See also* Hannah Nathanson, *What you need to know about Fairfax public schools this year*, Wash. Post (August 30, 2020), *available at* https://washingtonpost.com/education/2020/30/fairfax-public-schools-faq/ (asked in August 2020 whether "the school system curriculum changed as a result of the pandemic", a FCPS spokesperson reportedly told the *Washington Post* that "[t]he Standards of Learning set by the Virginia Department of Education [would] remain the foundation of what [was to be] taught in Fairfax classrooms").

[59] *See* Letter dated November 30, 2022, from Emily Frangos, Regional Director of the Office of Civil Rights to Dr. Michelle Reid, the Superintendent of Schools for Fairfax County, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/11215901-a.pdf (last accessed January 18, 2023).

[60] *Id.*  OCR observed that FCPS "administrators were explicitly advising their IEP and Section 504 teams to steer parents away from conversations about compensatory services , and to discuss only "recovery services" instead" that the OCR found inadequate.

      f.      Failure to provide "recovery services" that were significantly less than compensatory services and only provided such reduced services to approximately 1,070 disabled students out of 25,000 disabled students served by FCPS.[61]

284.    FCPS also produced email correspondence to OCR confirming that FCPS administrators were aware that disabled students were not receiving all of the required supports and services required under their IEPs.  These failures had measurable adverse impacts on disabled students.  By its own study published in November 2020, FCPS estimated that the number of disabled students with disabilities learning remotely during the pandemic who failed one or more classes more than doubled during the pandemic.[62]

285.    OCR observed that "by refusing to discuss compensatory services, [FCPS] appears to be **_applying the same erroneous standard_** that it used to deny students FAPE in the first place." (emphasis added).  Notably, the OCR observed that students who made "**_any progress at all_**, no matter how minimal, would apparently **_not_** be eligible for recovery services." (emphasis added).

286.    FCPS' abject failure to comply with the IDEA during the COVID-19 Pandemic is merely a symptom of the broader systemic ills outlined in this Complaint.  FCPS misused erroneous standards and inflated evaluations to deny services to children with disabilities well before schools shut their doors in 2020, and continues to use these same tactics to deny services to children today.  Unfortunately, M.B. is one such child who has been deprived, and remains deprived of his rights under the IDEA.

287.    M.B. received his first IEP in Fall of 2013.  However, from the outset, FCPS failed

---

[61] *Id.*

[62] *Id.*

to properly implement M.B.'s IEP. Among other issues, FCPS did not provide M.B. with movement breaks and other support required under his IEP to manage his ADHD and related disorders.

288. Faced with FCPS' failure to provide M.B. with the support and resources required under his IEP, M.B.'s parents decided to place him at a private school to begin First Grade. M.B.'s parents paid for this placement by themselves without assistance from FCPS.

289. After M.B. re-enrolled in public school in the Fall of 2018, FCPS continued to improperly implement his IEP. Among other things, he was deprived of use of a calculator during math classes that he required to aid him with his dyscalculia.

290. As time went on, FCPS also isolated M.B. from his peers. During Fifth Grade, M.B. was placed in general education classes for all subjects except for reading and math. However, in Sixth Grade, he was placed in a multi-disabilities classroom. M.B. was sequestered in this separate classroom with younger students who had different cognitive and emotional challenges for the majority of his school day.

291. Unsurprisingly, M.B. struggled in the inappropriate public-school placements imposed on him by FCPS. From Fifth Grade through Seventh Grade, he continued to fall further and further behind his grade level in several metrics even as his FCPS IEP team reported that he was making progress.

292. As M.B. fell behind academically, his behavioral challenges worsened as well. And, these behavioral challenges further impacted his ability to learn – compounding M.B.'s academic and emotional struggles. Nevertheless, during an October 15, 2019 Functional Behavior Assessment, and over the disagreement of M.B.'s parents, M.B.'s school-based IEP team determined that the data did not indicate that M.B. required a Behavioral Intervention Plan ("BIP").

293.     When confronted with its failures to properly implement M.B.'s IEP, FCPS did not change course and attempt to offer the services to which he was entitled under the IDEA. Instead, during an April 2020 IEP meeting, an FCPS administrator expressed concern that M.B.'s IEP had too many goals on it given his lack of progress and behavioral struggles. In other words, rather than provide the services or placement necessary to meet M.B.'s educational needs, FCPS sought instead to lower the bar.

294.     It was not until M.B.'s parents saw the writing on the wall and decided unilaterally to place him at the private Phillips School, at their own expense, that M.B. received a proper and properly-implemented IEP that addressed his academic and behavioral needs. Although he now receives an appropriate education, it is neither free, nor public, as guaranteed by the IDEA. The ongoing deprivation of M.B.'s right to FAPE is the direct result of VDOE's ongoing failures to carry out its oversight of LEAs including FCPS.

**6.     VDOE Fails to Prevent FCPS and other LEAs from Bullying Parents and Advocates When They Attempt to Exercise Their Rights under the IDEA**

295.     Within due process hearings and beyond, Virginia LEAs employ outrageously aggressive and retaliatory tactics against parents and advocates in an obvious attempt to bully and silence those seeking to justice for disabled children. VDOE does nothing to try to prevent this type of retribution or punish it.

296.     For example, in September 2021, an advocate filed a FOIA request seeking information about how much money FCPS was spending on its lawyers. Over 1,500 pages of electronic documents were produced as a result of the FOIA request, which the advocate shared with another fellow advocate. After reviewing the documents and carefully redacting confidential information about students and employees, the second advocate published certain of the pages on her website.

297.    In response, FCPS threatened to take legal action if the advocates did not return the properly-requested and properly-disclosed documents and if they continued to share the documents and FCPS-related information disclosed in the documents.  FCPS demanded the advocates disclose any and all recipients of the documents and remove all online postings about the documents.[63]  In short, FCPS demanded the advocates curb their speech about the information exposed through the FOIA request.  The advocates refused to comply with the demands, and in response, FCPS sued them.[64]

298.    The Court delivered a crushing defeat to FCPS, holding that its attempt to prevent the advocates from disseminating the documents and information about FCPS' tactics amounted to an unconstitutional prior restraint of free speech.[65]  Though the Court protected their rights, VDOE failed them.

## C.    VDOE's Systematic Failures Enable and Encourage FCPS and Other LEAs' Concerted and Ongoing Violations of the IDEA

299.    The IDEA was designed so that state agencies, school districts, and parents would work together to ensure that each disabled student receives a free appropriate public education, including any necessary support or accommodations.  Rather than work with parents to provide an appropriate public education, VDOE and FCPS have repeatedly violated, ignored, or fought against, their obligations under the IDEA and related statutes, even in the face of federal enforcement actions.

---

[63] *See* "Update on Fairfax County School Board's Legal Action Against Parents" (December 27, 2021), *available at* https://specialeducationaction.com/update-on-fairfax-county-school-boards-legal-action-against-parents/ (last accessed January 20, 2023).

[64]  *See id.*

[65] *See id.*

300.    As noted above, from June 23, 2020 through the present USDOE has repeatedly informed VDOE that its policies and procedure do not comply with the IDEA in several respects. Nevertheless, according to USDOE's September 1, 2022 follow-on letter to Superintendent Balow, VDOE has still failed "to demonstrate it has corrected the identified noncompliance related to State Complaint Procedures, Due Process Complaint and Hearing Procedures, and Independent Educational Evaluations."

301.    VDOE and FCPS also failed to ensure school district compliance with the IDEA during the COVID-19 Pandemic, as USDOE's findings related to Virginia's largest school district (described above) clearly show.

302.    FCPS also violated disabled students' rights in other ways.  It was sued in this District in October 2019 because of its practice of excessively using physical restraint and seclusion against special needs students, a primitive practice which violates state and federal law. For more than two years, FCPS fought this litigation and continued these practices.  Finally, on December 2, 2021, FCPS entered into a settlement agreement and consent order, in which it agreed to eliminate these practices.

303.    The investigations and litigation described in this complaint are symptomatic of the deep underlying problems of IDEA noncompliance and civil rights violations by VDOE, FCPS and other local school systems in Virginia.

304.    Prohibiting a challenge to these systematic problems outside the administrative process would only serve to insulate the state procedures from review—an outcome that would undermine the system Congress selected for the protection of the rights of children with disabilities.

305.    Accordingly, Named Plaintiffs seek class-wide relief in this Court, as follows.

## COUNT I

### 42 U.S.C. § 1983 Claims for Due Process Violations of the Fourteenth Amendment to the United States Constitution

**(On behalf of Named Plaintiffs and VDOE Class against Defendant Balow and on behalf of Named Plaintiffs and the FCPS Class against Defendants Balow and Reid)**

306.    Plaintiffs incorporate all allegations set forth in paragraphs 1–305, as if alleged herein.

307.    Defendants Balow and Reid have committed constitutional violations against Plaintiffs, who are citizens of the United States, under color of law.

308.    Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

309.    Defendants Balow and Reid have deprived Plaintiffs of their Fourteenth Amendment rights under color of law by depriving them of due process of law and denying them educational opportunities equal to non-disabled students.

310.    The Fourteenth Amendment mandates that all persons born in the United States are entitled to due process before restriction of their liberty or property, and to equal protection of the laws.  U.S. Const. amend XIV.

311.    Plaintiffs have a constitutionally protected property interest in being provided with an IEP consistent with the requirements of the IDEA.

312.    Plaintiffs have a constitutionally protected liberty interest in receiving an "Impartial Due Process Hearing" when challenging or contesting a proposed IEP.

313.    Plaintiffs have a clearly established right under the Fourteenth Amendment to the

United States Constitution to be free from government interference with, or deprivation of, their property and liberty interest in FAPE, their property interest in an adequate IEP, and their liberty interest in an Impartial Due Process Hearing consistent with adequate due process of law.

314. Constitutionally, adequate due process of law requires an objective proceeding, including proper notice and a fair opportunity to be heard.

315. A fair opportunity to be heard means neutral procedures applied by an impartial and unbiased decision maker, free from self-interest, self-dealing, malice, vindictiveness, or other illegitimate motives.

316. Procedures that are neutral on their face and in theory, but biased at their core and in fact are a sham do not satisfy the procedural due process requirements of the Fourteenth Amendment.

317. By way of illustration and not limitation, Named Plaintiff M.B.'s due process hearing was not adjudicated by an impartial factfinder, but by an individual who demonstrated a lack of knowledge of federal law, disengagement from the evidence, and open hostility toward the persons seeking relief. This manifestation of bias and ill-will toward the petitioners and their attorneys fell below the standards required under federal law and regulations governing the conduct of due process hearings in IDEA cases.

318. By way of further illustration and not limitation, in 2021 hearing officer Brooke-Devlin was assigned to adjudicate Named Plaintiff D.C.'s due process complaint. D.C.'s parents had previously submitted complaints against Ms. Brooke-Devlin for her failures to properly conduct D.C.'s 2015 due process hearing, which created an obvious source of bias for Ms. Brooke-Devlin against D.C. and his parents. Despite this glaring conflict, Ms. Brooke-Devlin refused to recuse herself and denied D.C.'s meritorious motion to disqualify her as the hearing officer on his

complaint. During the contentious hearing on D.C.'s motion for disqualification, Ms. Brooke-Devlin repeatedly displayed the very bias and open hostility towards D.C. which made it inappropriate for her to adjudicate his due process complaint.

319.    VDOE's and FCPS' other actions, described above, also contributed to these sham due process proceedings.

320.    As a result of these sham proceedings, Named Plaintiffs M.B. and D.C. were denied a fair opportunity to be heard in pursuit of their property and liberty interest in a free appropriate public education, their property interest in an IEP, and their liberty interest in an impartial Due Process Hearing in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

321.    The foregoing actions and omissions of Defendants Balow and Reid constitute a policy, practice, pattern, and/or custom of discriminating against Plaintiffs in violation of their constitutionally protected liberty and property interests.

322.    Defendants Balow and Reid acted intentionally or with reckless indifference to the constitutional rights of the Plaintiffs.

323.    The foregoing actions of Balow and Reid have injured and will continue to irreparably harm Plaintiffs, unless and until prospectively enjoined by this Court as permitted by *Ex Parte Young*, 209 U.S. 123 (1908) and *Antrican v. Odom*, 290 F.3d 178, 186 (4th Cir. 2002).

### COUNT II
### 42 U.S.C. § 1983 Claims for Equal Protection Violations of the Fourteenth Amendment to the United States Constitution

**(On behalf of Named Plaintiffs and VDOE Class as against Defendant Balow and on behalf of Named Plaintiffs and the FCPS Class as against Defendants Balow and Reid)**

324.    Plaintiffs incorporate by reference each averment set forth in paragraphs 1–323 above, and reallege each as if fully set forth herein.

325.    Plaintiffs are citizens of the United States, and Defendants are acting under color of law for purposes of 42 U.S.C. § 1983.

326.    Plaintiffs have a constitutionally protected fundamental right to procedural due process under the Fourteenth Amendment to the United States Constitution.

327.    Defendants violated Plaintiffs' fundamental due process rights by singling them out as classes and depriving them of neutral procedures applied by an impartial and unbiased decision maker, free from self-interest, self-dealing, malice, vindictiveness, or other illegitimate motives.

328.    Defendants' denial of Plaintiffs' fundamental right to procedural due process was arbitrary, capricious, and not rationally related to any legitimate interest.

329.    Plaintiffs also have a constitutionally protected property interest in "a system of free public elementary and secondary schools," as enshrined in the Constitution of Virginia.  Va. Const. art. VIII, § 1.

330.    Defendants Balow and Reid have singled out Plaintiffs as a class based on Plaintiffs' status as individuals with disabilities and parents of children with disabilities and denied them their constitutionally protected right to a free public education.  Simultaneously, Defendants Balow and Reid have provided other children without disabilities and their parents with the free public education required by the Constitution of Virginia.

331.    Defendants' denial of Plaintiffs' right to a free public education is arbitrary, capricious, and not rationally related to any legitimate state interest.

332.    The foregoing actions of Balow and Reid have injured and will continue to irreparably harm Plaintiffs, unless and until prospectively enjoined by this Court as permitted by *Ex Parte Young,* 209 U.S. 123 (1908) and *Antrican v. Odom,* 290 F.3d 178, 186 (4th Cir. 2002).

<u>**COUNT III**</u>

<u>**Declaratory Judgment for VDOE's Failure to Comply with Federal Law**</u>

**(On behalf of Named Plaintiffs and the VDOE Class against the
Virginia Department of Education)**

333.    Named Plaintiffs and the VDOE Class incorporate by reference each averment set forth in paragraphs 1–332 above, and reallege each as if fully set forth herein.

334.    Defendant VDOE is obligated under 20 U.S.C. § 1407(a)(1) to ensure that Virginia's local school districts comply with the IDEA.  One of the stated purposes of the IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that the rights of children with disabilities and parents of such children are protected.  As a department of the Commonwealth of Virginia, VDOE is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA, as provided in 20 U.S.C. § 1403.

335.    Defendant VDOE has failed and continues to fail to ensure that all children with disabilities residing in the Commonwealth of Virginia receive a free appropriate public education pursuant to 20 U.S.C § 1414.  VDOE has displayed a firm purpose to circumvent existing federal law and regulations and has consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the VDOE Class.  In doing so, it has also failed and continues to fail to ensure that appropriate procedural safeguards are put in place as required by 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and regulations.

336.    The foregoing failures of Defendant VDOE to comply with federal law and regulations and to bring Virginia local school districts into compliance with federal law and regulations have injured Plaintiffs, and will continue to injure plaintiffs if they persist.  However, VDOE's acts and omissions in violation of the IDEA have been concealed by its refusal to disclose to parents the true and accurate records pertaining to their children, its obstruction of parents and

advocates' efforts to obtain information about VDOE's due process hearing system, and its systematic efforts to frustrate disable children's access to a free and appropriate public education in Virginia.

337.    As set forth above, an actual controversy exists between Named Plaintiffs and the VDOE Class and VDOE with respect to VDOE's actions, policies, and procedures concerning the provision of special education services required under the IDEA and enforcing regulations.  This controversy is ongoing and is likely to continue.  Accordingly, Named Plaintiffs and VDOE Class seek a judicial determination and declaration of the respective rights and duties of the parties with respect to the IDEA.

338.    Such a declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties with respect to the matters set forth above.

## COUNT IV
## Injunction for VDOE's Failure to Comply with Federal Law

**(On behalf of Named Plaintiffs and the VDOE Class against the Virginia Department of Education)**

339.    Named Plaintiffs and VDOE Class incorporate by reference each averment set forth in paragraphs 1–338 above, and reallege each as if fully set forth herein.

340.    Defendant VDOE is obligated under 20 U.S.C. § 1407(a)(1) to ensure that Virginia's local school districts comply with the IDEA.  One of the stated purposes of IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that children with disabilities are provided FAPE and that the rights of children with disabilities and parents of such children are protected.  As a department of the Commonwealth of Virginia, VDOE is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA, as provided in 20 U.S.C. §1403.

341.    Defendant VDOE has failed and continues to fail to ensure that all children with disabilities residing in the Commonwealth of Virginia receive a free appropriate public education

pursuant to 20 U.S.C § 1414. VDOE has displayed a firm purpose to circumvent existing federal law and regulations and consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the VDOE Class. In doing so, it has failed and continues to fail to ensure that appropriate procedural safeguards are put in place as required by 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and regulations. These ongoing and continual failures, which previously had been concealed from Plaintiffs, include, but are not limited to, the following acts or omissions:

    a.    VDOE fails to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability and to ensure that all Virginia LEAs conduct comprehensive evaluations and reevaluations of any child suspected of having a disability,

    b.    VDOE fails to ensure Virginia LEAs compose appropriate "Individualized Education Program Teams" as required by federal law and regulations,

    c.    VDOE fails to ensure Virginia LEAs develop appropriate Individualized Education Programs that are based on the individual needs of the child,

    d.    VDOE fails to ensure Virginia LEAs implement consistently and completely Individualized Education Programs,

    e.    VDOE fails to ensure Virginia LEAs authorize and pay for an appropriate independent educational evaluation ("IEE") when requested by a parent, unless the LEA has promptly initiated an appropriate Due Process hearing,

    f.    VDOE fails to require Virginia teachers, education administrators, and any other Virginia education employees to create and maintain accurate,

complete, and timely records of a child's academic, emotional, and behavioral

progress according to the child's IEP,

g.     VDOE fails to provide to the child's parents the complete and unaltered

records of the child's academic, emotional, and behavioral progress according

to the child's IEP,

h.     VDOE is failing to adequately investigate complaints regarding the failure of

local school districts, including defendant FCPS, to provide a free appropriate

public education to all children with disabilities, and to otherwise comply

with federal law and regulations that protect children with disabilities,

i.     VDOE is failing to implement and enforce procedures to afford due process

to children with disabilities and their parents in resolving disputes as to

program placements, individualized education programs, tuition eligibility

and other matters as defined by federal statutes and regulations,

j.     VDOE is failing to implement an impartial special education due process

hearing system to resolve disputes between parents and local educational

agencies as required by federal law and regulations, and

k.     VDOE is failing to adequately implement and enforce procedural safeguards

required to be afforded to children with disabilities and their parents by 20

U.S.C. § 1415(d) and (f), as further implemented by 34 C.F.R. § 300.121,

including ensuring that every hearing officer be qualified and impartial.

342.   The foregoing failures of VDOE, including their failure to bring the Virginia special

education due process hearing system into compliance with federal law have injured and will

continue to irreparably harm Named Plaintiffs and the VDOE Class, unless and until prospectively

enjoined by this Court.  *See* 20 U.S.C. § 1403.

## COUNT V
## Declaratory Judgment for FCPS' Failure to Comply with Federal Law

### (On behalf of Named Plaintiffs and the FCPS Class against the
### Fairfax County School Board )

343.    Plaintiffs incorporate by reference each averment set forth in paragraphs 1–342 above, and reallege each as if fully set forth herein.

344.    Defendant FCPS is obligated to comply with the IDEA.  One of the stated purposes of IDEA, set forth in 20 U.S.C. § 1400(d)(1)(B) is to ensure that children with disabilities are provided FAPE and that the rights of children with disabilities and parents of such children are protected.  FCPS is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA.

345.    Defendant FCPS has failed and continues to fail to ensure that all children with disabilities residing in Fairfax County receive a free appropriate public education pursuant to 20 U.S.C § 1414.  FCPS has displayed a firm purpose to circumvent existing federal law and regulations and consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the FCPS Class.  In doing so, FCPS has also failed and continues to fail to comply with the procedural safeguards under 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and regulations.

346.    Not only has Defendant FCPS engaged in a systematic and pervasive failure to comply with the substantive rights and procedural safeguards afforded by the IDEA, it has also behaved in a manner intent on concealing the violations by, among other things, hiding and refusing to disclose information to parents, excluding parents from meetings and hearings pertaining to the rights of the child, and providing parents incorrect information.

347.    As set forth above, an actual controversy exists between Named Plaintiffs and the FCPS Class and Defendant FCPS with respect to FCPS' actions, policies, and procedures concerning the provision of special education services required under the IDEA and enforcing regulations. This controversy is ongoing and is likely to continue. Accordingly, Named Plaintiffs and the FCPS Class seek a judicial determination and declaration of the respective rights and duties of the parties with respect to the IDEA.

348.    Such a declaration is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties with respect to the matters set forth above.

### COUNT VI
### Injunction for FCPS' Failure to Comply with Federal Law

**(On behalf of Named Plaintiffs and the FCPS Class against the
Fairfax County School Board)**

349.    Plaintiffs incorporate by reference each averment set forth in paragraphs 1–348 above, and reallege each as if fully set forth herein.

350.    Defendant FCPS is obligated to comply with the IDEA. One of the stated purposes of the IDEA, set forth in 20 U.S.C. §1400(d)(1)(B) is to ensure that the rights of children with disabilities and parents of such children are protected. FCPS is not immune under the 11th Amendment from a suit in this Court to remedy a violation of the IDEA.

351.    Defendant FCPS has failed and continues to fail to ensure that all children with disabilities residing in Fairfax County receive a free appropriate public education pursuant to 20 U.S.C § 1414. FCPS has displayed a firm purpose to circumvent existing federal law and regulations and consistently employed the IDEA's due process hearings to frustrate the legal rights of Named Plaintiffs and the FCPS Class. In doing so, it has also failed and continues to fail to comply with the procedural safeguards under 20 U.S.C. § 1415, including a fair and impartial due process hearing before a qualified and impartial hearing officer, as required by federal law and

regulations. These ongoing and continual failures include, but are not limited to, the following acts or omissions:

a.  Defendant FCPS fails to conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

b.  Defendant FCPS fails to compose appropriate Individualized Education Program Teams,

c.  Defendant FCPS fails to develop appropriate Individualized Education Programs that are based on the individual needs of the child, by placing arbitrary limits on special needs services, failing to include parents in development of the IEP, concealing information pertinent to the development of the IEP and reevaluation process, and using inflated grades and false indicia of progress in order to manipulate the IEP and reevaluation process,

d.  Defendant FCPS fails to implement consistently and completely IEPs under 20 U.S.C. § 1414, *et seq.*,

e.  Defendant FCPS fails to authorize and pay for an appropriate independent educational evaluation ("IEE") when requested by a parent, when FCPS has not promptly initiated an appropriate Due Process hearing,

f.  Defendant FCPS fails to require teachers, administrators, and other FCPS employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP,

g.  Defendant FCPS fails, upon request, to immediately provide to the child's

parent the complete and unaltered records of the child's academic, emotional, and behavioral progress according to the child's IEP,

h.    Defendant FCPS, in an attempt to circumvent existing federal law and regulations, systematically and consistently delays implementation of the IEP and procedural safeguards designed to protect the legal rights of Named Plaintiffs and the FCPS Class,

i.    Defendant FCPS systematically uses the IDEA's procedural safeguards in a manner that unnecessarily and drastically increases the costs to parents, and

j.    Defendant FCPS has displayed a firm purpose to circumvent existing federal law and regulations by engaging in bullying and threats of retaliation to frustrate the legal rights of Named Plaintiffs and the FCPS Class under the IDEA.

352.    The foregoing acts and omissions of Defendant FCPS in violation of the IDEA have long been concealed by Defendants so that it could continue to perpetrate its scheme to withhold the special education services and procedural safeguards that are necessary to provide FAPE to disabled children in Fairfax County.  The acts and omissions of FCPS have injured and will continue to irreparably harm Named Plaintiffs and the FCPS Class, unless and until prospectively enjoined by this Court.  *See* 20 U.S.C. § 1403.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

353.    Certify each of the proposed classes under Federal Rule of Civil Procedure 23(a) and 23(b)(2), with Plaintiffs serving as Class Representatives of both the FCPS Class and VDOE Class, and with Plaintiffs' counsel serving as Class Counsel.

354.    Declare that FCPS is out of compliance with the IDEA by systematically failing to

comply with the IDEA, including failing to carry out its obligations to conduct evaluations pursuant to section 1414 of the IDEA and frustrating the procedural safeguards of section 1415 of the IDEA, including due process hearings.

355.    Enter an injunction against FCPS immediately requiring it to comply with its obligations under 20 U.S.C. § 1400, *et seq.*, including to:

      a.    Conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

      b.    Approve independent educational evaluations upon parental request, as required by 54 C.F.R. § 300.502, without requiring a prior public agency evaluation,

      c.    Require teachers, administrators, and other FCPS employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP;

      d.    Provide immediately upon parental request the complete and unaltered records of the child's evaluations, assessments, reviews, and academic, emotional, and behavioral progress, without requiring the submission of a FOIA request ;

      e.    Cease and eliminate immediately practices and procedures that result in the inaccurate measurement of a student's performance, including padding of grades, disregarding grades, inflating grades, assisting students in answering tests or evaluations, and reporting that a student is making progress without a defined, reported, and recorded measurement to demonstrate such progress,

      f.    Cease and eliminate immediately practices, procedures, counseling, advising,

or training of FCPS personnel that conceals or encourages concealment or non-disclosure of any violation of the IDEA,

g.  Cease and eliminate immediately any practice or procedure that delays the implementation, course, or resolution of any IDEA procedural safeguards[66], including postponing the assignment of hearing officers, the conclusion of the due process hearings, disclosure of education records to parents, or approval of IEEs,

h.  Cease and eliminate immediately any policy or procedure that conceals information or provides false information to parents concerning a child with disabilities to delay or deny the provision of special education services,

i.  Cease and eliminate immediately conduct that unnecessarily and drastically increases costs surrounding the exercise of the procedural safeguards, and

j.  Cease engaging in, approving of, or encouraging the use of bullying or threats against parents of children with disabilities who seek to exercise their IDEA rights.

356.  Declare that VDOE is out of compliance with section 1415 of the IDEA by systematically failing to carry out its obligation to provide procedural safeguards, including due process hearings, to Virginia children with disabilities and their parents by systematically failing to oversee Virginia LEA compliance with the substantive rights and procedural safeguards of the IDEA, and by failing to ensure that Virginia children with disabilities are provided a free and appropriate public education as required by the IDEA.

---

[66] The term "procedural safeguards" as used in this prayer for relief means and refers to the safeguards set forth in section 1415 of the IDEA and enforcing regulations.

357.   Enter an injunction against VDOE immediately requiring it to comply with 20 U.S.C. § 1414, including to:

a.   Conduct comprehensive evaluations and reevaluations of any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c), and ensure that all Virginia LEAs conduct comprehensive evaluations and reevaluations of any child suspected of having a disability,

b.   Ensure Virginia LEAs compose appropriate "Individualized Education Program Teams" in accordance with the defined term in 20 U.S.C. § 1414(d)(1)(B),

c.   Ensure Virginia LEAs develop appropriate Individualized Education Programs that are based on the individual needs of the child,

d.   Ensure Virginia LEAs implement consistently and completely Individualized Education Programs under 20 U.S.C. § 1414, *et seq*.,

e.   Ensure Virginia LEAs authorize and pay for an appropriate independent educational evaluation ("IEE") when requested by a parent, unless the LEA has promptly initiated an appropriate due process hearing,

f.   Require Virginia teachers, education administrators, and all other Virginia education employees to create and maintain accurate, complete, and timely records of a child's academic, emotional, and behavioral progress according to the child's IEP, and

g.   Upon request, immediately provide to a child's parent the complete and unaltered records of the child's evaluation, assessments, reviews, and academic, emotional, and behavioral progress, without requiring the

submission of a FOIA request .

358.    Declare that VDOE is not in compliance with the IDEA because it has failed to establish and maintain procedures in accordance with 20 U.S.C. § 1415 and 34 C.F.R. § 300.500, *et seq.*, to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education, and instead, has engaged in a systematic and harassing scheme to undermine the procedural safeguards of the IDEA.

359.    Enter an injunction against VDOE immediately requiring it to comply with its obligations under 20 U.S.C. § 1400, *et seq*, including to:

a.    Establish and implement procedures to ensure fair and impartial due process hearings pursuant to 34 C.F.R. § 300.511 & 300.512,

b.    Certify and recertify only knowledgeable and impartial hearing officers,

c.    Ensure that hearing officers are in compliance with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq*.,

d.    Dismiss hearing officers who have failed to comply with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq*.,

e.    Oversee and supervise the hearing officer and due process hearing system, independently, in a manner that ensures a fair due process hearing, as required by the 20 U.S.C. § 1415 and 34 C.F.R. § 300.511(c),

f.    Establish and implement procedures to allow parties to disputes under the IDEA, to resolve disputes through the mediation process according to 20 U.S.C. § 1415 and 4 C.F.R. § 300.506, without improper influence or interference by VDOE representatives,

g.   Ensure that parents of a child with a disability are afforded an opportunity to inspect and review all education records and attend all meetings with respect to identification, evaluation, and educational placement of the child and the provision of FAPE to the child, in accordance with 34 C.F.R. § 300.501, and

h.   Provide the requisite notice pursuant to 34 C.F.R. § 300.500, *et seq.*

360.   Declare that Defendant Balow's failure to ensure the procedural safeguards required by the IDEA, including the hearing officer system administered by VDOE, deprives Plaintiffs of procedural due process as provided by the Fourteenth Amendment to the Constitution of the United States.

361.   Declare that Defendant Balow has violated Plaintiffs' rights to equal protection under law, as provided by the Fourteenth Amendment to the Constitution of the United States, by establishing and allowing to persist systematic and pervasive efforts to deprive children with disabilities and their parents of their rights to due process under law and to a free public education.

362.   Enter an injunction against Defendant Balow in her official position prohibiting her from depriving children with disabilities and their families due process and equal protection under the law and requiring her to:

a.   Establish and implement procedures to ensure fair and impartial due process hearings pursuant to 34 C.F.R. §§ 300.511 & 300.512, including:

i.   establish an independent board to oversee the hearing officer system composed of knowledgeable educators and parents of disabled or special needs children to ensure balance and fairness, including overseeing the appointment, recertification, compensation, and training of hearing officers,

    ii.  collect, assemble, and make publicly available monthly and annual individual and aggregate hearing officer ruling statistics, with sufficient detail to determine the ruling record of each hearing officer for the time period at issue,

   iii.  collect, assemble, and publicly report individual and aggregate hearing officer statistics, on at least a quarterly basis and annual basis, in a manner that is readily accessible to the public,

   iv.  investigate hearing records and rulings of each hearing officer whose has ruled in favor of disabled students and parents less than 30% of the time over the last ten (10) years, to determine whether each such hearing officer has demonstrated that he or she has been knowledgeable and impartial in their rulings and publish a summary of the findings for each hearing officer,

    v.  remove any hearing officer who has a demonstrated history of unfairly ruling against disabled students and parents in due process hearings;

   vi.  publish a detailed explanation of the process going forward for qualifying, certifying, recertifying, training, and appointing hearing officers for due process hearings in the Commonwealth of Virginia, including the steps to be taken to ensure that hearing officers are knowledgeable and impartial in their rulings,

b.    Certify only knowledgeable and impartial hearing officers,

c.    Ensure that hearing officers are in compliance with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq.*,

d.    Dismiss hearing officers who fail to comply with 20 U.S.C. § 1415 and the policies and procedures set forth in 34 C.F.R. § 300.500, *et seq.*,

e.    Oversee and supervise the hearing officer and due process hearing system in a manner that ensures a fair due process hearing with a knowledgeable and impartial hearing officer, as required by the 20 U.S.C. § 1415 and 34 C.F.R. § 300.511(c),

f.    Cease and eliminate the policy and practice of assigning or allowing VDOE representatives to serve as "monitors" or "facilitators" in due process hearings or mediations under the IDEA,

g.    Establish and implement procedures to allow parties to disputes under the IDEA to resolve disputes through the mediation process according to 20 U.S.C. § 1415 and 34 C.F.R. § 300.506, without improper influence or interference by VDOE representatives,

h.    Ensure that parents of a child with a disability are afforded an opportunity to inspect and review all education records and attend all meetings with respect to identification, evaluation, and educational placement of the child and the provision of FAPE to the child, in accordance with 34 C.F.R. § 300.501, without the requirement of submitting a FOIA request, and

i.    Provide all requisite notice pursuant to 34 C.F.R. § 300.500, *et seq*.

363.    Declare that Defendant Reid has violated, and continues to violate, the due process rights of the FCPS Class by establishing and allowing to persist systematic and pervasive efforts within FCPS to undermine the procedural safeguards in the IDEA.

364.    Declare that Defendant Reid's failure to ensure the procedural safeguards required

by the IDEA, deprives families of due process under the law as provided by the Fourteenth Amendment to the Constitution of the United States.

365.    Declare that Defendant Reid has violated the equal protection rights of the FCPS Class by establishing and allowing to persist systematic and pervasive efforts to deprive children with disabilities and their parents of their rights to due process under law and to a free public education.

366.    Enter an injunction against Defendant Reid in her official capacity prohibiting her from depriving children with disabilities and their families equal protection and due process under the law, by requiring her to:

    a.    Establish and maintain procedures in accordance with 20 U.S.C. § 1415 and 34 C.F.R. § 300.500, *et seq.*, to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education:

    b.    Implement the above-mentioned procedural safeguards without undue delay,

    c.    Implement policies and procedures to prevent FCPS employees from concealing information and providing false information to parents ,

    d.    Cease unnecessarily and drastically increasing costs surrounding the exercise of the procedural safeguards,

    e.    Implement policies and procedures to prevent FCPS employees from bullying and threatening retaliation for exercising any of the procedural safeguards.

    f.    Prevent FCPS administrators and other employees from discriminating against children with disabilities and their families when providing free public education services,

g.   Prevent FCPS administrators and other employees from concealing information and providing false information to parents,

h.   Prevent FCPS from evading the requirement to evaluate and reevaluate any child suspected of having a disability, as required by 20 U.S.C. § 1414(a)-(c),

i.   Ensure FCPS creates appropriate "Individual Education Program Teams" in accordance with the defined term in 20 U.S.C. §1414(d)(1)(B),

j.   Preclude FCPS from modifying children's IEPs without complying with the notice and consent requirements of 20 U.S.C. §1414,

k.   Preclude teachers, administrators, and other FCPS employees from creating and maintaining, incomplete, inaccurate, and misleading records of a child's academic, emotional, and behavioral progress, and

l.   Preclude FCPS administrators and educators from improperly influencing the conduct and outcome of due process hearings.

367.   Award Plaintiffs' their attorney's fees and other costs of litigation to the maximum extent allowed under the IDEA, 42 U.S.C. § 1988, and any other applicable law, and any other relief to which they are entitled.

Dated:  January 20, 2023                Respectfully submitted,

By: */s/ R. Braxton Hill, IV*
    R. Braxton Hill, IV (VSB No. 41539)
    Craig T. Merritt (VSB No. 20281)
    MERRITTHILL, PLLC
    919 E Main Street, Suite 1000
    Richmond, VA 23219
    T  804-916-1600
    bhill@merrittfirm.com
    cmerritt@merrittfirm.com

Aderson B. Francois
(*pro hac vice to be submitted*)
Civil Rights Clinic,
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 532
Washington DC 200001
T 202-661-6721
aderson.francois@law.georgetown.edu


William R.H. Merrill (*pro hac vice*)
Scarlett Collings (*pro hac vice*)
Michael Adamson (*pro hac vice*)
Justin Kenney (*pro hac vice*)
SUSMAN GODFREY, LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
T 713-653-7865
bmerrill@susmangodfrey.com
scollings@susmangodfrey.com
madamson@susmangodfrey.com
jkenney@susmangodfrey.com

*Counsel for Plaintiffs*

# EXHIBIT A

**Hearing Officer Ruling Results for the Period from 2010 through July 2021**

## Key Statistics

|  | Northern Virginia | | Virginia | |
|---|---|---|---|---|
|  | Officers | Pct | Officers | Pct |
| Number of Hearing Officers with Zero Rulings for Parents | 10 | 83.33% | 14 | 63.64% |
| Outcomes of Cases Initiated | Cases | Pct | Cases | Pct |
| Withdrawn | 191 | 48.35% | 433 | 51.12% |
| Settled | 68 | 17.22% | 115 | 13.58% |
| Dismissed or in Ruling in Favor of Schools | 127 | 32.15% | 266 | 31.40% |
| Partial Decision for Parents and School District | 6 | 1.52% | 20 | 2.36% |
| Ruled in Favor of Parents | 3 | 0.76% | 13 | 1.53% |
| Total Cases | 395 | 100% | 847 | 100% |

## Details

| | Withdrawn | | Settled | | Dismissed | | Ruled in Favor of School District | | Split Decision | | Ruled in Favor of Parents | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cases | Pct | Cases | Pct | Cases | Pct | Cases | Pct | Cases | Pct | Cases | Pct | Cases |
| *Northern Virginia Region* | | | | | | | | | | | | | |
| Individual Hearing Officer | | | | | | | | | | | | | |
| Richard Alvey | 23 | 43.40% | 7 | 13.21% | 19 | 35.85% | 2 | 3.77% | 2 | 3.77% | 0 | 0.00% | 53 |
| Frank Aschmann | 23 | 53.49% | 8 | 18.60% | 5 | 11.63% | 4 | 9.30% | 2 | 4.65% | 1 | 2.33% | 43 |
| Morgan Brooke-Devlin | 26 | 59.09% | 5 | 11.36% | 4 | 9.09% | 9 | 20.45% | 0 | 0.00% | 0 | 0.00% | 44 |
| Bill Dangia | 11 | 50.00% | 8 | 36.36% | 2 | 9.09% | 1 | 4.55% | 0 | 0.00% | 0 | 0.00% | 22 |
| Alan Dockterman | 16 | 41.03% | 5 | 12.82% | 12 | 30.77% | 5 | 12.82% | 1 | 2.56% | 0 | 0.00% | 39 |
| Robert Hartsoe | 24 | 42.11% | 12 | 21.05% | 8 | 14.04% | 11 | 19.30% | 0 | 0.00% | 2 | 3.51% | 57 |
| James Mansfield | 5 | 27.78% | 4 | 22.22% | 3 | 16.67% | 5 | 27.78% | 1 | 5.56% | 0 | 0.00% | 18 |
| William Rollow | 8 | 47.06% | 6 | 35.29% | 2 | 11.76% | 1 | 5.88% | 0 | 0.00% | 0 | 0.00% | 17 |
| Jane Schroeder | 12 | 48.00% | 3 | 12.00% | 10 | 40.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 25 |
| David Smith | 10 | 58.82% | 2 | 11.76% | 1 | 5.88% | 4 | 23.53% | 0 | 0.00% | 0 | 0.00% | 17 |
| George Towner | 21 | 51.22% | 6 | 14.63% | 11 | 26.83% | 3 | 7.32% | 0 | 0.00% | 0 | 0.00% | 41 |
| Anthony Vance | 12 | 63.2% | 2 | 10.53% | 5 | 26.32% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 19 |
| *Total Northern Virginia* | 191 | 48.35% | 68 | 17.22% | 82 | 20.76% | 45 | 11.39% | 6 | 1.52% | 3 | 0.76% | 395 |
| *Outside of Northern Virginia* | | | | | | | | | | | | | |
| Individual Hearing Officer | | | | | | | | | | | | | |
| Lorin Costanzo | 22 | 66.7% | 1 | 3.03% | 8 | 24.24% | 2 | 6.06% | 0 | 0.00% | 0 | 0.00% | 33 |
| Raymond Davis | 0 | 0.00% | 2 | 40.00% | 2 | 40.00% | 1 | 20.00% | 0 | 0.00% | 0 | 0.00% | 5 |
| William Francis | 29 | 53.7% | 5 | 9.26% | 16 | 29.63% | 2 | 3.70% | 1 | 1.85% | 1 | 1.85% | 54 |
| Sarah Freeman | 19 | 35.2% | 10 | 18.52% | 16 | 29.63% | 5 | 9.26% | 1 | 1.85% | 3 | 5.56% | 54 |
| Robin Gnatowsky | 20 | 55.6% | 8 | 22.22% | 7 | 19.44% | 1 | 2.78% | 0 | 0.00% | 0 | 0.00% | 36 |
| Ternon Galloway-Lee | 29 | 44.6% | 7 | 10.77% | 15 | 23.08% | 8 | 12.31% | 5 | 7.69% | 1 | 1.54% | 65 |
| Rhonda Mitchell | 38 | 63.3% | 10 | 16.67% | 4 | 6.67% | 3 | 5.00% | 4 | 6.67% | 1 | 1.67% | 60 |
| Krysia Carmel Nelson | 11 | 84.6% | 0 | 0.00% | 1 | 7.69% | 1 | 7.69% | 0 | 0.00% | 0 | 0.00% | 13 |
| John Robinson | 37 | 50.7% | 0 | 0.00% | 22 | 30.14% | 11 | 15.07% | 1 | 1.37% | 2 | 2.74% | 73 |
| Peter Vaden | 37 | 62.7% | 4 | 6.78% | 8 | 13.56% | 6 | 10.17% | 2 | 3.39% | 2 | 3.39% | 59 |
| *Total Outside Northern Virginia* | 242 | 53.5% | 47 | 10.40% | 99 | 21.90% | 40 | 8.85% | 14 | 3.10% | 10 | 2.21% | 452 |
| **Total Virginia** | 433 | 51.1% | 115 | 13.58% | 181 | 21.37% | 85 | 10.04% | 20 | 2.36% | 13 | 1.53% | 847 |

# EXHIBIT B

USCA4 Appeal: 23-1854   Doc: 27   Filed: 09/06/2023   Pg: 432 of 436
Case 5:22-cv-01757   Document 432   Filed 01/20/23   Page 2 of 2 PageID# 436
Claims other parents did not file in the 23-24 (within) rulings...

## Key Statistics

| | Northern Virginia | | Virginia | |
|---|---|---|---|---|
| | Officers | Pct | Officers | Pct |
| Number of Hearing Officers with Zero Rulings for Parents | 12 | 75.00% | 30 | 75.00% |

| Outcomes of Cases Initiated | Northern Virginia | | Virginia | |
|---|---|---|---|---|
| | Cases | Col. Pct | Cases | Col. Pct |
| Withdrawn | 70 | 38.25% | 227 | 41.73% |
| Settled | 23 | 12.57% | 58 | 10.66% |
| Dismissed or in Ruling in Favor of Schools | 81 | 44.26% | 232 | 42.65% |
| Partial Decision for Parents and School District | 5 | 2.73% | 15 | 2.76% |
| Ruled in Favor of Parents | 4 | 2.19% | 12 | 2.21% |
| Total Cases | 183 | 100% | 544 | 100% |

## Details

| Northern Virginia Region | Withdrawn [19][20] | | Settled [1][3] | | Dismissed [4][6] | | Ruled in Favor of School District [7][9] | | Split Decision [10][12] | | Ruled in Favor of Parents [13][15] | | Total Cases [21] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Individual Hearing Officer | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | =[16]+[19] |
| Richard Alvey | 6 | 37.50% | 2 | 12.50% | 3 | 18.75% | 3 | 18.75% | 1 | 6.25% | 1 | 6.25% | 16 |
| Frank Aschmann | 8 | 42.11% | 4 | 21.05% | 3 | 15.79% | 4 | 21.05% | 0 | 0.00% | 0 | 0.00% | 19 |
| Morgan Brooke-Devlin | 2 | 18.18% | 5 | 45.45% | 5 | 45.45% | 2 | 18.18% | 0 | 0.00% | 0 | 0.00% | 11 |
| Bill Bajda | 6 | 54.55% | 2 | 18.18% | 2 | 18.18% | 0 | 0.00% | 1 | 9.09% | 1 | 9.09% | 11 |
| Alan Dockterman | 5 | 35.71% | 1 | 7.14% | 2 | 14.29% | 5 | 35.71% | 0 | 0.00% | 1 | 7.14% | 14 |
| Robert Hartsoe | 4 | 30.77% | 0 | 0.00% | 4 | 30.77% | 5 | 38.46% | 0 | 0.00% | 0 | 0.00% | 13 |
| James Mansfield | 4 | 33.33% | 1 | 8.33% | 3 | 25.00% | 3 | 25.00% | 1 | 8.33% | 0 | 0.00% | 12 |
| William Rollow | 6 | 42.86% | 3 | 21.43% | 2 | 14.29% | 3 | 21.43% | 0 | 0.00% | 0 | 0.00% | 14 |
| Jane Schroeder | 5 | 62.50% | 0 | 0.00% | 2 | 25.00% | 0 | 0.00% | 1 | 12.50% | 0 | 0.00% | 8 |
| David Smith | 2 | 25.00% | 0 | 0.00% | 2 | 25.00% | 4 | 50.00% | 0 | 0.00% | 0 | 0.00% | 8 |
| George Towner | 6 | 46.15% | 1 | 7.69% | 3 | 23.08% | 3 | 23.08% | 0 | 0.00% | 1 | 7.69% | 13 |
| Anthony Vance | 5 | 45.45% | 0 | 0.00% | 5 | 45.45% | 1 | 9.09% | 0 | 0.00% | 0 | 0.00% | 11 |
| Joe McGrail | 6 | 46.15% | 0 | 0.00% | 6 | 46.15% | 1 | 7.69% | 0 | 0.00% | 1 | 7.69% | 13 |
| Lawrence Lindeman | 1 | 12.50% | 1 | 12.50% | 4 | 50.00% | 2 | 25.00% | 0 | 0.00% | 0 | 0.00% | 8 |
| Louis S. Papa | 2 | 33.33% | 0 | 0.00% | 3 | 50.00% | 0 | 0.00% | 1 | 16.67% | 0 | 0.00% | 6 |
| Joseph B. Kennedy | 2 | 33.33% | 1 | 16.67% | 1 | 16.67% | 1 | 16.67% | 0 | 0.00% | 1 | 16.67% | 6 |
| **Total/Northern Virginia** | **70** | **38.25%** | **23** | **12.57%** | **45** | **24.59%** | **36** | **19.67%** | **5** | **2.73%** | **4** | **2.19%** | **183** |

| Outside of Northern Virginia | Withdrawn | | Settled | | Dismissed | | Ruled in Favor of School District | | Split Decision | | Ruled in Favor of Parents | | Total Cases |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Individual Hearing Officer | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | Cases | Pct of Tot. | |
| Lorin Costanzo | 35 | 58.33% | 3 | 5.00% | 14 | 23.33% | 8 | 13.33% | 0 | 0.00% | 0 | 0.00% | 60 |
| Raymond Davis | 2 | 25.00% | 2 | 25.00% | 3 | 37.50% | 1 | 12.50% | 0 | 0.00% | 0 | 0.00% | 8 |
| William Francis | 3 | 27.27% | 1 | 9.09% | 5 | 45.45% | 2 | 18.18% | 0 | 0.00% | 0 | 0.00% | 11 |
| Sarah Freeman | 19 | 55.88% | 2 | 5.88% | 3 | 8.82% | 8 | 23.53% | 1 | 2.94% | 1 | 2.94% | 34 |
| Robin Grabowsky | 6 | 40.00% | 4 | 26.67% | 3 | 20.00% | 2 | 13.33% | 0 | 0.00% | 0 | 0.00% | 15 |
| Ternon Galloway-Lee | 18 | 42.86% | 4 | 4.76% | 12 | 28.57% | 6 | 14.29% | 1 | 2.38% | 1 | 2.38% | 42 |
| Rhonda Mitchell | 7 | 36.84% | 3 | 15.79% | 6 | 31.58% | 2 | 10.53% | 1 | 5.26% | 0 | 0.00% | 19 |
| Krysia Carmel Nelson | 4 | 80.00% | 0 | 0.00% | 0 | 0.00% | 1 | 20.00% | 0 | 0.00% | 0 | 0.00% | 5 |
| John Robinson | 15 | 42.86% | 0 | 0.00% | 11 | 31.43% | 7 | 20.00% | 2 | 5.71% | 2 | 5.71% | 35 |
| Peter Vaden | 11 | 33.33% | 5 | 15.15% | 8 | 24.24% | 5 | 15.15% | 2 | 6.06% | 2 | 6.06% | 33 |
| Matt Archer | 12 | 48.00% | 1 | 4.00% | 4 | 16.00% | 7 | 28.00% | 1 | 4.00% | 0 | 0.00% | 25 |
| John Hooe | 1 | 50.00% | 0 | 0.00% | 1 | 50.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 2 |
| Edward Johnson | 3 | 33.33% | 4 | 44.44% | 0 | 0.00% | 2 | 22.22% | 0 | 0.00% | 0 | 0.00% | 9 |
| James Eicher | 3 | 37.50% | 0 | 0.00% | 1 | 12.50% | 4 | 50.00% | 0 | 0.00% | 0 | 0.00% | 8 |
| Richard E. Smith | 2 | 16.67% | 4 | 33.33% | 5 | 41.67% | 0 | 0.00% | 1 | 8.33% | 0 | 0.00% | 12 |
| Urcshe B. Ellis | 5 | 38.46% | 0 | 0.00% | 2 | 15.38% | 5 | 38.46% | 0 | 0.00% | 1 | 7.69% | 13 |
| Alfred Bernard | 1 | 20.00% | 0 | 0.00% | 2 | 40.00% | 2 | 40.00% | 0 | 0.00% | 0 | 0.00% | 5 |
| James T. Lloyd | 5 | 41.67% | 2 | 16.67% | 2 | 16.67% | 3 | 25.00% | 0 | 0.00% | 0 | 0.00% | 12 |
| Ayodele M. Ama | 0 | 0.00% | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Wanda N. Allen | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Stuart H. Dunn | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Henry H. Howell III | 0 | 0.00% | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Frank Michaels | 0 | 0.00% | 2 | 50.00% | 1 | 25.00% | 0 | 0.00% | 1 | 25.00% | 0 | 0.00% | 4 |
| C. Gilbert Hudson | 2 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 2 |
| **Total Outside Northern Virginia** | **157** | **43.49%** | **35** | **9.70%** | **86** | **23.82%** | **65** | **18.01%** | **10** | **2.77%** | **8** | **2.22%** | **361** |
| **Total Virginia** | **227** | **41.73%** | **58** | **10.66%** | **131** | **24.08%** | **101** | **18.57%** | **15** | **2.76%** | **12** | **2.21%** | **544** |

# EXHIBIT C

USCA4 Appeal: 23-1854   Doc: 27   Filed: 09/06/2023   Pg: 433 of 236

Case 1:22-cv-01070-MSN-IDD   Document 433-3   Filed 01/20/23   Page 2 of 2 PageID# 438

# Hearing Officer Ruling Results for the Period from 2003 through July 2021

## Key Statistics

### Number of Hearing Officers with Zero Rulings for Parents

| | Northern Virginia Officers | Pct | Virginia Officers | Pct |
|---|---|---|---|---|
| | 10 | 62.50% | 26 | 65.00% |

### Outcomes of Cases Initiated

| | Northern Virginia Cases | Col. Pct. | Virginia Cases | Col. Pct. |
|---|---|---|---|---|
| Withdrawn | 261 | 45.16% | 660 | 47.45% |
| Settled | 91 | 15.74% | 173 | 12.44% |
| Dismissed or in Ruling in Favor of Schools | 208 | 35.99% | 498 | 35.80% |
| Partial Decision for Parents and School District | 11 | 1.90% | 35 | 2.52% |
| Ruled in Favor of Parents | 7 | 1.21% | 25 | 1.80% |
| Total Cases | 578 | 100% | 1391 | 100% |

## Details

| Northern Virginia Region / Individual Hearing Officer | Withdrawn Cases | Pct of Tot. | Settled Cases | Pct of Tot. | Dismissed Cases | Pct of Tot. | Ruled in Favor of School/District Cases | Pct of Tot. | Split Decision Cases | Pct of Tot. | Ruled in Favor of Parents Cases | Pct of Tot. | Total Cases |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Richard Alvey | 29 | 42.03% | 9 | 13.04% | 22 | 31.88% | 5 | 7.25% | 3 | 4.35% | 1 | 1.45% | 69 |
| Frank Aschmann | 31 | 50.00% | 12 | 19.35% | 8 | 12.90% | 8 | 12.90% | 2 | 3.23% | 1 | 1.61% | 62 |
| Morgan Brooke-Devlin | 28 | 50.91% | 10 | 18.18% | 6 | 10.91% | 11 | 20.00% | 0 | 0.00% | 0 | 0.00% | 55 |
| Bill Dangoia | 17 | 51.52% | 10 | 30.30% | 4 | 12.12% | 1 | 3.03% | 1 | 3.03% | 0 | 0.00% | 33 |
| Alan Dockterman | 21 | 39.62% | 6 | 11.32% | 14 | 26.42% | 10 | 18.87% | 1 | 1.89% | 1 | 1.89% | 53 |
| Robert Hartsoe | 28 | 40.00% | 12 | 17.14% | 12 | 17.14% | 16 | 22.86% | 0 | 0.00% | 2 | 2.86% | 70 |
| James Mutsinfeld | 9 | 30.00% | 6 | 20.00% | 6 | 20.00% | 7 | 23.33% | 2 | 6.67% | 0 | 0.00% | 30 |
| William Pallow | 14 | 45.16% | 9 | 29.03% | 4 | 12.90% | 4 | 12.90% | 0 | 0.00% | 0 | 0.00% | 31 |
| Jane Schroeder | 17 | 51.52% | 5 | 15.15% | 10 | 30.30% | 0 | 0.00% | 1 | 3.03% | 0 | 0.00% | 33 |
| David Smith | 12 | 48.00% | 2 | 8.00% | 3 | 12.00% | 8 | 32.00% | 0 | 0.00% | 0 | 0.00% | 25 |
| George Towner | 27 | 50.00% | 7 | 12.96% | 14 | 25.93% | 6 | 11.11% | 0 | 0.00% | 0 | 0.00% | 54 |
| Anthony Vance | 17 | 56.67% | 2 | 6.67% | 10 | 33.33% | 1 | 3.33% | 0 | 0.00% | 0 | 0.00% | 30 |
| Joe McGrail | 6 | 46.15% | 0 | 0.00% | 6 | 46.15% | 0 | 0.00% | 0 | 0.00% | 1 | 7.69% | 13 |
| Lawrence Lindeman | 1 | 12.50% | 1 | 12.50% | 4 | 50.00% | 2 | 25.00% | 0 | 0.00% | 0 | 0.00% | 8 |
| Louis S. Papa | 2 | 33.33% | 0 | 0.00% | 3 | 50.00% | 0 | 0.00% | 1 | 16.67% | 0 | 0.00% | 6 |
| Joseph B. Kennedy | 2 | 33.33% | 1 | 16.67% | 1 | 16.67% | 1 | 16.67% | 0 | 0.00% | 1 | 16.67% | 6 |
| **Total Northern Virginia** | 261 | 45.16% | 91 | 15.74% | 127 | 21.97% | 81 | 14.01% | 11 | 1.90% | 7 | 1.21% | 578 |
| **Outside of Northern Virginia — Individual Hearing Officer** | | | | | | | | | | | | | |
| Lorin Costanzo | 57 | 61.29% | 4 | 4.30% | 22 | 23.66% | 10 | 10.75% | 0 | 0.00% | 0 | 0.00% | 93 |
| Raymond Davis | 2 | 15.38% | 4 | 30.77% | 5 | 38.46% | 2 | 15.38% | 0 | 0.00% | 0 | 0.00% | 13 |
| William Francis | 32 | 49.23% | 6 | 9.23% | 21 | 32.31% | 4 | 6.15% | 1 | 1.54% | 1 | 1.54% | 65 |
| Sarah Freeman | 38 | 43.18% | 12 | 13.64% | 19 | 21.59% | 13 | 14.77% | 2 | 2.27% | 4 | 4.55% | 88 |
| Robin Gostowsky | 26 | 50.98% | 12 | 23.53% | 10 | 19.61% | 3 | 5.88% | 0 | 0.00% | 0 | 0.00% | 51 |
| Temon Galloway-Lee | 47 | 43.93% | 9 | 8.41% | 27 | 25.23% | 14 | 13.08% | 8 | 7.48% | 2 | 1.87% | 107 |
| Rhonda Mitchell | 45 | 56.96% | 13 | 16.46% | 10 | 12.66% | 5 | 6.33% | 5 | 6.33% | 1 | 1.27% | 79 |
| Krysia Carmel Nelson | 15 | 83.33% | 0 | 0.00% | 1 | 5.56% | 2 | 11.11% | 0 | 0.00% | 0 | 0.00% | 18 |
| John Robinson | 52 | 48.15% | 9 | 8.33% | 33 | 30.56% | 9 | 8.33% | 1 | 0.93% | 4 | 3.70% | 108 |
| Peter Vaden | 48 | 52.17% | 9 | 9.78% | 16 | 17.39% | 11 | 11.96% | 4 | 4.35% | 4 | 4.35% | 92 |
| Matt Archer | 12 | 48.00% | 1 | 4.00% | 7 | 28.00% | 4 | 16.00% | 1 | 4.00% | 0 | 0.00% | 25 |
| John Hose | 2 | 50.00% | 0 | 0.00% | 2 | 50.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 4 |
| Edward Johnson | 4 | 44.44% | 3 | 33.33% | 2 | 22.22% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 9 |
| James Echner | 3 | 37.50% | 3 | 37.50% | 0 | 0.00% | 0 | 0.00% | 1 | 12.50% | 1 | 12.50% | 8 |
| Richard E. Smith | 5 | 41.67% | 2 | 16.67% | 2 | 16.67% | 1 | 8.33% | 1 | 8.33% | 1 | 8.33% | 12 |
| Urchie B. Ellis | 5 | 38.46% | 0 | 0.00% | 2 | 15.38% | 5 | 38.46% | 0 | 0.00% | 1 | 7.69% | 13 |
| Alfred Bernard | 1 | 20.00% | 0 | 0.00% | 2 | 40.00% | 2 | 40.00% | 0 | 0.00% | 0 | 0.00% | 5 |
| James T. Lloyd | 2 | 40.00% | 0 | 0.00% | 1 | 20.00% | 2 | 40.00% | 0 | 0.00% | 0 | 0.00% | 5 |
| Ayodele M. Ama | 0 | 0.00% | 2 | 16.67% | 3 | 25.00% | 6 | 50.00% | 1 | 8.33% | 0 | 0.00% | 12 |
| Wanda N. Allen | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Stuart H. Dunn | 0 | 0.00% | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Henry H. Howell III | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 1 | 100.00% | 0 | 0.00% | 0 | 0.00% | 1 |
| Franklin Michaels | 2 | 50.00% | 0 | 0.00% | 1 | 25.00% | 0 | 0.00% | 1 | 25.00% | 0 | 0.00% | 4 |
| C. Gilbert Hudson | 2 | 100.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 2 |
| **Total Outside Northern Virginia** | 399 | 49.08% | 82 | 10.09% | 185 | 22.76% | 105 | 12.92% | 24 | 2.95% | 18 | 2.21% | 813 |
| **Total Virginia** | 660 | 47.45% | 173 | 12.44% | 312 | 22.43% | 186 | 13.37% | 35 | 2.52% | 25 | 1.80% | 1391 |

# EXHIBIT D

USCA4 Appeal: 23-1854    Doc: 27    Filed: 09/26/2023    Pg: 434 of 436
Case 1:22-cv-01070-MSN-IDD   Document 134   Filed 01/20/23   Page 2 of 7 PageID# 440

# Virginia Department of Education
## Division of Special Education and Student Services
## Office of Dispute Resolution and Administrative Services

## Special Education Hearing Officer System
## Time Record / Invoice

VDOE Case #: 21-009

H.O. Name: RHONDA J. S. MITCHELL

EIN/SS#: See attached IRS form W-9
eVA number: VC0000161913

Student's Name:

School Division: FAIRFAX COUNTY PUBLIC SCHOOLS (FCPS)

Please Note: List the specific date and amount of time for each service. DO NOT aggregate the time.

| Date | Description of Activity | Hours x $125 |
|------|------------------------|--------------|
| August 27, 2020 | notification of appointment | |
| August 31, 2020 | formal appointment; confirmation letter; notice of 1st prehearing conference; reviewed complaint; amended notice of first prehearing conference; VDOE appointment of evaluator and case # | 1.40 |
| September 1, 2020 | reviewed FCPS subpoenas; reviewed timeline requirements; prehearing report (draft); issue identification; conference call prep; conference call; reviewed complaint enclosures | 5.10 |
| September 2, 2020 | final prehearing report; notice of hearing; notice of 2nd prehearing conference; prehearing order | 4.40 |
| September 3, 2020 | research; reviewed parent objections to subpoenas and other concerns; reviewed FCPS' response | 2.45 |
| September 4, 2020 | reviewed parent response to FCPS response to parent concerns; reviewed parent objections to IEP team; decision letter re parent concerns; emails re parent concerns about resolution session members | 6.45 |

**JA136**

| | | |
|---|---|---|
| September 5, 2020 | emails re subpoenas, resolution session and confidentiality; reviewed parent's subpoena | 2.15 |
| September 8, 2020 | emails re subpoenas; notices for 2nd and 3rd conference calls; emails re resolution session and confidentiality | 1.05 |
| September 9, 2020 | reviewed emails; reviewed FCPS Motion to Quash; research | 2.15 |
| September 11, 2020 | reviewed mails; prep for conference call; 2nd conference call | 2.45 |
| September 12, 2020 | amended formal notice of hearing;  reviewed parent's email dated September 11th with enclosures | 2.10 |
| September 13, 2020 | 2nd prehearing order; reviewed FCPS insufficiency and response; decision on notice of insufficiency and SOL; research; emails | 8.30 |
| September 14, 2020 | entered protective order; notice of 3rd prehearing conference call; revised previous notice of call; decision addendum | 2.40 |
| September 15, 2020 | reviewed parent's September 13, 2020 email re burden of proof and attorney misconduct allegations | 1.10 |
| September 16, 2020 | prep for conference call; 3rd conference call; hearing agenda; 3rd prehearing order ; notice of 5th prehearing conference call | 2.05 |
| September 17, 2020 | reviewed parent's email response to FCPS' Motion to Dismiss, Objection to Sufficiency, and Response; reviewed back and forth emails between parent and BK re drop box access' answered parent's email re her FOIA | 2.20 |
| September 20, 2020 | reviewed parent's motions for sanctions; reviewed parent's enclosures including VDOE letter of findings; reviewed FCPS' response to motion for sanctions; reviewed parent's request to delay submission of exhibit books; research | 4.15 |
| September 21, 2020 | reviewed parent's request for hearing delay and enclosures; prep for conference call; conference call; parent emails | 2.15 |
| September 22,2020 | parent emails re privacy violations and alleged FCPS misrepresentations; emergency conference call;  amended hearing notice | 2.00 |
| September 23,2020 | notice of 6th conference call; 4th prehearing order; reviewed emails; received exhibit books | 4.40 |
| September 25, 2020 | reviewed exhibit books; prep for conference call; conference call; emails | 5.35 |
| September 26, 2020 | reviewed exhibit books; 5th prehearing order; emails | 7.05 |

**JA137**

| | | |
|---|---|---|
| September 27, 2020 | emails; reviewed exhibit books | 6.35 |
| September 28, 2020 | reviewed exhibit books; emails | 7.15 |
| September 29, 2020 | emails; reviewed exhibit books; prep for hearing | 3.25 |
| September 30, 2020 | prep for hearing; hearing | 6.00 |
| October 1, 2020 | prep for hearing; hearing | 8.10 |
| October 2, 2020 | prep for hearing; hearing | 9.00 |
| October 3, 2020 | review evidence | 2.10 |
| October 6, 2020 | emails; amended hearing notice; notice of mid-hearing conference call | .55 |
| October 7, 2020 | mid-hearing conference call; drafted order re transcripts; emails | 2.50 |
| October 8, 2020 | emails; research | .50 |
| October 9, 2020 | completed order re transcripts; research | 2.45 |
| October 10, 2020 | reviewed exhibits; emails | 1.30 |
| October 12, 2020 | prep for hearing; organize hearing notes | 1.15 |
| October 13, 2020 | prep for hearing; hearing | 8.20 |
| October 14, 2020 | prep for hearing; hearing | 8.50 |
| October 15, 2020 | prep for hearing; hearing | 4.00 |
| October 16, 2020 | hearing notice extension | .15 |
| October 17, 2020 | review exhibits; organized hearing notes; research | 2.35 |
| October 18, 2020 | prep for hearing | .20 |

| Date | Description | Hours |
|---|---|---|
| October 19, 2020 | prep for hearing; hearing | 12.00 |
| October 20-21, 2020 | email traffic and message search | 1.40 |
| October 22, 2020 | research; review exhibits; emails back and forth re post hearing issues | 4.10 |
| October 23, 2020 | decision: cover sheet, intro and history | 4.30 |
| October 24, 2020 | post hearing decision; emails | 1.55 |
| October 25, 2020 | decision: intro and history; issues; burden of proof | 5.45 |
| October 26, 2020 | emails re transcripts; decision: intro and history | 5.00 |
| October 28, 2020 | reviewed transcripts | 2.15 |
| October 29, 2020 | reviewed transcripts; decision:      ; intro and history; witness appearances | 5.20 |
| October 31, 2020 | decision: synopsis and facts; transcripts | 5.35 |
| November 1, 2020 | petitioner's brief; transcripts | 5.00 |
| November 2, 2020 | petitioner's brief; transcripts | 7.15 |
| November 4, 2020 | read briefs | 9.00 |
| November 5, 2020 | research; transcripts; emails | 7.20 |
| November 6, 2020 | decision: revisions; emails | 8.10 |
| November 7, 2020 | decision: edits and additions | 1.50 |
| November 9, 2020 | decision letter 2; research | 5.20 |
| November 10, 2020 | decision letter 2 | 2.30 |

| November 11, 2020 | completed decision letter 2; decision: intro additions | 5.35 |
| November 12, 2020 | decision: synopsis | 6.00 |
| November 13, 2020 | decision: synopsis | 5.10 |
| November 15, 2020 | decision: synopsis; witnesses | 10.30 |
| November 17, 2020 | decision: witnesses; research | 3.35 |
| November 18, 2020 | review briefs; decision: arguments | 6.45 |
| November 19, 2020 | decision: arguments; legal analysis and findings | 11.30 |
| November 20, 2020 | decision: legal analysis and findings | 4.30 |
| November 21, 2020 | decision: findings summary; research; edits | 3.45 |
| November 22, 2020 | decision: orders; appeal rights; edits | 7.45 |
| November 23, 2020 | decision: legal analysis; edits; review SEA-STARS correspondence; letter SEA-STARS | 6.15 |
| November 24, 2020 | decision: additions; edits; research | 10.00 |
| November 25, 2020 | decision: edits | 2.30 |
| November 27, 2020 | decision: edits, additions | 5.15 |
| November 28, 2020 | decision: edits; additions | 3.35 |
| November 29, 2020 | decision: edits | 1.45 |
| November 30, 2020 | decision: final edits, decision sent; case closure report | 6.40 |

**JA140**

| December 1-3, 2020 | post hearing emails from petitioner | |
| December 6, 2020 | W-9, timesheet (invoice) | 1.00 |

**Subtotal: 346.9 HOURS**

**Minute calculation guide: .15 = 15 minutes; .30 = 30 minutes; .45 = 45 minutes, etc.**

**TOTAL AMOUNT DUE: $43,325.00**

**All administrative duties and postal costs were performed Gratis.**

**Please remit payment within 30 days to:**
**RHONDA MITCHELL**
**5001 LIPPINGHAM DRIVE**
**CHESTER, VIRGINIA 23831**

Signed: _____/s/_____

Dated: December 7, 2020

# EXHIBIT E

*September 2, 2022*

Summary of Hearing Officer Information and Ruling Record

    This matrix summarizes publicly available information for individuals appointed as Hearing Officers to preside over due process cases brought by parents of disabled or special needs children in Virginia under the Individuals with Disabilities and Education Act ("**IDEA**") for the period from 2010 to June 2021. The chart also provides the ruling record of each officer for the time period from 2003 through June 2021. The information in the chart below is based on public searches and information provided in response to a request for information under the Virginia Freedom of Information Act. This chart also indicates the year such individual was formally approved and certified to serve as a Hearing Officer based on the Special Education Hearing Officer listing published in June 2021 by Virginia ("**Hearing Officer Listing**").

| Hearing Officer | Publicly Available Professional Background | Number of Rulings in Favor of Parents in last twenty years |
|---|---|---|
| ***Northern Virginia*** | | |
| Richard M. Alvey | Certified as a Hearing Officer in 1996. Based on LinkedIn profile, practices law in Stafford, Virginia as a sole practitioner. | 1 out of 69 cases (1.4%) |
| Frank G. Aschmann | Certified as a Hearing Officer in 1994. Based on a Martindale law firm summary, Aschmann works in a two-member law firm Aschmann & Aschmann in Alexandria Virginia with Charles Aschmann, Jr. The firm's practices include personal injury and employment law. | 1 out of 62 cases (1.6%) |
| Morgan Brooke-Devlin | Certified as a Hearing Officer in 1993. Based on a Dunn & Bradstreet report, Morgan Brooke-Devlin works for a two-person law firm Brooke-Devlin & Nester based in Falls Church, Virginia. | 0 out of 55 cases (0%) |
| William J Dangoia | Certified as a Hearing Officer in 1999. Based on multiple legal listing services, Dangoia works as a sole practitioner in Occoquan, VA. | 0 out of 33 cases (0%) |
| Alan Dockterman | Certified as a Hearing Officer in 1997. Based on multiple legal listing services, Dockterman works a sole practitioner in Alexandria, Virginia. | 1 out of 53 cases (1.9%) |
| Robert Hartsoe | Certified as a Hearing Officer in 1999. Based on his firm's website, Hartsoe works for a two-member law firm Hartsoe & Morgan based in Fairfax, Virginia. The firm also employs one other attorney. | 2 out of 70 cases (2.9%) |

10893729v1/017480

| Hearing Officer | Publicly Available Professional Background | Number of Rulings in Favor of Parents in last twenty years |
|---|---|---|
| James M. Mansfield | Certified as a Hearing Officer in 1999.  Based on multiple legal listing services, Mansfield works as a sole practitioner in Fairfax, Virginia. | 0 out of 30 cases (0%) |
| William E. Rollow | Certified in 1996.  Based on the Hearing Officer Listing and his LinkedIn profile, Rollow worked for a two-member firm Rollow and Giroux based in Great Falls, Virginia.  Rollow died in 2021. | 0 out of 31 cases (0%) |
| Jane Schroeder | Certified in 1999.  Based on multiple legal listing services, Schroeder is a sole practitioner based in Reston, Virginia. | 0 out of 33 cases (0%) |
| David R. Smith | Certified in 2000.  Based on multiple legal listing services, David R. Smith is a sole practitioner based in Fairfax, Virginia. | 0 out of 25 cases (0%) |
| George C. Towner, Jr. | Certified in 1993.  Based on multiple legal listing services, Towner worked as a sole practitioner based in Arlington, Virginia.  Towner died in 2021. | 0 out of 54 cases (0%) |
| Anthony C. Vance | Certified in 1987.  Based on multiple legal listing services, Vance worked as a sole practitioner based in McLean, Virginia.  Vance died in 2020. | 0 out of 30 cases (0%) |
| ***Outside of Northern Virginia*** | | |
| Lorin A. Costanzo | Certified in 1995.  Based on multiple legal listing services, Costanzo is a sole practitioner based in Vinton, Virginia. | 0 out of 93 cases (33%) |
| Raymond E. Davis | Certified in 1989.  Based on his obituary, Davis was retired since 2010 and did not appear to have any other sources of income from employment other than hearing officer fees.  Davis died in 2017. | 0 out of 13 cases (0%) |
| William S. Francis, Jr. | Certified in 1985. Based on multiple legal listing services, Francis is a sole practitioner based in Richmond, Virginia. | 1 out of 65 cases (1.5%) |
| Sara S. Freeman | Certified in 1989.  Based on multiple legal listing services, Freeman is a sole practitioner based in Norfolk, Virginia. | 4 out of 88 cases (4.5%) |

2

10893729v1/017480

| Hearing Officer | Publicly Available Professional Background | Number of Rulings in Favor of Parents in last twenty years |
|---|---|---|
| Robin S. Gnatowsky | Certified in 1997. Based on multiple legal listing services, Gnatowsky is a sole practitioner based in Glen Allen, Virginia. | 0 out of 51 cases (0%) |
| Ternon Galloway Lee | Certified in 2001. Based on multiple legal listing services, Galloway Lee is a sole practitioner based in Williamsburg, Virginia. | 2 out of 107 cases (1.9%) |
| Rhonda J.S. Mitchell | Certified in 2001.  Based on multiple legal listing services, Mitchell is a sole practitioner based in Chester, Virginia. | 1 out of 79 cases (1.3%) |
| Krysia Carmel Nelson | Certified in 2001. Based on multiple legal listing services, Carmel Nelson is a sole practitioner based in Keswick, Virginia. | 0 out of 18 cases (0%) |
| John V. Robinson | Certified in 1997. Based on multiple legal listing services, Robinson is a sole practitioner based in Richmond, Virginia. | 4 out of 108 cases (3.7%) |
| Peter Vaden | Certified in 1996. Based on multiple legal listing services and his publicly available resume, Vaden is a sole practitioner based in Charlottesville, Virginia. Based on his resume, he appears to receive income as a hearing officer for several Virginia state agencies. | 4 out of 92 cases (4.3%) |

3

108937729v1/017480

**JA145**

# EXHIBIT F

LAW OFFICE OF
# WILLIAM B. REICHHARDT
1940 DUKE STREET, SUITE 200
ALEXANDRIA, VIRGINIA 22314

WILLIAM B. REICHHARDT (VA, MD)
GRACE E. KIM (VA), Of Counsel

TELEPHONE (443) 949-7290
FACSIMILE (703) 548-9446

EMAIL:  wbr@wbrlaw.com

October 6, 2015

Sheila T. Gray, Administrative Coordinator
Office of Dispute Resolution and Administrative Services
Department of Education
Commonwealth of Virginia
P. O. Box 2120
Richmond, VA  23218-2120

Re:  Due Process Evaluation-

Dear Ms. Gray:

    I am the attorney who represented the parents in this recent Due Process action against the Fairfax County Public Schools. Ms. Morgan Brooke-Devlin was the presiding Hearing Officer. I am compelled to write this letter because during my 20 years of law practice in the area of special education I have never experienced such a biased and legally misinformed opinion from a Hearing Officer as was apparent in this case.

    This Due Process case involved placement of a significantly disabled 11-year-old boy to the Grafton residential school in Winchester through the actions of the CSA in Fairfax County. Before the child was recommended to return home, the CSA unilaterally closed the case and ceased funding for the Grafton School. The parents sought relief through the IDEA and IEP process. When resolution could not be reached with the school district, the Due Process action was filed.

    This was a complicated case which involved four full days of hearing and over 200 exhibits were filed. The complexity of the case notwithstanding, it was apparent that the Hearing Officer was continually confused about the law and Virginia Regulations that govern school district responsibility in cases involving placements of children for non-educational reasons. In addition, in her final determinations of "fact" and conclusions of law, Ms. Brooke Devlin misconstrued or ignored clear and convincing evidence presented in the parents' case. She excused the school district's failure to provide services (even after the school district witness admitted such mistakes during the hearing).  She suggested that literally all of the parents' expert witnesses were not credible even though a number of them have impressive reputations in their fields and had conducted more thorough evaluations than any material submitted by the school district.

**JA147**

This hearing officer invalidated a key provision of the Virginia Administrative Code (8 VAC 20-81-30), believing it to be in conflict with federal law and therefore preempted. It should be noted that neither party made this argument at the hearing nor. I submit that this was clearly a wrong conclusion. In fact, this Administrative Code section was a pivotal consideration for the stay- put and ultimate determination in this case. Not only did the hearing officer fail to address the facts in relation to this code section, she did not later reconsider her position when it was pointed out to her in writing. The hearing officer made a stay put determination for this child that he be placed in a public day program that was not proposed by either the school district or the parents and is over 75 miles from the residential placement where he was enrolled.

I have participated in numerous Due Process actions. I have settled many special education cases with school districts throughout Virginia and I lecture regularly to attorneys and advocates throughout the state regarding settlement negotiations and special education litigation. I have argued cases in federal courts at the district and appellate level. I have certainly experienced adverse rulings from hearing officers and judges, but I have never seen a judicial officer work so hard to avoid plain facts on the record in an apparent attempt to rule against the parents, misconstrue the law, and excuse literally every adverse action of the school district. Unfortunately, it was clear right after Ms. Brooke-Devlin's preliminary ruling on the stay put motion that she did not know the applicable law and was either unable or unwilling to review her ruling after her omission was brought to her attention. As a result, the parents in this case have no alternative but to file appeals to federal court for relief.

It is imperative that the Due Process procedure be perceived as fair and unbiased. Ms. Brooke Devlin's performance in this case jeopardized that goal. Please consider this letter to be a formal complaint and I ask that she not be appointed in any further Due Process actions. I am happy to share more specific aspects of this record with you or any member of your staff should you wish to conduct an independent review of this case. You might also be concerned that a Hearing Officer has now ruled that 8 VAC 20-81-30 is invalid and in direct conflict with federal law.

Thank you for your consideration in this matter.

Sincerely,

William B. Reichhardt

cc:  Mr. and Mrs. Trevor Chaplick

1

```
 1                  UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3
       D.C., by his parents and      :
 4     guardians, et al.,            :
                                     :   Civil Action
 5              Plaintiff,           :   No. 1:22-cv-01070-MSN-IDD
                                     :
 6          v.                       :
                                     :   May 4, 2023
 7     FAIRFAX COUNTY SCHOOL BOARD,  :   1:55 p.m.
       et al.,                       :
 8                                   :
                                     :
 9              Defendant.           :
                                     :
10     ............................. :

11
                    TRANSCRIPT OF MOTION HEARING
12         BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
                UNITED STATES DISTRICT COURT JUDGE
13
     APPEARANCES:
14
       For the Plaintiffs:          MERRITTHILL, PLLC
15                                  R. Braxton Hill, IV, Esq.
                                    919 East Main Street
16                                  Suite 1000
                                    Richmond, VA 23219
17
                                    SUSMAN GODFREY L.L.P. (CA-NA)
18                                  Michael Brent Adamson, Esq.
                                    Pro hac vice
19                                  1900 Avenue of the Stars
                                    Suite 1400
20                                  Los Angeles, CA 90067

21                                  William Rudolph Merrill, Esq.
                                    Pro hac vice
22                                  1000 Louisiana Street
                                    Suite 5100
23                                  Houston, TX 77002

24

25                                  (Continued)
```

```
 1     (Continued)

 2     For the Defendants:          FAIRFAX COUNTY PUBLIC SCHOOLS
                                    Julia Bougie Judkins, Esq.
 3                                  Jeanne-Marie Raymond Burke, Esq.
                                    8115 Gatehouse Road
 4                                  5th Floor
                                    Falls Church, VA 22042
 5
                                    Jeanne-Marie Sidonie Raymond
 6                                  Burke, Esq.
                                    Office of Division Counsel
 7                                  8115 Gatehouse Road
                                    Suite 5600
 8                                  Falls Church, VA 22042

 9                                  McGUIREWOODS LLP
                                    Jackie White, II, Esq.
10                                  1750 Tysons Boulevard
                                    Suite 1800
11                                  Tysons, VA 22102

12                                  Farnaz Farkish Thompson, Esq.
                                    888 16th Street NW
13                                  Suite 500
                                    Washington, D.C. 20006

14
       Also Present:               Brian David Schmalzbach, Esq.
15                                  Daniel Masakayan, Esq.
                                    Michael McMillin, Esq.
16                                  Aderson François, Esq.

17     Court Reporter:             Diane Salters, B.S., CSR, RPR, RCR
                                    Official Court Reporter
18                                  United States District Court
                                    401 Courthouse Square
19                                  Alexandria, VA 22314
                                    Email: Dianesalters.edva@gmail.com
20                                  Telephone:  (301) 338-8033

21

22

23

24
       Proceedings reported by machine shorthand.  Transcript produced
25     by computer-aided transcription
```

3

1          THE COURTROOM DEPUTY:  *D.C., by his parents and*

2  *guardians, Trevor Chaplick and Vivian Chaplick, et al. v. Fairfax*

3  *County School Board, et al.*, Case Number 22-cv-1070.  Will the

4  parties please note their appearances for the record?

5          MR. HILL:  Good afternoon, Your Honor.  Braxton Hill

6  from the Merritt Law Firm on behalf of the plaintiffs.

7          MR. ADAMSON:  Michael Adamson with Susman Godfrey on

8  behalf of the plaintiffs.

9          MR. MERRILL:  William Merrill on behalf of Susman

10  Godfrey on behalf of the plaintiffs.  We'll be the ones speaking

11  today.  We also have Mr. Aderson François of the Georgetown Law

12  Center, who is co-counsel in the case, as well as our clients,

13  Mr. Trevor and Vivian Chaplick.

14          THE COURT:  Good afternoon.  Good afternoon to you all.

15  Let me just try and understand it.  Who will be arguing this

16  afternoon, or what is your intention?

17          MR. MERRILL:  If it's okay with Your Honor, Mr. Adamson

18  and I have split the argument divided by the issues, and I'll be

19  covering the standing issue, the class allegations issue, and

20  Mr. Adamson will be covering, essentially, the rest of the

21  issues.

22          THE COURT:  All right.  That's all right.  A little bit

23  unusual, but I'll certainly permit it.

24          MR. MERRILL:  Thank you.

25          THE COURT:  Good afternoon.

4

*Proceedings*

1              MS. JUDKINS:  Julia Judkins for the school board and

2    Dr. Reid.

3              THE COURT:  Good afternoon.

4              MS. BURKE:  Good afternoon.  Jeanne-Marie Burke for the

5    school board and Dr. Reid.

6              THE COURT:  Good afternoon.  And who else do we have

7    here, just so that I know?

8              MS. BURKE:  This is our colleague, Michael McMillin,

9    and he will not be entering an appearance.

10             MS. THOMPSON:  Good afternoon, Your Honor.  My name is

11   Farnaz Farkish Thompson, and I represent the Virginia Department

12   of Education and Virginia superintendent of public instruction,

13   Lisa Coons.

14             MR. WHITE:  Jack White on behalf of the Virginia

15   Department of Education and the superintendent.

16             THE COURT:  Good afternoon.  Very good.

17             Well, this matter comes before the Court on motions to

18   dismiss the amended complaint filed by the various defendants,

19   and I've received the pleadings and had the opportunity to review

20   the materials, and I'll hear argument at this time.  I don't need

21   to hear all of the argument that's presented in the papers.  This

22   is really an opportunity for me to ask questions and to hear what

23   you think is most important, but I want you to assume that I'm

24   familiar with the facts and with the law and that we will have a

25   focused discussion.  I don't want anyone to interpret any

*Proceedings*

1    interruption as being rude or uninterested.  It's really more

2    about using our time as productively as possible.

3           I will tell you that there will be no surprises here.

4    I'm going to take this matter under advisement.  This is an

5    opportunity to educate me.  Although this is the Eastern District

6    of Virginia and I would ordinarily endeavor to rule from the

7    bench, and do frequently, there is enough here that I think I'll

8    want to take a little bit of time to think about it some more.

9    So with that in mind, I will hear, first, from the defendants who

10   have made this motion.

11          MS. JUDKINS:  Yes, Your Honor.  I'm glad to hear you

12   don't expect us to regurgitate everything in the memoranda,

13   because I would not be able to do that, in all honesty.

14          On behalf of the school board and Dr. Reid, we are

15   arguing, really, this is not a case where one proceeding can go

16   forward and resolve questions that will apply to everyone

17   regardless of which class.  For example, Fairfax has 30,000

18   children identified with disabilities who have IEPs, and then

19   7,000 who are under 504 and don't have IEPs.  I do know that you

20   are familiar with the process, having actually sat and reviewed

21   an administrative record, so you understand the process, and I

22   don't intend to argue that, except that as to Fairfax County

23   School Board and the Chaplicks' and the Binghams' complaint,

24   specifically because they are here, what is this case about?

25   It's a case about the Chaplicks and the Binghams wanting a redo,

6

1    undo whatever happened in their cases, because they remind us in

2    their pleadings that, Oh, by the way, don't forget that we have

3    our claims and we will be litigating our claims in this court.

4            THE COURT:  Well, let me stop you --

5            MS. JUDKINS:  Yes.

6            THE COURT:  -- and help us with the structure this

7    afternoon.  I think what I'd like to do is hear your argument --

8    and I'll hear everyone's argument -- with regard to the standing

9    for M.B. first, and then we'll turn to D.C., and then we'll turn

10   to the organization.  Those are the three plaintiffs that are

11   identified --

12           MS. JUDKINS:  Right.

13           THE COURT:  -- and they have dramatically different

14   arguments.  So let's start with M.B., and I'll give you a chance

15   to speak, give your colleagues a chance to speak, hear from the

16   plaintiffs, and then we'll move on one by one so that we're not

17   mixing up the arguments.

18           MS. JUDKINS:  Right.  With regard to M.B., they have

19   exhausted their administrative remedies and are now before Judge

20   Ellis with the same complaints about their IEP.  Their individual

21   complaints are specific as to the IDEA.  Nobody's alleged ADA or

22   504 or anything else -- I'll get to the 1983 -- but they are very

23   specific, and they've all been adjudicated under the process.

24   And then now they're in front of Judge Ellis on the court review,

25   and their complaints and the issues they put forward are in their

*Proceedings*

1   pleadings.  They're a public record.  So what do they expect, and

2   how could this Court resolve their complaints except to go back

3   and review the administrative record, which Judge Ellis is doing?

4   They would like to argue that you have a biased hearing officer

5   process.  We have nothing to do with that; that's VDOE.  The

6   Supreme Court of Virginia maintains those lists.  They send the

7   name; they identify who's going to be your hearing officer.  We

8   have nothing to do with that; and, regardless, all they claim

9   supports their allegations of bias is what happened in their

10  cases and statistics about results over which we have no control.

11  We just don't manage that process.  So with regard to the

12  Binghams, they have been through the process that Congress said

13  was suitable for resolving IDEA claims, and it's very

14  technical -- and I'm relying on the *Sellers* case -- where you

15  have this structured system.  And why do they have this

16  structured system?  Because if not, every single family who is

17  unhappy with their IEP would come in to state or federal court

18  and expect the judge, or maybe even ask a jury, to review:

19  Review this IEP and listen to our experts who will tell you they

20  should have done it this way, they should have done it that way.

21  That has all been avoided because of the federal law and how it's

22  structured.  You can't get out of that structure in the way that

23  they're trying to do here.

24          THE COURT:  Well, how do you respond to the argument

25  that the plaintiffs make that these are not substantially similar

*Proceedings*

1   claims?  That's the analysis the Court has to go through,

2   correct, under the duplicative-litigation doctrine that you're

3   invoking, right, that there's a case before Judge Ellis and

4   there's now a case before me, and that your argument is this is

5   the same case, these are the same issues and, therefore, it needs

6   to be with Judge Ellis because that's the process that's been

7   followed under the --

8           MS. JUDKINS:  Right.

9           THE COURT:  -- IDEA.  Plaintiffs argue that, No, we

10  didn't raise these claims about the system itself, that the

11  regulations implementing the system and the entire

12  decision-making process, the hearing officer is so flawed, so

13  infected with bias, that that's not being litigated before Judge

14  Ellis; how do you respond to that?

15          MS. JUDKINS:  Well, I argue what they are claiming in

16  this case.  Most of the allegations relate to either the

17  Chaplicks or the Binghams.  They go paragraphs after paragraphs

18  of what happened in their process, and they say in their pleading

19  that they -- on page 33, plaintiffs admit in the complaint that

20  they have their own claims under the IDEA and their own claims

21  against FCSB under the IDEA -- I'm sorry, this is in one of their

22  briefs -- confirming that they are seeking to litigate what

23  happened in their cases.  They are asking.  They have this huge

24  claim that the whole system is broken and they want it -- as they

25  say, they want it overturned; they want the system in Virginia,

1   VDOE-wise, overturned.  Well, the Binghams, they mention, and so

2   do the Chaplicks, Don't forget us; we're still here and we

3   want -- in their briefs, in one of their replies -- we want to

4   litigate our claims.  Well, what do the Binghams have to litigate

5   that's not already in front of Judge Ellis?  Their whole record

6   is in front of Judge Ellis, the administrative record.  They went

7   through an evaluation.  They detailed the processes they had in

8   trying to develop IEPs and the objections they have.  They had an

9   administrative hearing, and they go through that, and they have

10  one sentence:  Biased administrative hearing officer.  What

11  facts?  They don't even identify who that person is.  It's not

12  the same hearing officer who heard the Chaplicks.  We know that.

13  So what do the Binghams seek if they -- what do they seek?  If

14  they are seeking to deconstruct the entire system, what does that

15  mean?  They want a redo?  They want everything from the bottom up

16  to be redone?  That's incredible, and it would be really

17  impossible.  So I look at this as two families who have specific

18  claims and have reiterated in their pleadings that they intend to

19  go forward on their specific claims.

20          As to the Binghams, they're already in the court.

21  They're in the court for whatever relief they could ever get in

22  this court for the claims they have outlined:  We wanted

23  residential placement -- I'm sorry, We wanted placement in

24  PHILLIPS School as opposed to the school --

25          THE COURT:  Burke Centre.

*Proceedings*

1          MS. JUDKINS:  Burke Centre.  So that's what they want

2    you to do, to review their record and determine whether the

3    hearing officer was wrong and they should get to go to PHILLIPS.

4    Well, I know the briefs have already been filed in the case

5    before Judge Ellis; that's why it's duplicative.  All this other

6    stuff is really against the system, primarily VDOE.  As they

7    allege it against the school board, it's all conclusory:  You

8    don't do evaluations; you don't do IEPs; you do bad IEPs; you

9    don't listen to parents.  There's a whole litany of conclusory

10   statements.  Well, how is the Court supposed to determine that?

11   You've got to -- in *Endrew*, the Supreme Court said this is such a

12   detailed specific unique process to each child.  Are you going to

13   go through all 30,000 of Fairfax's files to determine whether

14   there was an evaluation, there was a good evaluation or bad

15   evaluation, there was an IEP, there was a problem with the IEP?

16   How about you'd have to call out the cases that already had

17   administrative hearings and --

18          THE COURT:  Let me --

19          MS. JUDKINS:  Of course.

20          THE COURT:  -- I'm sorry for --

21          MS. JUDKINS:  Oh, no, go ahead.

22          THE COURT:  Let me just focus you, stop you there so I

23   can hear --

24          MS. JUDKINS:  Okay.

25          THE COURT:  -- from everyone.

11

1       With regard to standing and M.B., what I'm hearing you

2   say is that there's no standing for this matter to be heard

3   because of the Judge Ellis case --

4       MS. JUDKINS:  Right.

5       THE COURT:  -- and that is where it should be resolved.

6   And I think you're making, and you've made in the papers, the

7   argument that there could be inconsistent results about the same

8   facts, and that would be improper, and that's your --

9       MS. JUDKINS:  Yes.

10      THE COURT:  -- argument as to why M.B. --

11      MS. JUDKINS:  Yes.

12      THE COURT:  -- can't serve as a plaintiff in this

13  matter --

14      MS. JUDKINS:  Right.

15      THE COURT:  -- is that right?

16      MS. JUDKINS:  Yes.

17      THE COURT:  Okay.  Is there anything else you want to

18  add with regard to that before I hear from your colleague and

19  then hear a response?  And then we'll come back and address D.C.

20  since there are somewhat different facts there.  If you want to

21  rely on the same arguments, you can, but, of course, there is no

22  case before --

23      MS. JUDKINS:  I'm the only one --

24      THE COURT:  -- Judge Ellis.

25      MS. JUDKINS:  -- arguing here today, Your Honor --

12

*Proceedings*

 1          THE COURT:  That's fine.

 2          MS. JUDKINS:  -- for the school board.

 3          THE COURT:  That's fine, too.

 4          So I want to hear from the Virginia Department of

 5   Education to the extent --

 6          MS. JUDKINS:  Oh, okay.

 7          THE COURT:  -- they want to --

 8          MS. JUDKINS:  Oh, I'm sorry.  All right.

 9          THE COURT:  -- weigh in on the issue of standing of

10   M.B.  It may be that the structure I've chosen is more

11   confusing --

12          MS. JUDKINS:  No, I appreciate it.

13          THE COURT:  -- than the one that you'd have, but that's

14   at least what we're going to try out here.

15          MS. JUDKINS:  I appreciate it.

16          MS. THOMPSON:  May it please the Court.  Would you mind

17   if I just made a few remarks before I dive into the argument on

18   standing?

19          THE COURT:  You can, but --

20          MS. THOMPSON:  Very brief.

21          THE COURT:  -- I'd like to stay focused on this issue

22   by issue.

23          MS. THOMPSON:  This lawsuit is about a lawful, yet

24   imperfect, system to provide two children with disabilities a

25   free appropriate public education in one local educational

*Proceedings*

 1   agency -- Fairfax County Public Schools.  The Individuals with

 2   Disabilities Education Act provides an imperfect federal

 3   statutory scheme that recognizes that not all parents'

 4   preferences may be accommodated with each offer of a free

 5   appropriate public education; nonetheless, the due process

 6   hearing in Virginia allows for the highest court in Virginia, the

 7   Supreme Court of Virginia, to recuse bias hearing officers, and

 8   remains a lawful administrative process to adjudicate the

 9   plaintiffs' claims.  This Court should dismiss the first amended

10   complaint with respect to standing because none of the plaintiffs

11   have standing.  And, specifically, Your Honor, with respect to

12   M.B., the crux of his claim is a past injury, and the burden is

13   on plaintiffs to demonstrate standing, and what they are asking

14   for is injunctive relief, which is prospective relief; and in

15   order to get that, you have to demonstrate an injury in fact, a

16   concrete imminent harm that the state defendants would impose

17   upon M.B., and there is no such harm.  M.B. had his due process

18   hearing.  He didn't object to the hearing officer in that

19   hearing, and he hasn't alleged that he would actually request

20   another due process hearing.

21        And there's one thing I'd like to note:  When

22   plaintiffs discussed dispute resolution services, they really

23   define it in a footnote as three things.  They define it as

24   mediation, a due process hearing, and also the opportunity to

25   bring a complaint directly before the State Department of

*Proceedings*

1    Education; yet, the only thing that M.B. alleges is that he went

2    through a due process hearing.  And that's a past failure; that's

3    in the past; and that alone is insufficient to demonstrate

4    standing with respect to the state defendants because there's no

5    allegation of an imminent concrete harm that the Virginia

6    Department of Education or Virginia superintendent would make

7    against M.B.

8          THE COURT:  Let me just ask you about that.  Do you

9    believe that if plaintiffs had included an allegation that they

10   were going to go through this process again -- because their

11   student would still be in the system and that they would be

12   faced, then, with the same problems of a biased hearing officer

13   or a systemic problem -- that that would solve the problem with

14   regard to standing?

15         MS. THOMPSON:  It would solve the problem, Your Honor,

16   with respect to alleging a concrete injury in fact.  That would

17   be solved.  What wouldn't be solved is redressability, because

18   even if Your Honor granted everything that plaintiffs requested,

19   it still wouldn't really remedy the situation, because what

20   they're asking for is a different outcome from the due process

21   hearing.  So even if we replaced all 22 hearing officers with the

22   Virginia Department of Education, it wouldn't necessarily result

23   in exactly what these plaintiffs want, which is the

24   free appropriate public education that their parents prefer; and

25   that's really not the issue under the IDEA.  And so they would

15

*Proceedings*

1    have the injury in fact if they alleged what you just said, but

2    they wouldn't be able to demonstrate redressability with respect

3    to the relief that they request in this particular lawsuit.

4           THE COURT:  In other words, if what they are asking

5    Judge Ellis to do is to address the past harm of not paying for

6    the PHILLIPS School, and if Judge Ellis were to agree that there

7    had been a violation and that the hearing officer had been

8    incorrect, he could then order that the school system pay them

9    for the money they'd expended at the PHILLIPS School; but in this

10   lawsuit, what they're asking for is only injunctive relief, and

11   that even if they were to get what they're asking for, that would

12   not address the past harm; it wouldn't involve money being given

13   to them; it would, at most, allow them, in the future, to go

14   through a process that was different from the process that they

15   went through that they were dissatisfied with?  Is that an --

16          MS. THOMPSON:  Yes, Your Honor.  That's exactly -- I

17   don't even need to make the point you just made -- that's exactly

18   our argument.

19          THE COURT:  Is there anything else with regard to

20   standing in M.B. that you wish to make?  Again, I'll give you the

21   opportunity to make all of your arguments and address the other

22   two plaintiffs in due course.

23          MS. THOMPSON:  No, Your Honor.  That's all with respect

24   to M.B. and standing.  Thank you.

25          THE COURT:  Thank you.

1          MR. MERRILL:  Your Honor, William Merrill for the

2     plaintiffs.

3          First of all -- and the Court probably already knows

4     that -- but on the issue of standing, you only have to

5     demonstrate that one plaintiff has standing.  That's the Fourth

6     Circuit case -- it's based on a Supreme Court case -- but the

7     Fourth Circuit case of *Bostic v. Schaefer*, which is 60 F.2d 352

8     at 370.  So as we go through -- obviously, we do want to go

9     through all three, but I think that's an important context.

10          I think the defendants misunderstand the nature of our

11     case.  This is not a case about D.C.'s or M.B.'s IEP.  It is not

12     a case about whether they should or should not receive whatever

13     particular services they should receive.  This is a case about a

14     broken system.  We are here to represent one of Virginia's most

15     vulnerable populations -- disabled children.  These children are

16     being deprived of critical federal and constitutional rights in

17     Fairfax County and throughout Virginia.  The IDEA requires that

18     Fairfax County and other local education agencies fully evaluate

19     students with disabilities, develop and implement plans that will

20     allow these disabled students to make appropriate educational

21     progress.  The IDEA also provides, as a critical part of the due

22     process -- or of the IDEA process, that these students will have

23     the right to an impartial due process hearing.  The Virginia

24     Department of Education has the obligation, under the IDEA, to

25     ensure that the local education agencies perform their

*Proceedings*

1    obligations under the IDEA.  We have a school district that is

2    blatantly violating its obligations, and we have a Department of

3    Education that is supporting that effort and doing nothing to

4    correct these problems.

5          Fairfax County, over the last many years, has developed

6    a series of policies and practices that make it impossible for

7    any parent to obtain the services -- the full services to which

8    they're entitled under the IDEA.  These policies and practices

9    begin with resisting and delaying parents' requests for an

10   initial evaluation of their child to determine if their child has

11   a disability.  They continue through every stage of the process,

12   through the due process stage, where VDOE has curated a slate of

13   hearing officers who never -- or almost never rule in favor of

14   parents.  This is not about individual -- particular individual

15   plaintiffs.  They are representatives of a class that we've

16   alleged to correct significant violations by Fairfax County and

17   Virginia.

18         THE COURT:  Let me just stop you, Counsel.  I think I

19   understand the motivation behind the lawsuit.  It's set out in

20   great detail with a lot of information in the complaint, the

21   amended complaint.  And I understand that the goal is to find

22   plaintiffs who can be representative of a class, but, of course,

23   the individual plaintiffs have to have standing in order to serve

24   in that representative capacity, and so the Court, of course, has

25   to address that first before addressing the merits of the

*Proceedings*

1   lawsuit, even accepting the allegations as true, as the Court

2   must under 12(b)(6).

3            Before we jump to those issues, I'd like to see if we

4   can focus just on what the gravamen is of your view with regard

5   to each of these three plaintiffs that you have selected to serve

6   in this capacity.  And so starting with M.B., if you can just

7   respond to the arguments that you've heard made here in court and

8   in the pleadings, in your most concise way, that would be helpful

9   for me, and then I want to move on so that they're not all lumped

10  together, because as you've pointed out, it can be three, it can

11  be two, it can even be one, but the Court has to evaluate each

12  one independently.

13           MR. MERRILL:  And, Your Honor, I apologize.

14           THE COURT:  It's all right.

15           MR. MERRILL:  These matters are personal, I think, to

16  me and many of the people who are here, and I will get very

17  focused.

18           In this case, we do not allege, as Fairfax says, or we

19  do not seek to have individual determinations made about D.C. or

20  M.B.  We seek systematic -- we seek the Court to address

21  systematic policies and practices relating to several stages of

22  the IEP process, including the due process hearing and hearing

23  officer system.

24           The duplicative case issue, I think we kind of grouped

25  that with the exhaustion issue because duplicative case is not a

19

*Proceedings*

1    jurisdictional issue, and I don't know if the Court wants me to

2    address that.  I can.  Mr. Adamson was going to cover that with

3    the exhaustion, but if you want me to address it, I can tell you

4    that the issue is, as the Court has identified -- I'll just cover

5    it -- it's the similarly situated -- or the similar claims.

6    These are not similar claims.  One is about an individual's right

7    to particular relief under the IDEA; the other is about the

8    broken system that prevented M.B. from presenting his case in an

9    impartial due process hearing.

10          THE COURT:  But help me understand.  For M.B. to be a

11   plaintiff in a case, whether as an individual or as a class

12   representative, he has to have suffered an injury, correct?

13          MR. MERRILL:  Yes.

14          THE COURT:  That injury relates to the way the school

15   system interacted with him and with his family with regard to the

16   IEP and the provision of special education services, correct?

17          MR. MERRILL:  Correct.  There are systematic issues

18   that could not be addressed by a hearing officer that can be

19   addressed in this case and in federal court.

20          THE COURT:  So help me understand why those issues

21   could not have been addressed by the hearing officer.  I

22   understand why you might say to me that telling a person they are

23   biased, they have a conflict of interest, they are part of a

24   system that is broken, you might believe would fall on deaf ears,

25   but why could that legal issue not have been presented and

20

*Proceedings*

1    preserved?

2          MR. MERRILL:  Because that hearing officer does not

3    have the ability to give the relief that we're requesting in this

4    case.  The hearing officer cannot enjoin the school district.

5    The hearing officer cannot enjoin the Virginia Department of

6    Education.

7          THE COURT:  But M.B. wanted relief that related to his

8    educational opportunities.  He wanted a hearing officer to find

9    that the school system should pay for the PHILLIPS School because

10   that's what he needed based on his diagnoses, correct?

11         MR. MERRILL:  Yeah.  And I think, though, you're

12   combining past injuries with future relief, and the standing

13   inquiry is different for past injuries, which are being addressed

14   by the other proceeding --

15         THE COURT:  By Judge Ellis?

16         MR. MERRILL:  Right.

17         THE COURT:  But had his lawyers -- and I understand

18   there are different lawyers in that case; I've looked at that

19   docket; I've looked at those pleadings -- had those lawyers said,

20   In addition to the mistakes that we've identified that the

21   hearing officer made with regard to the evaluation of the

22   services that he needs, we also think that you are, whatever,

23   unqualified or biased or have a conflict of interest or had been

24   appointed under a system that is fundamentally flawed and

25   inconsistent with the Constitution, and the hearing officer said,

*Proceedings*

1    Well, thank you very much; I've reviewed those issues; I reject

2    them; here's my answer, that those issues would have been

3    preserved, and Judge Ellis, who has nothing to do with the VDOE

4    or Fairfax County and would be able to look at and evaluate those

5    claims, could then have ruled on the constitutionality or the

6    violation of the IDEA based on bias or conflict of interest?

7    Isn't that possible?

8              MR. MERRILL:  I think the federal court could have.

9    The hearing officer could not have granted the relief.  In other

10   words, the relief that we seek is not to correct M.B.'s IEP or

11   the determination that was made in that case.  The relief we seek

12   is correcting the system going forward so that both D.C., M.B.,

13   and all participants in the system are able to have an

14   opportunity for an impartial due process hearing, to have

15   eliminated the practice of padding grades, mischaracterizing

16   progress, and covering up information that basically breaks the

17   entire system.  So those things were not fixed at the time he

18   went through.  And, certainly, if M.B. had had the information in

19   the complaint that we now have, which he didn't other than his

20   own information, then maybe he would have been able to bring it,

21   but that was well before we had the information in the complaint

22   and, certainly, well before M.B. had any of that information.

23             THE COURT:  Thank you.

24             MR. MERRILL:  And, Your Honor, I think the issue here,

25   as I think Your Honor understands, is that in an injunctive

*Proceedings*

1  relief case, it's the ongoing issue and the ongoing harm of

2  continuing to be part of this broken system.  It's the continuing

3  constitutional violations and the continuing violations of the

4  IDEA that we want to get at.

5          THE COURT:  Thank you.  And, again, some of these

6  arguments may overlap, but I want to address D.C. and then the

7  organization, then we can move on, make sure that we've addressed

8  the exhaustion issues as well.  That is one of the challenges of

9  dividing up arguments, is sometimes things arise like this, but

10  that's all right, we'll have a chance for everyone to speak.

11          So, Ms. Judkins, is there anything you want to add,

12  since D.C. is obviously in a different position since there is no

13  comparable case to the case before Judge Ellis?

14          MS. JUDKINS:  Oh, as to D.C.?  D.C. has failed to

15  exhaust administrative remedies; and in the complaint, they just

16  make excuses as to why they think it wouldn't have worked,

17  because of the biased hearing system, again, for which we are not

18  responsible, and that's VDOE.  We don't concede it's biased in

19  any way.

20          What I find interesting is there's so many avenues they

21  had to bring this issue of bias to the attention of someone,

22  including the Supreme Court of Virginia, before going through the

23  process, but nobody availed themselves of this.  In the

24  allegations, they produce a cranky letter from Bill Reichhardt

25  complaining about what happened back in 2015, but they're not

1    really here for 2015.  There is a complaint process.  If you feel

2    that the hearing officer is biased, unfit, doesn't know what

3    they're doing, you can file a written complaint with the VDOE and

4    go through that process.  No one has ever done that.  So I feel

5    like we're conflating the class action with all these other

6    claims.  This is a very difficult pleading and lawsuit to try to

7    parse out.  What do they want, and who do they want to do what

8    they want?  I'm assuming they want you, Judge Nachmanoff, to tell

9    the Commonwealth of Virginia, Your system is no good; you've got

10   to redo it.  Their system mirrors the federal; that's general

11   assembly.  That's a separation of powers issue.  So with regard

12   to -- going back to D.C., they're trying to avoid following the

13   IDEA by making claims that seem much larger than what really is

14   at issue here.  They didn't exhaust their administrative

15   remedies, and they say it would be futile because the hearing

16   officer is biased?  What evidence do you have of that; the

17   statistics about what her record is?  Well, you can actually get

18   more information -- it's public record -- of all the hearing

19   officers and what they do, but they did their own through FOIA.

20   That is not establishing anywhere close to a plausible claim of

21   bias.  So what excuse do they have for not exhausting their

22   administrative remedies?  None.  And they could put this in front

23   of a judge who could hear their claim in more detail by looking

24   at the record.  And I dispute that they're not seeking to have

25   somebody do that because I'm looking right at their pleading in

24

*Proceedings*

1    the reply:  "Notably, VDOE further glosses over the fact that

2    HOV, D.C.'s parents, and M.B.'s parents have their own

3    independent claims under the IDEA and has offered no explanation

4    as to why those claims should be dismissed."

5            So they do have their own claims, and they wouldn't

6    have gone to the trouble of reciting all those allegations.  He

7    doesn't have -- they can't.  They don't have standing to have you

8    go through this whole thing, and there are no systemic violations

9    that have supported, sufficiently, with facts under *Iqbal*.  So

10   I'm saying there's a huge *Iqbal* argument here about saying, Oh,

11   we have systemic claims, the system is broken.

12           THE COURT:  And, again --

13           MS. JUDKINS:  Right, right, I know.

14           THE COURT:  -- trying to go through this systemically,

15   let's get to the 12(b)(6) after we --

16           MS. JUDKINS:  Right, right.  What I'm saying --

17           THE COURT:  I think I hear what you're saying, which is

18   they have failed to exhaust.

19           MS. JUDKINS:  Right.

20           THE COURT:  All right.

21           MS. THOMPSON:  Your Honor, with respect to D.C., he

22   also lacks standing for the same reason.  The only thing they can

23   point to is a past failure, and he has not even requested a due

24   process hearing since February of 2021, and he doesn't even

25   allege that he's going to request a due process hearing; and then

25

*Proceedings*

1    when he did request a due process hearing in the past, never

2    followed through with it.  And so, really, there's no allegation

3    against the state defendants that the state defendants will cause

4    him imminent harm or injury.  It's the same issue.

5           And also with respect to redressability, if you, again,

6    gave all the relief that plaintiffs request, it still wouldn't

7    really cure the crux of D.C.'s claim, which is the preference

8    that his parents have for a free appropriate public education.

9    You could have the best, most impartial administrative hearing,

10   and it still wouldn't result in the outcome that plaintiffs seek.

11          THE COURT:  And how do you respond to the argument that

12   *Deal* addresses an ongoing injury, and that by being in the

13   situation that he's in where he continues to be in this placement

14   that his parents are paying for, he's suffering an ongoing

15   injury?

16          MS. THOMPSON:  Well, Your Honor, he does have the

17   opportunity to request a due process hearing with respect to

18   that.  He has not, and so that would be the first time that the

19   state defendants would have an opportunity to address that, and

20   he hasn't acknowledged or even alleged that he would want to

21   request a due process hearing.  And I realize we're creeping into

22   the arguments regarding exhaustion, and I'll just say this one

23   thing -- and I realize it touches on exhaustion, not on standing,

24   because everyone is talking about how this hearing system,

25   plaintiffs allege, has systemic bias -- but the one thing no one

*Diane Salters, B.S., CSR, RPR, RCR*
Official Court Reporter

**JA173**

26

*Proceedings*

1    is pointing to is that Virginia regulations provide that you

2    first make an objection to the hearing officer regarding that

3    hearing officer.  Once that hearing officer rules on that

4    objection, Plaintiffs M.B. and D.C. would each have had five days

5    to submit an affidavit to the Executive Secretary of the Supreme

6    Court of Virginia for the Supreme Court to rule on whether that

7    hearing officer should be disqualified.  None of the plaintiffs

8    did that, but plaintiffs inadvertently acknowledge how effective

9    that would be in their first amended complaint.  In paragraph 174

10   of that first amended complaint, quote:  In 2004, the hearing

11   officer was disqualified from a due process hearing by the

12   Supreme Court of Virginia after he enlisted a school board's

13   attorney to help prepare his response to the parents' request for

14   disqualification.  So the plaintiffs acknowledge in their

15   complaint that there is a process where the Supreme Court of

16   Virginia, the highest court in the Virginia, could opine and

17   disqualify a hearing officer and, in fact, did so effectively.

18   So with respect to D.C., which is your question, there was never

19   any request for a due process hearing, and they didn't pursue it,

20   and there was never, even in the 2015 due process hearing, an

21   affidavit filed with the Executive Secretary of the Supreme Court

22   of Virginia; and the regulations are clear that you have to do

23   that in order to preserve the objection, and the regulations are

24   also clear that the hearing will not take place until the Supreme

25   Court actually rules on the objection.  So there really is an

Proceedings

1   impartial administrative hearing that is available but that

2   plaintiffs have not taken advantage of, and D.C. specifically

3   does not allege that he intends to take advantage of, so he has

4   no injury in fact with respect to standing.

5        THE COURT:  And, again, I asked you the question with

6   regard to M.B., but if the plaintiffs added that allegation, if

7   they have the opportunity to do so, that they would go back and

8   pursue that, would that then address the standing issue?

9        MS. THOMPSON:  If plaintiffs had alleged that they

10  would request and go through a due process hearing, then it would

11  again address -- it would address injury in fact because they

12  could then allege -- and it would depend on how they alleged

13  this; this is hypothetical -- but if they allege, We intend to

14  request a due process hearing from the Virginia Department of

15  Education, and they, in fact, did so, that's fine; they would

16  still have their injury in fact, that would be alleged, but they

17  would not cure the issue with redressability because even if we,

18  again, fire all the hearing officers, replace them, replace the

19  entire system, it doesn't mean that the result for D.C. or M.B.

20  would be any different.  It just means that the process may be

21  slightly changed, but I think the process is pretty good as it is

22  with the Supreme Court of Virginia, the highest court in

23  Virginia, being able to recuse and disqualify any hearing officer

24  who is biased or, for whatever reason, should not prevail over

25  that hearing.

28

*Proceedings*

```
 1              THE COURT:  Thank you.
 2              MR. MERRILL:  Your Honor, for D.C., I just want to
 3     address a couple things first.  Fairfax County's lawyer said that
 4     we allege that both D.C. and M.B. have claims.  They do have
 5     claims.  They're the claims in this case.  They're trying to mix
 6     that with their other claims that they had in either prior cases
 7     or ongoing cases.  So when we say they have claims, that means
 8     they have claims in this case that are redressable by the
 9     injunctions that we're seeking.
10              THE COURT:  And tell me what that would look like for
11     D.C. and M.B.  In other words, if somehow we just skipped to the
12     end and the Court granted your relief, what would it mean for
13     D.C. and M.B.?
14              MR. MERRILL:  Yeah.  And the relief would be the
15     injunctive relief we're seeking at the end, which is the
16     correction of the hearing officer system and the correction of
17     the mischaracterization, padding of grades, and all of the
18     process.  For D.C., it would likely -- we would probably be in a
19     hearing now if the system was working.  They have -- D.C. has
20     already been to hearing officers twice -- one in 2015, another in
21     2021 -- a hearing officer that has never, in decades, over two
22     decades, ruled in favor of a parent.  And if D.C. had the
23     opportunity for a fair hearing without any of the violations that
24     currently exist, we would be in that hearing and not in this
25     court.
```

*Proceedings*

1    THE COURT:  So the relief would be a change in the

2    process of selecting hearing officers and the implementation of

3    the system?

4    MR. MERRILL:  Yeah.

5    THE COURT:  And then what would that mean for D.C.;

6    that he would then be a student eligible to apply for an IEP --

7    MR. MERRILL:  He already is.  He has an IEP.  The IEP

8    does not pay for full payment for his private school, and so he

9    could file a due process hearing challenging that determination

10    and pursue it before an impartial hearing officer.  His

11    constitutional right --

12    THE COURT:  So the relief would not be this Court

13    ordering that he be paid --

14    MR. MERRILL:  No.  We --

15    THE COURT:  -- for past tuition that's already been

16    paid by the parents, and it wouldn't be a finding by a hearing

17    officer; it would simply be that he would be like every other

18    student in Fairfax County, eligible to ask for the accommodations

19    required by the IDEA?

20    MR. MERRILL:  Yes.  We're not asking this Court to

21    issue any monetary relief.  It's all injunctive relief, and --

22    THE COURT:  But injunctive relief is usually you get to

23    do something or somebody is prohibited --

24    MR. MERRILL:  Right.

25    THE COURT:  -- from doing something.  So I'm trying to

*Proceedings*

1   figure out what it is that this Court would be ordering.

2          MR. MERRILL:  The Court will order corrections in the

3   system, including -- the system is set up so that the VDOE has

4   100 percent control over who gets to be a hearing officer.  They

5   have 100 percent control over who gets to remain a hearing

6   officer each year.  They're supposed to review that.  They pay

7   hearing officers.  They place monitors into the hearing to

8   actually watch the hearing officers; and as we alleged in the

9   complaint, there's only two monitors that do it statewide.  We

10  have, from a hearing officer, statements that the monitor -- one

11  of these two monitors attempted to influence him to reject the

12  parents' expert on multiple calls that were *ex parte*, and the

13  calls were supposed to be scheduling calls, and the monitor

14  brought up these issues on those calls and tried to convince the

15  hearing officer to rule against the parents.  So if that's one of

16  the only of two monitors who attend every single hearing, I think

17  that raises a pretty strong inference that there's bias in the

18  process.

19         THE COURT:  All right.  I'm sorry, I went off on a

20  tangent there.  Is there anything else you want to say with

21  regard to standing with regard to D.C.?

22         MR. MERRILL:  No.  I think D.C.'s standing is that he's

23  being currently injured by not having the opportunity to assert

24  his claims before a fair and impartial hearing officer in a fair

25  hearing and with accurate records that would be available to him.

31

Proceedings

1          THE COURT:  Okay.  Thank you.

2          Ms. Judkins, you want to address the final, which is

3    the Hear Our Voices, the organizational argument about the

4    adequacy of the organization serving as a plaintiff?

5          MS. JUDKINS:  Well, first of all, what they're

6    attempting to do in this case is exactly what is their mission to

7    do.  They're doing exactly what their mission is.  And I think it

8    might have been VDOE that put in one of their briefs they want

9    to -- they're doing what they are supposed to do according to

10   their mission; and under those circumstances, any organization

11   would always be able to.  But their standing has got to be

12   wrapped up in, also, an injury in fact.  I'm hearing different

13   things than I interpreted from their pleadings.  I'm hearing they

14   don't want past relief, all right; they want future relief, but

15   that's all speculative.  They still have the IEP process.  And

16   besides having explained how to get rid of a biased hearing

17   officer, that process goes before the Supreme Court of Virginia.

18   So what is this Court going to do; issue an injunction that tells

19   the Virginia Department of Education and, perhaps, the Supreme

20   Court of Virginia, You can't maintain this list of hearing

21   officers, you can't do this, you can't do that, you've got to

22   change it?  Well, this is all state law that's telling the

23   general assembly what they have to do and the word for word for

24   the federal statute.

25          So as for the school board, they want to -- you would

Diane Salters, B.S., CSR, RPR, RCR
Official Court Reporter

**JA179**

*Proceedings*

1    have to review, what, all of their practices on how they maintain

2    records, and then issue a directive to them:  Well, you're going

3    to have to start doing this with your records, you're going to

4    have to start doing that?  The federal courts are not supposed to

5    be running the school systems.  If they have a problem with the

6    IEP based on the records that were used, they go to a due process

7    hearing, and then they have the judge look at it in district

8    court.  And, by the way, they can go to the Fourth Circuit after

9    that.  And arguing that it's expensive, well, it's certainly not

10   as expensive as this would turn out to be if it was a wholesale

11   investigation into -- they even allege that the school board is

12   doing everything wrong just like the state is doing everything

13   wrong.  So you'd have to look at everything they did and issue an

14   injunction when it's pure speculation as to what any of these

15   folks would actually do under the circumstances.

16            THE COURT:  Thank you.

17            MS. THOMPSON:  Your Honor, Hear Our Voices lacks both

18   representational and organizational standing.  With respect to

19   representational standing, none of its members who have been

20   identified have standing because our argument is that M.B.

21   and D.C. don't have standing for the reasons I articulated

22   earlier.

23            And then with respect to representational standing,

24   they would also have to demonstrate that none of their individual

25   members would be required to participate in order for them to be

*Proceedings*

1    a plaintiff, and they simply cannot do that because the crux of

2    the claims are these due process hearings which, allegedly, have

3    these biased hearing officers, and the result is really, Did the

4    plaintiffs receive a free appropriate public education?  And

5    that's really unique to Plaintiffs M.B. and D.C.  That's not Hear

6    Our Voices.  So with respect to representational standing, Hear

7    Our Voices lacks that, and with respect to organizational

8    standing, the precedent that's controlling is *Lane v. Holder*, and

9    also *Know Your IX v. DeVos* is instructive, and Hear Our Voices is

10   choosing to use its resources to pursue this worthy cause through

11   litigation as opposed to other advocacy activity that it aspires

12   to pursue at a future date.

13           THE COURT:  So their argument is, though, that somehow

14   they're allocating more resources to this than they would to

15   other things, and that that is the injury that they're suffering.

16           MS. THOMPSON:  Yes, Your Honor, but that's an injury by

17   choice; that's not an injury that's imposed upon them.  So if the

18   Virginia Department of Education had a policy that said Hear Our

19   Voices cannot help any parents or disabled children, cannot

20   attend due process hearings, that would be a policy that directly

21   injures Hear Our Voices, but Hear Our Voices cannot choose to

22   pursue its policy goals through a lawsuit as opposed to through

23   other advocacy, before the General Assembly of Virginia or before

24   Congress.  That's a choice; and where it decides to use its

25   resources, that if that's its decision, that it can't claim that

*Proceedings*

1    it had to use its resources in order to pursue this litigation,

2    and, therefore, it doesn't have organizational standing.

3            THE COURT:  Thank you.

4            MR. MERRILL:  Your Honor, I just wanted to point out,

5    on standing, there's been a lot of discussion, obviously, on both

6    sides on the merits.  Standing is not a determination on the

7    merits, you know, so I'm going to try to lay a little bit less on

8    the merits and just tell you I disagree with a number of their

9    characterizations, but I think it's better to address the issue.

10           The two forms of standing under *Hunt v. Washington* is

11   the, I guess it's called "associational standing" or

12   "representational standing."  There are three prongs.  The first

13   prong is whether one of the individuals has standing, so that's

14   going to generally rise and fall based on M.B. and D.C.  There

15   are other members of Hear Our Voices who could be brought

16   forward, but at this point, we haven't brought those details to

17   the Court, but if for some reason you found D.C. or M.B. didn't

18   have standing, we would certainly like the opportunity to amend

19   to add those individuals.

20           The other prong that I think is relevant here is, you

21   know, that neither the asserted relief nor the relief requested

22   or the -- sorry -- the claims asserted that the relief requested

23   require the participation of the individuals.  This is a case,

24   again, about systematic changes at VDOE and at Fairfax County

25   that we're seeking to pursue, and neither of those requires any

35

*Proceedings*

1   particular participation by any particular member other than as a

2   class representative, because you have to have some plaintiff,

3   right, but you don't need every member of the organization to

4   participate in order to obtain an injunction or declaratory

5   relief.  That creates systemwide changes.

6        THE COURT:  But you agree that the Court is limited to

7   looking at the numbers that you've identified as individuals

8   right now?  You're suggesting there may be others, but they're

9   not part of the amended complaint?

10        MR. MERRILL:  Yes.  I think the case law says that we

11   do have to identify specific individuals and describe their

12   particular situation so that the Court can make that

13   determination.

14        THE COURT:  And with regard to organizational standing,

15   help me understand how you distinguish the *Know Your IX* case -- I

16   assume it's *Know Your IX* -- about an organization designed

17   to promote issues having to do with Title IX and gender in the

18   schools, and that the Court's analysis there, following the

19   Fourth Circuit, is --

20        MR. MERRILL:  Yeah.  I think the difference is -- and

21   the key is, you know, whether it was, you know, some voluntary

22   change you made and whether it was already part of your mission

23   to do whatever you're doing.  And this is a case where Hear Our

24   Voices is getting contacted by parents through both the website

25   and directly to address and help them with the current situation

*Proceedings*

1    in Virginia.  Hear Our Voices has had to put down, as we

2    explained in the complaint in paragraphs -- I think it was

3    paragraphs 40 to 44 -- as we explained in the complaint, has had

4    to put down specific tasks that they were working on at the time

5    in order to address these issues.

6         THE COURT:  Well, let me ask you this in this way:  If

7    Hear Our Voices is an organization that is designed, its mission

8    is to address the issue of compliance with the IDEA in making

9    sure that students and families get what they're entitled to

10   under the law with regard to a free appropriate public education,

11   and that that takes different forms -- educating parents and

12   children, lobbying state legislatures, engaging in advocacy, if

13   those are sort of the three buckets -- and there's an allocation

14   of a third and a third and a third for each, but now because of

15   this litigation, more money is going towards the advocacy as

16   opposed to the educational lobbying, is that a choice that the

17   organization is making or is that an injury caused by the

18   defendants?

19        MR. MERRILL:  Well, I would say, in this case, it's an

20   injury caused by the defendants, because these are not -- this is

21   not part of the planned process of HOV.  They had planned items

22   that they were working on.  This is an interruption of that

23   process.  I mean, we're not reaching out and saying, Please call

24   us.  This is an interruption of the process by people who are

25   coming and saying, I have a problem; this is based on this

*Proceedings*

1    current situation.  And so, that, I think, does give them

2    organizational standing.  And to give you an example, the *Know*

3    *Your IX* case, as it were, some of the things that were involved

4    there were allegations that attorneys lost work or would lose

5    work because, in the future, this new application would cause

6    them to have less work.  That's nothing like this case where you

7    actually have a diversion of resources.  You also had a situation

8    where the entity was a lobbying entity and was doing more

9    lobbying on the exact issue that was involved.  There were four

10   different plaintiffs in *Know Your IX*, but their situations were

11   very different from HOV's situation in this case.

12            THE COURT:  All right.  Thank you.

13            MR. MERRILL:  Thank you.

14            THE COURT:  Well, I think we've exhausted the issue of

15   standing -- legal joke -- but I want to make sure everyone's had

16   the opportunity to make whatever other arguments they wish to

17   make.  And so, Ms. Judkins, if there are any other arguments you

18   want to make -- we have veered into exhaustion, into 12(b)(6) --

19   if there's anything else you want to highlight, I'll give you

20   that opportunity now and let other counsel --

21            MS. JUDKINS:  On exhaustion?

22            THE COURT:  -- address the issues as well.

23            MS. JUDKINS:  You mean exhaustion of remedies?

24            THE COURT:  On any other issue.

25            MS. JUDKINS:  On any other issue, okay.

*Proceedings*

```
 1          THE COURT:  Any other issue that's been briefed.
 2          MS. JUDKINS:  Oh, right, right, right, right.  Okay.
 3          As to one of the things that has been addressed is
 4  whether Perez, that recent case from the U.S. Supreme Court,
 5  controls this case, and --
 6          THE COURT:  Let me just cut to the chase on that.  I'm
 7  going to grant the motion.  I'll consider the authority.  I've
 8  read the opposition, the reply brief, and the Perez case as well.
 9  You're welcome to address its inapplicability, and they're
10  certainly able to address why they think it bears on the decision
11  here, but for purposes of cleaning up the record, I'll grant the
12  motion.  I've already read it.
13          MS. JUDKINS:  I don't think I need to address any
14  further than I have in my briefs about it.  They argue -- they
15  have a 1983 claim against our superintendent as well as the state
16  superintendent.  I think the Sellers case is very clear.  First
17  of all, it's odd.  It's odd that the only reason they would have
18  brought these claims against the superintendents in their
19  official capacity is because they know they're really bringing it
20  against the entity.  Dr. Reid is -- they're really bringing it
21  against Fairfax County School Board.  They can't do that because
22  Sellers says we have this system told to us by the government
23  that's very detailed, and you have to follow that.  You can't go
24  outside of the IDEA if you're making a due process claim related
25  to your IDEA by saying, Oh, by the way, I'm bringing a 1983
```

*Proceedings*

1    claim.  That case shuts that down.  And there are other statutory

2    schemes in which the Supreme Court has said this statutory scheme

3    shuts down the 1983 case.  A 1983 case, as you know, is just a

4    means by bringing -- enforcing another federal right.  Well, the

5    due process right to which they claim they're entitled is part of

6    the IDEA, and they do not have a 1983 claim, thus, this doesn't

7    take it out of the parameters of *Perez.*  But it's very important,

8    especially from the standpoint of suing the individual, Dr. Reid,

9    a superintendent who took the job in the summer of '22, and then

10   tried to say that that's separate from the other claims that

11   they're making against Fairfax County School Board.  It's not.

12   It's the same claim, and they can't do it.

13          As to the exhaustion, I think we've covered that.  They

14   have to do it.

15          As to -- there's so many things, it's difficult to --

16   as to the relief, really, to get a handle on how unmanageable

17   this is is to look at what they want you to actually issue in the

18   form of an injunction against Fairfax County Public Schools.

19   They want you to enjoin them from -- they want you to tell them,

20   Immediately comply with your obligations under U.S. Code, conduct

21   comprehensive evaluations and reevaluations of any child

22   suspected to have a disability, approve independent educational

23   evaluations upon parental request, require teachers,

24   administrators, and other FCPS employees to create and maintain

25   accurate and complete timely records, provide -- basically, make

*Proceedings*

1   sure you provide the right IEP, and cease and eliminate practices

2   and procedures that result in inaccurate measurement of student's

3   performance.  How are you going to do that?  Are you going to

4   hear about every student's -- these are just all conclusory

5   arguments that they've made without any facts.  The only way

6   to -- you'd have to accept their word for everything they've said

7   and say, Okay, Fairfax County School Board, make sure you follow

8   the law.  Well, that's not appropriate for injunctive relief.

9   Make sure you do the right IEPs.  Well, we say we do the right

10  IEPs, so are we going to bring in almost 30,000 files and show

11  you that we do the right IEPs?  And this is where I get into the

12  argument, Are you going to remove from those files ones that

13  judges in this court or state court have already looked at?  That

14  requires running around and trying to figure out -- or ones that

15  went to the Fourth Circuit?  Or ones that had none of these

16  problems and no parents complained about?  This is -- as they

17  have drafted this and tried to compile it, it is not appropriate

18  for injunctive relief, class relief.  There's no commonality.

19        The case law outlines very specifically how each

20  student's IEP is unique to that student.  It may have to do with

21  residential placement.  And D.C., the Chaplick family, they

22  unilaterally removed -- they've admitted that in the pleadings --

23  from a residential educational program at Grafton; and that's a

24  program that provides not just educational services, but services

25  through residential living that are necessary in order for the

41

*Proceedings*

1   child to benefit from educational services.  They put him in a

2   group home.  That's not a residential facility designed to help

3   the student or facilitate their educational access.  That's a

4   group home.  And they did it because he's 19, going to be 20, and

5   the group home is where he's going to have to be for the rest of

6   his life.  So they made that change.  I'm not going to argue with

7   them about why they did it.  Maybe the timing was right, but it's

8   not the type of residential placement that is appropriate or

9   available under IDEA, and you'd have to hear all that and figure

10   that out.  How can we be enjoined from things that are only

11   anecdotally related to the court but involve very specific,

12   detailed, and different circumstances for thousands of kids?

13           That's all I have to say.

14           THE COURT:  Thank you.

15           MS. THOMPSON:  Your Honor, I'd like to briefly address

16   exhaustion of the administrative remedies, briefly mention

17   waiver, and then discuss why there's no claim under the IDEA

18   that's stated that the Virginia Department of Education and

19   superintendent are responsible for.  My colleague, Jack White,

20   will address the constitutional claims, the doctrine of

21   collateral estoppel, the first-to-file rule, and why there's no

22   state -- there's no class action stated under Rule 23, if Your

23   Honor does not mind, but we will be brief.

24           With respect to exhausting administrative remedies,

25   D.C. and the Chaplicks did not pursue a due process hearing to

42

*Proceedings*

1    completion over D.C.'s placement in the 2021 school year;

2    never even pursued a due process hearing for the dispute over

3    changing D.C.'s group home in 2021.  D.C. and the Chaplicks do

4    have to go through a due process hearing in order to exhaust

5    their state administrative remedies before they can file a

6    lawsuit before this Court; and M.B. and the Binghams, they did

7    not exhaust their administrative remedies because they never

8    raised the claims that they raised before this Court in their due

9    process hearings, and they don't allege that they raised the same

10   claims in their due process hearings that they raised before this

11   Court.

12           I just want to take a step back.  The IDEA allows the

13   state to either implement a one-tier or a two-tier due process

14   hearing system.  So in some states, there's a two-tier hearing

15   system where the child and the parent must go to the local

16   educational agency first, and there's a hearing before the local

17   educational agency -- here, it would be Fairfax County Public

18   Schools -- and the local educational agency would provide the

19   hearing officers.  If the parents and child are dissatisfied with

20   the ruling before that due process hearing, then they would go to

21   the State Department of Education or the state educational agency

22   and have a second due process hearing.  Virginia's system is much

23   more efficient.  Virginia chose a one-tier system so that the

24   child and the parents may go directly to the Virginia Department

25   of Education, and it's an impartial hearing system that's

43

*Proceedings*

1   administered by the Supreme Court of Virginia.  I'm not going to

2   repeat kind of the regulation, but it is Virginia Administrative

3   Code § 20-81-210 with respect to how to object to the hearing

4   officer, and also how to file the affidavit with the Executive

5   Secretary of the Supreme Court of Virginia to preserve the

6   objection with respect to the hearing officer, and to have,

7   ultimately, the Supreme Court rule on that objection.  Neither

8   plaintiffs did that here, and so they failed to exhaust their

9   administrative remedies with respect to any claims they have

10  against biased due process hearing officers.

11          They also don't raise any of the constitutional claims

12  that they raised before this Court in their due process hearings.

13  The exhaustion requirements under federal and state laws apply to

14  Counts I through IV.  Even though Counts I and II concern

15  constitutional claims -- which my colleague, Mr. White, will

16  address -- they can't circumvent the IDEA's exhaustion

17  requirement by basically dressing up the same claim as a Section

18  1983 claim or by filing under a different statute.  So the

19  Supreme Court case that's most relevant on this point is *Fry v.*

20  *Napoleon Community Schools*.  That case basically says the court

21  looks at the gravamen of the plaintiffs' claim; and, here, the

22  gravamen of the plaintiffs' claim is the core of what the IDEA is

23  supposed to guaranty -- a free appropriate public education.

24          Now, Section 1983 claims, essentially, concern whether

25  the state defendants provided an administrative process that

*Proceedings*

1   provides sufficient due process and equal protection for the

2   plaintiffs to receive a free appropriate public education.  If we

3   put it another way, the due process claims and equal protection

4   claim are only relevant if the plaintiffs did not receive a free

5   appropriate public education.  The plaintiffs acknowledge in

6   their reply brief to Fairfax County School Board's response to

7   *Sturgis*, quote, Plaintiffs seek remedies way beyond a single

8   child's FAPE.  They seek to overhaul an education system and its

9   corresponding regulations and policies that are broken, quote, at

10  each stage of the process required by the IDEA.

11          The requirements of the IDEA remain central to their

12  Section 1983 claims.  Foregoing exhaustion in this case would

13  essentially allow plaintiffs to evade the IDEA's restriction

14  through artful pleading, which Justice Kagan also cautions

15  against in the *Fry* case.  The relief that plaintiffs seek is

16  available under the IDEA, and the recent Supreme Court case in

17  *Sturgis v. Perez* supports the state defendants' position.  In

18  *Sturgis*, the Supreme Court essentially stated that if there's an

19  IDEA claim and the plaintiffs are seeking equitable relief, they

20  would still have to go through the due process hearing even

21  though that due process hearing would not be able to provide them

22  the specific relief they request, because equitable relief is

23  available under the IDEA, and it's the same case here, Your

24  Honor.  Plaintiffs have conceded that they only are requesting

25  equitable relief, and that same relief is available under the

*Proceedings*

1    IDEA.  They've failed to exhaust their administrative remedies,

2    and that's fatal.  They argue that they should have an exception

3    to their exhaustion requirement.  And they have, really, three

4    arguments, but all of them fail.

5         First, Your Honor, the plaintiffs concede in their

6    first amended complaint that it's not futile to object to a

7    hearing officer.  They actually point out one case where the

8    Supreme Court of Virginia did disqualify a due process hearing

9    officer successfully for bias, so it's not futile here to go

10   through the system.

11        But the second argument they make is that when you sue,

12   really, the Virginia Department of Education, you should be able

13   to kind of circumvent the exhaustion requirement; and the Fourth

14   Circuit has held that even if that hearing officer can't give you

15   the relief that you're seeking, that specific relief, that

16   doesn't mean that you can circumvent the exhaustion requirement.

17   That's the case in *Bills v. Virginia Department of Education*.  A

18   federal district court essentially dismissed the same claims that

19   the plaintiffs are making here -- due process claims, equal

20   protection clause claims under Section 1983, in addition to ADA

21   claims, the Rehabilitation Act claims.  All of those claims were

22   dismissed because plaintiffs failed to exhaust their

23   administrative remedies.

24        Third, there's no systemic exception or

25   vicarious exception to exhausting your administrative claims

46

*Proceedings*

1    here.  *Pullen v. Botetourt County School Board* is the case that

2    plaintiffs cite; but in *Pullen*, the court ruled that, really, the

3    plaintiffs haven't alleged a systemic exception; and, here, it's

4    the same thing.  They point to one particular hearing officer who

5    made a ruling that plaintiffs disagreed with, but they haven't

6    shown systemic failures with the system; and pointing to flawed

7    statistics that they skewed doesn't adequately give this Court a

8    plausible reason to exert this systemic exception to exhaustion.

9    The exception in *Pullen* wasn't used because the relief was

10   available under the IDEA that the plaintiffs were seeking; and,

11   here, the relief is also available.

12          And with respect to waiver, just briefly, Your Honor,

13   D.C. and the Chaplicks failed to make the claims that they are

14   making before this Court during their due process hearings.  They

15   had an opportunity to.  The Virginia regulations are really clear

16   that if you don't make objections with respect to the hearing

17   officer, you waive them; and they don't raise their

18   constitutional claims.

19          Juts briefly with respect to the IDEA, D.C. and M.B.

20   fail to state a claim against the state defendants for any

21   violations of the IDEA for which the Virginia Department of

22   Education or the superintendent are responsible for.  The

23   Virginia Department of Education does not create Individualized

24   Education Programs.  The Virginia Department of Education does

25   not meet with parents to discuss Individualized Education

*Proceedings*

1   Programs.  It doesn't implement them.  And, really, that's not

2   the role of the Virginia Department of Education.  The plaintiffs

3   here actually have acknowledged that Fairfax County Public

4   Schools provided them with a free appropriate public education

5   because both plaintiffs had an Individualized Education Program,

6   which requires parental consent, and those programs identified

7   the educational needs of the students and gave them an

8   opportunity to participate -- gave both parents an opportunity to

9   participate in the creation and development of those IEPs.  While

10  both plaintiffs allege that their children were not placed in the

11  school of their preference, the issue under the IDEA is really

12  whether Fairfax County Public Schools offered an appropriate

13  program for them at schools identified in their IEPs.

14          Procedural violations alone are insufficient to state a

15  claim under the IDEA unless the procedural violation somehow

16  would lead to the loss of an educational opportunity for the

17  disabled child.  So any alleged procedural violations that the

18  state defendants committed, they're insufficient alone to

19  establish an IDEA claim because they did not result in the

20  deprivation of an educational opportunity for a child in this

21  case.

22          The argument about the bias of the hearing officers is

23  really a red hearing.  The Supreme Court provides a roster of

24  vetted hearing officers, and plaintiffs complained that the

25  Virginia Department of Education reimburses these hearing

48

1    officers.  But there's a lot of state agencies that reimburse the

2    hearing officers that work for them, and that's just the way the

3    IDEA contemplated it, that the federal Department of Education

4    gives money to the states, and the state would pay the hearing

5    officers that are required to be provided in this process.

6         The skewed statistics about the outcomes of their due

7    process hearing, likewise, are insufficient.  The statistics

8    don't take into account cases that have been withdrawn, settled,

9    or where there's a partial ruling for a parent.

10        What plaintiffs are really seeking here is to change

11   the IDEA and to kind of change the scope of the Virginia

12   Department of Education's role in implementing and helping kind

13   of oversee that process.  What they want the Virginia Department

14   of Education to do is to basically supplant the role of the local

15   educational agency and to second-guess their decision.  That's

16   not really what the IDEA allows the state defendants to do.  And,

17   again, Your Honor, even if plaintiffs received everything that

18   they asked for, the outcome of their due process hearings would

19   not necessarily change, which is really the crux of this case.

20        So for all these reasons, I respectfully request that

21   this Court dismiss the first amended complaint; and my colleague,

22   Mr. White, will present the rest of our defenses.

23        THE COURT:  Thank you.

24        MR. WHITE:  Good afternoon, Your Honor.  May it please

25   the Court.  Again, my name is Jack White on behalf of the

49

1    Virginia Department of Education and its superintendent.  There

2    are four items that I'd like to address, and I'll make every

3    effort not to rehash our arguments that have already been

4    covered.

5              First, on the constitutional claims, much has been said

6    about the claims brought against Section 1983.  I want to

7    emphasize that crucial to understanding the terminal deficiency

8    of the claims brought under Section 1983 is the fact that we are

9    talking here about statutorily created rights, not constitutional

10   rights; and at their core, both the due process claims and the

11   equal protection claims are really different forms of the same

12   challenge to the provision of a FAPE.  They're just recast as

13   arguments under Section 1983.  So the case that was cited,

14   *Sellers v. School Board of Manassas*, is both instructive and

15   dispositive because the Fourth Circuit said that because the IDEA

16   provides a comprehensive remedy and remedial scheme for

17   violations of its own requirements, parties may not sue under

18   Section 1983 for an IDEA violation.

19             Now, I'd like to spend a moment -- we've talked about

20   D.C.'s Section 1983 claims in the light of standing, but I want

21   to talk about those claims in terms of collateral estoppel

22   because the doctrine of collateral estoppel bars those claims

23   related to the 2015 placement dispute because collateral estoppel

24   also applies to IDEA administrative determinations; and, there,

25   we had an administrative determination where the issue is

*Proceedings*

1   identical to the one previously litigated.  The issue was

2   actually determined, and as my co-counsel mentioned, D.C. chose

3   not to appeal and did not seek recourse to the Executive

4   Secretary of the Supreme Court of Virginia.  There was an actual

5   determination that was crucial and a necessary part of the

6   decision.  So having had the chance to litigate previously, it's

7   appropriate, as a matter of law, to preclude D.C. from

8   relitigating the same issue here.

9        With respect to the first-to-file rule, I want to say

10  only that the first-to-file rule exists to avoid courts arriving

11  at disparate results, and Your Honor is well aware of the case

12  currently before this very court before Judge Ellis which,

13  essentially, is arguing the same thing that is set forth in the

14  arguments before this Court.  And for that reason, M.B.'s claims

15  should also be dismissed.

16       Finally, Your Honor, I want to talk about the motion to

17  strike the class claims that have been set forth.  A relic of the

18  IDEA is that it's one of those instances where Congress, in its

19  penchant for acronyms, actually did what it intended to do.  The

20  precursor to the Individuals with Disabilities Education Act was

21  called the Education for All Handicapped Children Act; and when

22  it was reenacted in 1990, it was changed to the Individuals with

23  Disabilities Education Act in order to focus on each individual

24  student.  Here, plaintiffs' allegations reveal that the putative

25  class claims would require heavily individualized adjudication

*Proceedings*

1    that would render a class action unworkable.  Indeed, they are

2    seeking to advance a class under Rule 23(b)(2) which allows for

3    parties to set forth a putative class if final relief of an

4    injunctive nature or a corresponding declaratory nature could

5    feasibly settle the legality or illegality of the behavior with

6    respect to a class as a whole; however, what Rule 23 does not do

7    is it does not authorize a class to proceed when each individual

8    class member would be entitled to a different injunction or

9    different declaratory judgment, and that's the problem that we

10   could feasibly face here.

11        Plaintiffs cannot establish commonality.  And I think

12   the allegations in this case track the sort of proof that the

13   United States Supreme Court found inadequate in *Wal-Mart v.*

14   *Dukes*.  There, the proposed class alleged that female employees

15   have suffered a common Title VII injury.  But that did not

16   establish commonality because the putative plaintiffs had not

17   offered what the court called "glue" holding the alleged reasons

18   for the alleged Title VII violations together.  It was critical

19   that Wal-Mart managers had discretion to make individual

20   employment decisions, and the Supreme Court found it unbelievable

21   that all managers would exercise their discretion in a common way

22   without some common distinction; and, there, as here, there were

23   no common official policies or directions, and the Supreme Court

24   held that plaintiffs' statistical and anecdotal evidence did not

25   support a common mode of exercising discretion.  Now, the lack of

52

1    commonality there would be worse in a situation -- or more

2    challenging in a situation like this because the Court would have

3    to review highly individualized facts given the nature of the

4    IDEA and the Individualized Education Program requirements under

5    the statute.  Students receive specifically designated

6    instruction in each instance to put together an Individualized

7    Education Program, and these IEPs, or Individualized Education

8    Programs, put together a comprehensive plan in terms of what

9    special education and additional needs are required.  In

10   addition, each student's Individualized Education Program has to

11   be specially tailored.  So at the end of the day, the Court would

12   have to hold many trials to determine the admissibility of any

13   individual member into the class.

14          Further, both proposed class definitions turn on

15   fact-intensive inquiries that would require many trials just to

16   determine whether an individual is potentially a part of the

17   class.  So the Virginia Department of Education class requires an

18   eligibility for special education and related services.  The FCPS

19   class requires that current students have disabilities.  Those

20   questions of eligibility and disability are often the subject of

21   heated inquiries in administrative processes, which this Court

22   would have to engage in, in each instance of determining who's

23   part of the class.  Now, that is not even getting into the

24   exhaustion problem, and I don't want to exhaust the Court with

25   too much discussion on exhaustion because my co-counsel has

53

*Proceedings*

1    mentioned it, but suffice it to say that the IDEA's exhaustion

2    requirement is not escaped by the statutory scheme just because

3    of class certification.

4            For these reasons, we not only believe that the motion

5    to strike the class claims should be granted, but we also believe

6    that the motion to dismiss should be granted in its entirety.

7            THE COURT:  Thank you.

8            MR. MERRILL:  Your Honor, I'll touch briefly on the

9    class allegation and the motion to strike the class, and then my

10   colleague, Mr. Adamson, will cover the rest.

11           The defendants cite throughout their briefs cases from

12   other circuits where motions to strike have -- class allegations

13   have been upheld.  There's two big problems with their cases.

14   The first is they are not Fourth Circuit cases, and the law in

15   the Fourth Circuit is very clear that you need a developed

16   factual record in order to make class determinations.  And the

17   *International Woodworkers* case, I think, is probably kind of the

18   key case on this issue where they said it is seldom, if ever,

19   possible to resolve class representation questions from the

20   pleadings.  The defendants, in their briefing, I believe, raised

21   that that's an older case which can matter in some cases in class

22   certification, but that is still the law in the Fourth Circuit.

23   We quoted, or cited, here at the bottom -- we didn't have a

24   chance to respond to their reply -- so we've cited the *FOBBS v.*

25   *Hunt* case, which is a 2021 case which comes to the same

*Proceedings*

1    conclusion in relation to a motion to strike.  So in the Fourth

2    Circuit, motions to strike are generally not granted, and we

3    didn't find any that were granted that had anything similar to

4    this case.

5            The other thing is their cases are generally cases that

6    are apparent from the pleadings that a class would not be

7    possible, cases from, like, the Sixth Circuit and the Fifth

8    Circuit where you have nationwide classes with multiple states'

9    laws, and issues like reliance which require individual analysis

10   are included in those cases.  So those would be cases that even

11   if you developed a factual record, you wouldn't be able to prove,

12   class-wide, you know, the commonality and predominance.  In this

13   case, we allege systematic issues; and in class actions,

14   systematic issues are generally the hallmark of class

15   certification.  And, obviously, they dispute that some of these

16   issues are systematic, but I think we've pled, pretty clearly,

17   that there are policies and that there are practices that are

18   throughout Fairfax County and throughout VDOE that affect the

19   class.

20           So I would say, you know, in relation to the Fourth

21   Circuit, that this should be a very easy issue, but we do also

22   provide -- and this is in our briefing -- the *G.T.* case, which is

23   a recent case addressing these issues at the class certification

24   stage in a case that has very similar types of issues to this

25   case.  The allegations in that case also related to a number of

55

*Proceedings*

1    policies and practices that affected -- or caused a broken system

2    in relation to the handling of behavioral issues in IDEA cases

3    which resulted in an excessive number of removals from the

4    schools because of behavior.  There were, I think, six different

5    policies and practices that were brought at class certification

6    in that case which did have the glue that's necessary to hold

7    them together that was referenced in the *Wal-Mart* case.  Your

8    Honor may be familiar with *Wal-Mart*.  *Wal-Mart* is a nationwide --

9    or was an attempt at a nationwide class where there was no policy

10   that applied throughout Wal-Mart's system that the plaintiffs

11   could identify, and there were millions of individual plaintiffs

12   in that case, not anything like the situation here.

13          I'll turn it over to Mr. Adamson.

14          THE COURT:  Thank you.

15          MR. ADAMSON:  Your Honor, a lot to cover.  I'm going to

16   try and do it sequentially.  I want to start out with addressing

17   some of what we feel are mischaracterizations of the gravamen of

18   the complaint.

19          On this slide that we've prepared is a summary of some

20   of the key allegations in the case, and this isn't a

21   comprehensive list, but this shows you some of the specific

22   allegations that we've raised against both of the defendants.  So

23   when Fairfax County says, Well, we don't even know what's being

24   alleged, well, here's the answer.

25          The next slide is the same, but showing the specific

*Proceedings*

1    provisions of the IDEA and implementing regulations that are

2    implicated.

3            I'm going to go to the next slide.  And here's where I

4    want to spend a little bit of time correcting misconceptions and

5    mischaracterizations of the gravamen of the complaint.  The

6    policies and practices that we identify as violative of the IDEA

7    hinder disabled students and their families at every step of

8    their attempts to secure an appropriate education.

9            First, defendants obstruct student evaluations and

10   routinely reject medical evaluations.  This practice prevents

11   disabled students from even having a fair opportunity to enter

12   the system.

13           Second, if disabled students are lucky enough to gain

14   access to the system, Virginia schools have a policy of inflating

15   disabled students' grades and exaggerating their progress.  This

16   conceals from parents the severity of their children's

17   disabilities and prevents parents from seeking the help disabled

18   students need to succeed.

19           THE COURT:  Mr. Adamson, I don't want to interrupt, but

20   we've been at this a long time, and I want to give you a full

21   opportunity to be heard --

22           MR. ADAMSON:  Sure.

23           THE COURT:  -- but we're on a motion to dismiss.  We

24   started with standing.  We're talking about the sufficiency of

25   the pleadings.  And I understand the desire to sort of get into

*Proceedings*

1    the merits, argue your case -- I'm not suggesting you're doing

2    that -- but help me tie it back to what the defendants have

3    alleged here with regard to where we are procedurally as to why

4    this is important.  Everything that I'm seeing you argue here --

5    and I've read this -- is really all about the IDEA.  It's all

6    about the process, the IEP process and the failures, the serious

7    gray failures that you're alleging; but, of course, that's part

8    of their argument as to why these claims are insufficient,

9    because they fall squarely within a process that's set out under

10   federal law -- and that I'm very familiar with, having dealt with

11   these cases individually -- and so you've made a number of

12   arguments, again, that I don't need to hear again --

13           MR. ABRAMSON:  Sure.

14           THE COURT:  -- trying to distinguish between what's

15   happening before Judge Ellis and what you believe can be pursued

16   here --

17           MR. ADAMSON:  Sure.

18           THE COURT:  -- but, frankly, these arguments suggest to

19   me that it's all the same thing.  So help me understand what it

20   is you're trying to get the Court to consider before I recess and

21   really consider what, ultimately, I'm going to do.

22           MR. ADAMSON:  Sure.  And, admittedly, in an inefficient

23   manner, I was trying to make the point that the relief we seek

24   and the allegations that we raise cannot be alleged -- or cannot

25   be resolved utilizing the procedures under the IDEA.  They're

1  administered by the VDOE.

2       THE COURT:  And just tell me, real quick, why.  I think

3  I know what you've said before in the pleadings, which is that

4  these are systemic or structural problems, and you believe that

5  they could not be presented to a hearing officer, but tell me why

6  in your own words.

7       MR. ADAMSON:  You know, there's been a lot of

8  discussion about the remedies we seek.  Those are detailed in our

9  complaint at the end, paragraphs 353 to -67.  The impact this

10  Court could have, and what we're requesting, for example, is a

11  declaration that the Fairfax County Public Schools' admitted

12  practice of inflating grades is against the law.  What we're

13  asking is for declarative and injunctive relief to stop the VDOE

14  from inserting their monitors into due process hearings, because

15  we've seen what happens when that occurs.  We have allegations

16  from the due process hearing officer who says that he had

17  *ex parte* communications telling him to disregard testimony

18  offered on behalf of parents.  When he didn't, he was --

19       THE COURT:  And I understand that.  I guess I'm

20  wondering why when that happened or when it was discovered, it

21  couldn't have been raised by counsel and then addressed.  And if

22  the guilty parties were the ones to whom it had to be addressed,

23  it was putting them on absolutely clear notice that they had

24  violated the law.  And then if that was ignored, there are a

25  whole set of procedures, including in federal court, to have that

59

*Proceedings*

1    recognized and redressed.  And so I guess I'm still unclear.  I

2    understand what you're asking the Court to do and what the

3    purpose of this lawsuit is, but I'm trying to understand why it

4    couldn't have been done in those particular circumstances.

5        MR. ADAMSON:  So the *Heldman* case in the Second Circuit

6    and the *D.M.* case in the Third Circuit make it clear that when

7    you're seeking relief that would require changing state

8    regulations as we are doing here, changing district practices,

9    that that's not relief that you can attain by asking a due

10   process hearing officer to provide it.

11       If we could go to slide 14.  One other point on that is

12   we are asking for relief to solve the system which is set forth

13   by Virginia regulation that gives the VDOE absolute control over

14   the hearing officers.

15       Now, this leads into the exhaustion issue, and

16   plaintiffs prevail on exhaustion under any one of three different

17   frameworks.  First, as the Supreme Court recently held in

18   *Perez* v. *Sturgis*, plaintiffs don't need to exhaust where

19   administrative processes under the IDEA cannot supply what

20   plaintiffs seek, and that makes perfect sense.  It would be a

21   waste of time for both parents and school districts to litigate

22   disputes that can only be resolved by a federal court.  Here, the

23   hearing officers lacked the authority to give plaintiffs the

24   relief they seek, so the amended complaint falls squarely within

25   *Sturgis*.

60

1          Second, if you go to the next slide, even if *Sturgis*

2     doesn't apply, the futility exception applies.  The Supreme Court

3     recognized the futility exception in *Honig v. Doe,* holding that

4     exhaustion should not be required in cases where such exhaustion

5     would be futile either as a legal or practical matter.  Here, it

6     would be futile both legally, for reasons I've described, and

7     practically for plaintiffs to invoke Virginia's broken IDEA

8     procedures to try to reform those procedures.

9          Third, plaintiffs don't need to exhaust because their

10    claims implicate the integrity and reliability of the IDEA

11    dispute resolution procedures themselves.  Now, defendants claim

12    that what some courts refer to as "the systemic exception" hasn't

13    been recognized by the Fourth Circuit, but that's misleading

14    because as the *Beth V.* court observed, the systemic exception

15    merely flows implicitly from or is, in fact, subsumed by the

16    futility and no administrative relief exceptions; and as we've

17    discussed, both of those exceptions have been upheld by the U.S.

18    Supreme Court.  So in any of these frameworks, D.C. and his

19    parents are excused from exhausting IDEA procedures and, of

20    course, the defendants do not content that M.B. and his parents

21    failed to exhaust.

22          Moving on, let's touch next on the *Sellers* issue, Your

23    Honor.  If we could go to slide 17.  I think VDOE's counsel made

24    a comment that *Sellers* is informative and dispositive, and we

25    agree because *Sellers* says exactly the opposite of what the

1  defendants are claiming it says, holding that the IDEA's

2  exhaustion provision does permit plaintiffs to resort to

3  Section 1983 for constitutional violations, notwithstanding the

4  similarity of such claims to those stated directly in the IDEA.

5  So, here, plaintiffs resort to Section 1983 for constitutional

6  due process and equal protection violations, and these claims are

7  very different from the educational malpractice claims at issue

8  in *Sellers*.  Here, plaintiffs do not seek tort-like damages; in

9  fact, they don't seek any individualized relief at all.  Instead,

10 plaintiffs allege a widespread denial of constitutional rights,

11 including the deprivation, without due process, of property and

12 liberty interests that derive not only from the IDEA, but also

13 from the U.S. Constitution and the Virginia Constitution.  The

14 constitutional claim asserting property or liberty interests that

15 relate to the IDEA is not somehow transformed into a statutory

16 claim.  As *Sellers* made clear, constitutional claims have their

17 own heightened standards that plaintiffs must satisfy consistent

18 with Congress' intent to make the more expansive remedies

19 available under Section 1983 or more culpable constitutional

20 failures.

21        Turning now to the waiver issue, slide 19.  You know

22 what?  Before we move on from *Sellers* -- I apologize -- they

23 referenced a couple different cases I want to touch on briefly.

24 First is the *Bills v. Virginia Department of Education* case.

25 *Bills* turned on the Fourth Circuit's holding that the

*Proceedings*

1  unavailability of the specific relief sought in the

2  administrative process does not render resort to the

3  administrative process futile.  That holding is directly rejected

4  by *Sturgis*.

5  Second, the Court does acknowledge the existence of the

6  futility exception.

7  And, third, plaintiffs' futility argument doesn't

8  depend on the unavailability of the requested relief -- that's

9  the no administrative relief exception -- instead, it's based on

10  the allegations that the due process hearings are biased -- and

11  we've been over those a lot -- but allegations like the warning

12  to D.C.'s parents that they shouldn't even bother with the due

13  process hearing because they would lose.

14  Okay.  Let's please go to slide 19, the waiver issue.

15  Notably, the Fairfax defendants do not assert this argument in

16  their briefs.  It has no merit.  The VDOE defendants purport to

17  characterize the administrative records of M.B. and D.C.,

18  suggesting that M.B. and D.C. intentionally and knowingly waived

19  arguments in their administrative proceedings, but defendants'

20  characterization of those proceedings certainly cannot satisfy

21  their burden on their affirmative defense at the motion to

22  dismiss stage.

23  And we can go to the next slide.  Further, plaintiffs

24  didn't become aware of issues alleged here until after the

25  administrative proceedings.  For example, in paragraph 114 of the

*Proceedings*

1    amended complaint, it says [as read:]  The Chaplicks did not know

2    at the time they entered into a prior settlement that

3    Brooke-Devlin, like over 80 percent of the hearing officers in

4    Virginia, had ever ruled in favor of a special needs family.

5    Plaintiffs also allege that many of the facts here were concealed

6    by the defendants, and I can tell you some of those paragraphs:

7    46, 66, 245, 271, 273, 283, 336, and 341, to name a few.

8         On collateral estoppel -- we can go to the 21st

9    slide -- the claims here are not at all the same as those related

10   to D.C.'s 2015 placement dispute because defendants did not

11   specify which issues were supposedly not asserted previously.

12   Plaintiffs did not even know in 2015 about the systemic violation

13   issues alleged here.  Plaintiffs have alleged plenty of new

14   evidence, including that D.C.'s reading and math skills are worse

15   now than what was found in the 2015 proceedings.  Plaintiffs'

16   allegation here is that they never had a full and fair

17   opportunity to litigate -- which is one of the elements -- and in

18   D.C.'s prior hearings, his parents sought individualized relief

19   for D.C. related to D.C.'s IEP; and not to belabor the point, but

20   that, here, it's different systemic issues that are being

21   litigated.

22        On the duplicative case issue -- we can go to slide

23   16 -- I think this has been discussed, but M.B.'s other suit is

24   nothing like this one.  In his other suit, he seeks to resolve an

25   individualized dispute regarding his own IEP; and, there again,

64

*Proceedings*

1    there are systemic issues.

2         There was also an argument about equal protection I

3    wanted to address.  If we can go to slide 18, please.  I don't

4    actually think the defendants discussed this, but I did want to

5    address something that came up in one of their replies.  They

6    claim that plaintiffs don't even argue that their claims survive

7    if rational basis review applies, but that's not true.  Rational

8    basis review was applied in *Plyler v. Doe*, and defendants still

9    must be able to show the alleged practices further

10   some substantial state interest.  Defendants have never even

11   tried to explain how inflating disabled students' grades and

12   curating a slate of biased hearing officers could possibly

13   further some substantial state interest.  And, of course, states

14   cannot possibly have a substantial interest in violating federal

15   law, and defendants have never contended otherwise.

16        Lastly, VDOE's counsel mentioned the issue of vicarious

17   exhaustion in connection with class allegations; and in our

18   briefs, I want to point to the *Jarboe v. Maryland Department of*

19   *Public Safety and Correctional Services* case.  In the current

20   posture of the case, just as in *Jarboe*, there's no reason -- or

21   no basis to rule that vicarious exhaustion does not apply.  Case

22   law provides good reason to believe that a single filing rule

23   will apply even if the case is not certified.  It's possible that

24   the Court would find a lack of commonality or adequacy, but those

25   are factual issues that should be developed for the purposes of

*Proceedings*

1   making that evaluation.

2          Lastly on this issue, the Fairfax defendants, in their

3   response to the notice of supplemental authority, cited two cases

4   in which 23(b)(2) claims, very similar to those alleged here,

5   were certified for class certification; and in both of those

6   cases, not even the named plaintiffs had exhausted their

7   administrative remedies.  So the notion that absent class members

8   must do so is absolutely incorrect.

9          That's all I have.

10         THE COURT:  Thank you very much.  I appreciate all of

11  the effort that counsel have made today.  It is difficult to

12  absorb this much information, both for the Court to hear it and,

13  I'm sure, for you to share it, and I appreciate everyone's

14  efforts to answer my questions and to address the many issues in

15  this case.

16         As I told you at the beginning, I'm not going to rule

17  from the bench.  I will consider everything that you've shared

18  with me.  I will review the information in the pleadings.  Some

19  of you may have heard me say this before:  I deal with a lot of

20  different kinds of cases.  The IDEA and cases involving schools

21  and children and parents and children with special needs are

22  amongst the most difficult cases for the Court to address.

23  People have strong feelings; the litigants have strong feelings;

24  the lawyers have strong feelings; the school districts have

25  strong feelings; and all of that is appropriate because people of

*Proceedings*

1    goodwill can have different ideas about how best to educate

2    children and what children need in order to have a productive way

3    to learn, especially when those children face challenges that

4    other children don't face.  Sadly, the courtroom is probably not

5    the best place to resolve those differences.  I encourage lawyers

6    always, when they are advocates and in an adversarial setting, to

7    further their clients' interests, to abide by their requirement

8    as officers of the court, but also to think about their role as

9    counselors and how they can engage in productive discussions with

10   each other to resolve cases.  I did that countless times as a

11   magistrate judge.  In every IDEA case I've ever seen, the idea

12   that the Court deciding, ultimately, what should happen is,

13   perhaps, the least effective way for the benefit of the child to

14   have the matter resolved.

15          Parents love their children.  They want what's best for

16   them.  People go into education because they want children to

17   succeed.  These are not cases where somebody wants someone to

18   fail and somebody wants somebody to win, but the nature of

19   litigation is often a zero-sum game.  I'm not suggesting that

20   this case is well positioned for the lawyers to sit down and talk

21   to each other and to resolve the case, but I am asking everyone

22   to leave here and reflect on what you're trying to do and the

23   shared values that you may have and whether or not there might be

24   a better way of addressing these extremely important issues.  I'm

25   making no valued judgments about any legal issue or about what

1    I'm going to do, and what I'm saying to you now is familiar to

2    those of you who have heard me before or want to review other

3    cases that I've handled.

4         So that is as much as I can share.  I budgeted less

5    time than we took.  It is a reflection of the importance of this

6    case.  I did not want to cut anyone off or not have sufficient

7    time to review it.

8         So I take this matter under advisement, and court will

9    now be in recess.

10        (Proceedings concluded at 3:46 p.m.)

11

12              *     *     *     *     *

13              <u>CERTIFICATE OF REPORTER</u>

14        I, Diane Salters, hereby certify that the foregoing

15   transcript is a true and accurate record of the stenographic

16   proceedings in this matter.

17

18                           /s/ Diane Salters

19                           _____

20                           Diane Salters, CSR, RCR, RPR
                             Official Court Reporter

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| D.C., *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>FAIRFAX COUNTY SCHOOL<br>BOARD, *et al.*,<br><br>    *Defendants*. | 1:22-cv-01070 (MSN/IDD) |

## MEMORANDUM OPINION & ORDER

This matter comes before the Court on Fairfax County School Board's Motion to Dismiss (Dkt. No. 51) and the Virginia Department of Education's Motion to Dismiss (Dkt. No. 58). Having considered the arguments made in the parties' written briefs and at oral argument, the Court will grant those motions for the reasons that follow.

**I.    BACKGROUND**

Congress enacted the IDEA to guarantee children with disabilities an education that meets their needs and to give parents of children with disabilities a say in how their children are educated. Specifically, the IDEA grants children a substantive right to a free appropriate public education (a "FAPE"), *see* 20 U.S.C. § 1401(9), and grants children and their families procedural rights to safeguard that FAPE, *see id.* § 1415. To realize its goals, the IDEA conditions federal funding on school systems' provision of both the substantive rights and the procedural safeguards outlined by the law. *See id.* § 1407(a)(1). Most often, school systems satisfy that condition by providing disabled students with individualized education plans ("IEPs") that provide necessary accommodations. *Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F. Supp. 2d 554, 562 (E.D. Va. 2009).

1

Plaintiffs seek to bring this action on behalf of a class led by D.C. and M.B. (two Fairfax County students with disabilities), their parents (with D.C. and M.B., the "Individual Plaintiffs"), and Hear Our Voices, Inc. (a disability advocacy organization).[1] Together, Plaintiffs challenge Virginia's administration of the IDEA. In all, they raise nine claims against the Virginia Department of Education ("VDEO"), VDEO Superintendent Jillian Balow, Fairfax County Public Schools ("FCPS"), and FCPS Superintendent Michelle Reid seeking both declaratory and injunctive relief. Specifically, Plaintiffs ask this Court to declare that Virginia's IEP-review process violates the IDEA and deprives families of due process. Plaintiffs then ask the Court to enter an injunction that would force Defendants to implement changes that would bring Virginia into compliance with Plaintiffs' understanding of the IDEA.

## II.    DISCUSSION

Article III requires "any person invoking the power of a federal court" to "demonstrate standing to do so." *Virginia House of Delegates v. Bethune-Hill*, 139 S.Ct. 1945, 1950 (2019). Thus, before proceeding to the merits of a case, the Court must first address that jurisdictional requirement. Having done so, the Court finds that none of the Plaintiffs have standing, and their claims must therefore be dismissed.

### A.  Standing (All Plaintiffs)

Generally, to establish standing, plaintiffs are required to show that they (1) suffered a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–

---

[1] The Individual Plaintiffs' claims arise out of two different adverse IEP determinations. D.C. and his parents claim that his rights under the IDEA were violated when Defendants refused to modify his IEP determination and declined to pay for the cost of his full-time residence at a group home. Dkt. No. 43 ¶¶ 258–69 ("Am. Compl."). M.B. and his parents claim that his rights were violated when Defendants refused to modify his IEP determination and declined to pay his tuition at a private day school. Am. Compl. ¶¶ 287–94.

61 (1992). And when forward-looking injunctive relief is sought, there must also be a showing that the plaintiff faces a "real and immediate threat" of being injured in the future. *See Thomas v. Salvation Army S. Terr.*, 841 F.3d 632, 638 (4th Cir. 2016) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983)). For the reasons stated below, the Court finds that only the Individual plaintiffs have standing to sustain this action.

### 1. The Organizational Plaintiff

Organizations, like individuals, may sue in their own right by satisfying the standard tripartite test. *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands*, LLC, 713 F.3d 175, 182 (4th Cir. 2013). However, organizations can also sue on behalf of their members when they show that (1) the represented members have standing to sue on their own behalf; (2) the interest the organization seeks to protect is connected to the organization's purpose; and (3) neither the claim nor the relief would require the participation of the individual members. *Id.* at 184. HOV fails on both fronts.

### a. HOV's Standing to Sue on Behalf of Its Members

First, HOV cannot stand in the shoes of its members. And because there is no doubt that the first two prongs of the associational standing inquiry are satisfied here, this case turns on Plaintiffs' ability to satisfy the third. The Court finds that they do not.

Unlike the first two requirements of the associational standing inquiry (which are rooted in Article III's goal of ensuring adversarial vigor), the third is "less than a constitutional necessity" and is "best seen as focusing on matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union v. Brown Grp., Inc.*, 517 U.S. 544, 556–57 (1996). For that reason—even when a claim is justiciable—"[p]rudential concerns often bar a third party from suing on behalf of others

who chose not to sue." *Parent/Professional Advoc. League v. City of Springfield*, 934 F.3d 13, 33 (1st Cir. 2019).

Here, even if the Court found that pursuing Plaintiffs' claims would not require the participation of individual students,[2] associational standing is inappropriate because HOV would be standing in the shoes of putative class members that may not have been able to bring these claims on their own behalf.

Take the two families before the Court in this case. As will be discussed below, D.C. and the Chaplicks are unable to sustain their claims because they failed to exhaust Virginia's administrative procedures. And—absent that exhaustion—there is no reason why organizations (like HOV) should be able to press the claims of students (like D.C.) in the aggregate. *Cf. id.* ("[I]t would not make sense to allow the organizations here to escape the exhaustion requirement for students they are purportedly representing."). Similarly, allowing HOV to sue on behalf of M.B. and the Binghams does not cure the fact that those claims are duplicative and undercut the interest in judicial efficiency. For those reasons, the Court finds that associational standing is inappropriate.

---

[2] The Court in unconvinced that adjudicating these claims would require individual participation. Individualized proof is not required "when the defendant's conduct is the primary subject of inquiry." *Hanover Cnty. NAACP v. Hanover Cnty.*, 461 F. Supp. 3d 280, 289 (E.D. Va. 2020). And, to grant relief here, the Court would need only focus on the Defendants' conduct (not Plaintiffs') to determine whether Virginia's system provides all the rights and procedural safeguards that the IDEA requires. And even if that inquiry did require resolving some individualized issues, those secondary questions do not foreclose HOV's ability to satisfy the standing requirements. *See All. For Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 570 F. Supp. 2d 533, 543 (S.D.N.Y. 2008) (finding that—even though some individualized showings will need to be made—associational standing was proper because "the conduct of Defendants . . . will be the primary subject of the inquiry").

However, as the Court explains, other prudential and administrative concerns block HOV's ability to show that associational standing would be appropriate in this case.

**JA219**

**b. HOV's Standing to Sue in Its Own Right**

Second, the organization also lacks the ability to sue on its own behalf. Again, to establish Article III standing to sue in its own right, HOV must show that it faces an imminent threat of being injured in the future. *Lujan*, 504 U.S. at 560–61. As do many organizations, HOV claims that it is and will continue to suffer a cognizable injury because Defendants' conduct caused an "involuntary diversion of resources" which "frustrated HOV's ability to carry out its mission." Dkt. No. 65 at 22. Specifically, HOV seems to suggest that, because Virginia's IEP-review process is riddled with "insidious" problems, the organization will have to spend more of its time and resources lobbying to have the policies changed. *Id.* But even accepting that as true, the Fourth Circuit has routinely rejected similar arguments.

In *Lane v. Holder*, a gun-rights organization whose activities included advocacy as well as "education, research, publishing and legal action," challenged a federal firearm statute. 703 F.3d 668, 671 (4th Cir. 2012). The group alleged that it had suffered an Article III injury because it needed to divert resources in order to help its members navigate the new law, and thus could not spend those funds on other goals. *Id.* The Fourth Circuit held that voluntary "budgetary choices" are not cognizable injuries under Article III. *Id.* at 675. And in *CASA de Maryland, Inc. v. Trump*, the Fourth Circuit, "put a finer point" on *Lane*'s holding when it explained that "it is not relevant for Article III purposes whether [the plaintiff] felt moved to act in a particular manner." 971 F.3d 220, 238 (4th Cir. 2020). Indeed, as the Court found, "[m]any statutes and regulations may spur private organizations to react to them in some fashion." *Id.* at 239. Thus, "a voluntary budgetary decision, however well-intentioned, does not constitute Article III injury." *Id.* Holding otherwise "would give *carte blanche* for any organization to manufacture standing by choosing to make

expenditures about its public policy of choice." *Id.* (internal quotation omitted). The Court follows those instructions today.

HOV has the "principal mission of securing appropriate and equal education services for students with disabilities." Am. Compl. ¶ 39. HOV, like the organizational plaintiffs in the cases discussed above, pursues its (admittedly noble) goals "through assistance, advocacy, and legislative efforts." *Id.* For that reason, like the organizational plaintiffs in the cases discussed above, HOV cannot establish standing. Simply put: HOV is an advocacy organization; and as such, it is not injured simply because Defendants action compelled the organization to do the very thing it was formed to do. Indeed, "[i]f this Court were to allow a party whose organizational mission is to engage in policy advocacy to claim injury on the basis of a need to engage in that exact activity, any advocacy group could find standing to challenge laws when there are changes in policy." *Know Your IX v. DeVos*, No. 1:20-cv-1224, at *6 (D. Md. Oct. 20, 2020); *see also Knowledge Ecology Int'l v. Nat'l Institutes of Health*, No. 1:18-cv-1130, at *6 (D. Md. Apr. 11, 2019) (explaining that the organizational plaintiff's "core purpose" as an organization was "pursuing precisely the type of advocacy it undertook" and that resources spent on litigating the case in front of the court were "very much in line with [the plaintiff's] core mission rather than a diversion of resources away from it.").

### 2.  The Individual Plaintiffs

The Individual Plaintiffs have standing.

### a.  The Individual Plaintiffs Have Alleged Cognizable Injuries

Defendants first argue that the Individual Plaintiffs lack standing to pursue declaratory and injunctive relief because they have not shown a threat of imminent injury since neither alleges that they will go through the IEP-review process again in the future. *See* Dkt. No. 59 at 17. Plaintiffs

respond that, under Fourth Circuit law, they are not required to establish an imminent threat of future injury—because the Defendants are "engaged in ongoing violations of federal law that cause Plaintiffs *ongoing* injury." Dkt. No. 65 at 19 (emphasis added). Specifically, Plaintiffs claim that Defendants continue to injure them by depriving children and their families of "the protections afforded by the IDEA," Am. Compl. ¶ 196, and of "viable avenues of relief through adequate due process hearings," *id.* ¶ 280, and of "free, full, initial evaluation," *id.* ¶ 225. *See* Dkt. No. 65 at 20. Plaintiffs also assert that they suffer an ongoing injury because "Defendants' actions have compelled [Plaintiffs] to pay, *and continue to pay*, for a significant portion of the services to which their children are entitled." *Id.* at 8 (citing Am. Compl. ¶¶ 260–69, 293–94) (emphasis added).

To support their argument, Plaintiffs convincingly rely on *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183 (4th Cir. 2018). The plaintiffs in that case challenged a school district's "Bible in Schools" program on Establishment Clause grounds. The defendant school district attacked plaintiffs' standing to assert the claim. Specifically, the defendant there argued that plaintiffs failed to establish a cognizable injury that would entitle them to forward-looking relief. Plaintiffs disagreed, asserting that they faced an ongoing injury because (among other things) the family had—and continued—to bear the additional costs of having the student attend school in another district. The Fourth Circuit accepted that claim. In doing so, the appellate court held that—because the injury persisted, *i.e.*, because the family remained compelled to have the student attend school in a different district and incur the additional costs of doing so—the plaintiffs adequately alleged that they suffered an "ongoing" injury and thus were entitled to pursue injunctive relief. *Deal*, 911 F.3d at 188.

Like the plaintiffs in *Deal*, Plaintiffs here have adequately alleged that they continue to be injured by Defendants' alleged conduct. Again, the Amended Complaint alleges that, because

D.C.'s IEP request was denied, the Chaplicks are forced to pay his residential expenses at the Grafton School. Am. Compl. ¶¶ 258–69. Plaintiffs also allege that, because M.B.'s IEP was denied (and because that denial was upheld by a hearing officer), the Binghams are forced to pay his tuition costs at the Phillips School. *Id.* ¶¶ 287–94. Each of these allegations state ongoing injuries. And notwithstanding Defendants' arguments to the contrary, Plaintiffs are not required to also allege an imminent injury as the ongoing nature of the injuries that were alleged is sufficient to maintain an action for injunctive relief. *See Deal*, 911 F.3d at 189 (citing *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (recognizing that a plaintiff can "satisfy the injury-in-fact requirement for prospective relief" either by demonstrating "a sufficiently imminent injury in fact" *or* by demonstrating "an ongoing injury")); *see also Abbott v. Pastides*, 900 F.3d 160, 168 (4th Cir. 2018) (noting that a plaintiff may seek prospective relief against a defendant's "*ongoing or imminent*" conduct) (emphasis added)).

As such, the Court finds that Plaintiffs have established a cognizable injury capable of supporting their claims for prospective relief.

### b. The Individual Plaintiffs' Injuries are Redressable by a Favorable Decision

Defendants also argue that, even if Plaintiffs had alleged a cognizable injury, that injury would not be redressable. Dkt. No. 69 at 11.

To satisfy the redressability element of standing, a plaintiff "must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (*quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000)). However, the burden imposed by this requirement is not onerous: Plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Instead,

plaintiffs "need only show that they personally would benefit in a tangible way from the court's intervention." *Id.* (internal quotation omitted).

Meeting that low bar, Plaintiffs have established that their injuries are redressable. Plaintiffs alleged that, because Defendants are depriving them of the opportunity to have a due process hearing before an unbiased hearing officer, their IEP requests were improperly denied, and they are forced to bear additional educational costs for D.C. and M.B. As relief, Plaintiffs ask the Court to order Defendants to bring its systems into compliance with the IDEA and allow Plaintiffs to reassert their claims to a now-neutral decision-maker. Thus, taking those allegations as true, Plaintiffs' injuries would certainly be remedied if this Court were to grant the sought-after relief.

Urging the Court to reach the opposite conclusion, Defendants argue that Plaintiffs injuries would be redressable only if a favorable decision in this case would guarantee a different outcome in future IEP-review processes. Dkt. No. 89 at 14:17–21 ("What wouldn't be solved is redressability, because even if Your Honor granted everything that plaintiffs requested, it still wouldn't really remedy the situation, because what they're asking for is a different outcome from the due process hearing."). However, the Supreme Court has not required such certainty. Rather, as that Court has held, "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 285 (2018).

Here, Plaintiffs allege that the inability to assert their claims to a neutral arbiter is the primary obstacle standing between them and the relief they seek. And although it is no doubt possible that even a new hearing officer would reach the same conclusion on Plaintiffs' IEP requests, that alone is insufficient to preclude a finding of redressability. *See Larson*, 456 U.S. at 243 n.15 (rejecting the "draconic" notion that a plaintiff must show that they are certain to

9

**JA224**

ultimately obtain everything they seek to establish redressability). Instead, it is enough to find that this Court would be removing at least one obstacle by granting relief which gives Plaintiffs the *opportunity* to present their claims to an unbiased hearing officer. And, for that reason, a favorable decision in this case would bestow a "tangible benefit" on Plaintiffs. *Cf. Deal*, 911 F.3d at 190. Thus, the Individual Plaintiffs' injuries are redressable.

### B.  Exhaustion (D.C. and the Chaplicks)

Notwithstanding their (failed) standing arguments, Defendants assert that the Court lacks jurisdiction to hear the claims brought by D.C. and the Chaplicks because the family did not exhaust their administrative remedies by challenging that decision through a due-process hearing. Dkt. No. 52 at 5–8; Dkt. No. 59 at 15–19. The Court agrees.[3]

To bring a claim under the IDEA, plaintiffs must first exhaust their administrative remedies. *E.L. v. Chapel Hill-Carrboro Bd. Of Educ.*, 773 F.3d 509, 514–15 (4th Cir. 2014). To do so, plaintiffs are typically required to: first, request an independent evaluation of the challenged IEP determination; then, second, try other dispute-resolution procedures (like mediation); then, finally, assert their challenge in a due process hearing before a hearing officer. *See generally* 20 U.S.C. § 1415. And when a plaintiff fails to do so, the court lacks subject matter jurisdiction to hear their claims. *See K.I. v. Durham Pub. Sch. Bd. of Educ.*, 54 F.4th 779, 794–95 (4th Cir. 2022).

By their own admission, the Chaplicks did not satisfy the exhaustion requirement. Instead, Plaintiffs argue that they were not required to go through a due process hearing for two reasons: first, because they are making "systemic" claims; and second, because going through the administrative process would have been futile. Both arguments fail.

---

[3] While Counts I and II are brought under 42 U.S.C. § 1983, this exhaustion requirement applies to those claims all the same. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 168 (2017) ("[The IDEA]'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a FAPE . . . . If a lawsuit charges such a denial, the plaintiff cannot escape [the IDEA's exhaustion requirements] merely by bringing [their] suit under a statute other than the IDEA").

First, the Court rejects Plaintiffs' invitation to apply a lowered exhaustion standard to claims that challenge entire systems. *See* Dkt. No. 65 at 27–30 (relying on out-of-circuit cases, including *W.H. v. Tennessee Dep't of Educ.*, No. 3:15-cv-1014, 2016 WL 236996, at *6 (M.D. Tenn. Jan. 20, 2016)). But—while it acknowledges the courts in other jurisdictions that have done so—this Court is nonetheless constrained by the law of the Fourth Circuit, which has not yet adopted that modified standard. For that reason, the Court will not alter the existing exhaustion standards here.

Second, the Court rejects Plaintiffs' futility arguments. The Chaplicks suggest that exhausting their administrative remedies would have been futile because that hearing officer "has demonstrated a decades-long pattern of bias against families of disabled and special needs students seeking relief." Dkt. No. 65 at 31. However, to support that suggestion, Plaintiffs point to statistics about how often that hearing officer rules in favor of families seeking relief, the fact that the hearing officer ruled against the Chaplicks several years prior, and the fact that the officer refused to recuse herself from D.C.'s more-recent case. *Id.* None of those things are enough to overcome the "presumption of honesty and integrity" that hearing officers enjoy. *See K.I. v. Durham Pub. Sch. Bd. Of Educ.*, No. 1:19-cv-857, 2020 WL 3512213, at *6 (M.D.N.C. June 29, 2020). And because Plaintiffs' speculations fall short of a "clear showing of actual bias," this Court finds that exhaustion would not have been futile and the failure to do so is not excused. *Cf. id.*

### C. Duplicative Litigation (M.B. and the Binghams)

Finally, Defendants argue that the claims brought by M.B. and the Binghams should also be dismissed because, after the hearing officer denied their claim at the due process hearing, the Binghams filed an administrative appeal that is currently pending before another judge in this

courthouse. *See* Dkt. No. 52 at 8–9 (referring to *M.B. v. Fairfax Cnty. Sch Bd.*, 1:22-cv-930 (E.D. Va.) (Ellis, J.)). The Court agrees.

The Supreme Court has charged the lower federal courts  to adhere to the principle of avoiding duplicative litigation. *See Colorado River Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976). Generally, "[d]uplicative claims include those in which there are no significant differences between the claims, parties, and available relief in the two suits." *Krakauer v. Dish Network, LLC*, No. 1:14-cv-333, 2017 WL 4417957, at *5 (M.D.N.C. Oct. 3, 2017). And when faced with duplicative suits, a district court may exercise its discretion to dismiss, transfer, or stay the iterative action. *MVP Grp. Int'l, Inc. v. Smith Mountain Indus., Inc.*, No. 2:11-cv-2608, 2012 WL 425010, at *1 (D.S.C. Feb. 9, 2012).

Here, the Binghams' claims in their administrative appeal are substantially similar to the ones made in this case. In both cases, the family makes almost identical factual allegations. Both cases seek to undo the hearing officer's determination on M.B.'s IEP request. And both cases would give the Binghams separate bites at the proverbial apple. Worse than that, however, is the reality that (as with any duplicative suit) entertaining the Binghams claims would create a risk of dueling decisions  coming from judges in the same courthouse. For that reason, the Court will, in the interest of judicial economy, use its discretion to dismiss the claims brought by M.B. and the Binghams as impermissibly duplicative.

III.    **CONCLUSION**

For the reasons discussed above, none of the Plaintiffs have presented a claim that can move beyond this stage.[4] Accordingly, it is hereby

**ORDERED** that Plaintiffs' Motion for Leave to File Supplemental Authority (Dkt. No. 71) is **GRANTED**; it is further

**ORDERED** that Fairfax County School Board's Motion to Dismiss (Dkt. No. 51) is **GRANTED**; and it is further

**ORDERED** that Virginia Department of Education's Motion to Dismiss (Dkt. No. 58) is **GRANTED**.

**SO ORDERED.**

_____
/s/
Michael S. Nachmanoff
United States District Judge

July 25, 2023
Alexandria, Virginia

---

[4] This opinion should not be read as foreclosing a different plaintiff's (or group of plaintiffs') ability to pursue the claims at issue here. Indeed, at this time, the Court does not see how the deficiencies discussed above would apply to plaintiffs that had taken full advantage of all available administrative procedures—including the ability to seek the disqualification of an allegedly biased hearing officer in the Virginia Supreme Court—and chose to challenge Virginia's implementation of the IDEA in a single suit. The Court also doubts that HOV's (or a different organization's) ability to establish associational standing would implicate the same prudential concerns if attempting to stand in the place of such individuals. Thus, while this case must be dismissed, a future case may fare differently.

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| D.C., *et al.*, <br>    *Plaintiffs*, <br><br>    v. <br><br> FAIRFAX COUNTY SCHOOL <br> BOARD, *et al.*, <br>    *Defendants*. | 1:22-cv-01070 (MSN/IDD) |

**ORDER**

This matter comes before the Court on Defendants' Motion to Clarify (Dkt. No. 91). Because it appears just and proper to do so, that motion will be granted.

In its Memorandum Opinion and Order (Dkt. No. 90), the Court stated that, when plaintiffs fail to exhaust their administrative remedies, "the court lacks subject matter jurisdiction to hear their claims." Dkt. No. 90 at 10. The Fourth Circuit, however, has recently overruled its precedent to "hold the IDEA's exhaustion requirement is not a jurisdictional requirement but a claims-processing rule." *See K.I. v. Durham Pub. Sch. Bd. of Educ.*, 54 F.4th 779, 792 (4th Cir. 2022). For that reason, the Court will modify its Opinion to disclaim the notion that Plaintiffs' claims were dismissed on jurisdictional grounds. Instead, without changing any other aspects of its analysis, the Court treats the IDEA's administrative exhaustion requirement as a claims-processing rule. But, because the same reasons that D.C. and the Chaplicks fail the exhaustion requirement are dispositive whether it is jurisdictional or a claims-processing rule, Plaintiffs' claims remain dismissed. Accordingly, it is herby

**ORDERED** that Defendants' Motion to Clarify (Dkt. No. 91) is **GRANTED**; and it is further

**ORDERED** that the Court's Memorandum Opinion and Order (Dkt. No. 90) is **MODIFIED** in accordance with this Order.

                     **SO ORDERED.**

                      /s/
                 Michael S. Nachmanoff
                 United States District Judge

August 1, 2023
Alexandria, Virginia

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| D.C., *et al.* <br>       Plaintiffs, <br><br>     v. <br><br> FAIRFAX COUNTY SCHOOL BOARD, *et al.* <br><br>       Defendants. | Civil Action: 1:22-CV-01070-MSN-IDD |

**PLAINTIFFS' NOTICE OF APPEAL**

Plaintiffs D.C., by his parents and guardians, Trevor Chaplick and Vivian Chaplick; Trevor

Chaplick; Vivian Chaplick; M.B., by his parents and guardians James Bingham and Sheila

Bingham; James Bingham; Sheila Bingham; and Hear Our Voices, Inc. appeal to the United States

Court of Appeals for the Fourth Circuit from the Order Granting Motions to Dismiss (Dkt. 90 as

modified by Dkt. 94).  This putative class action has not yet been certified.

Dated: August 14, 2023                    Respectfully submitted,


                                        By: */s/ R. Braxton Hill, IV*
                                          R. Braxton Hill, IV (VSB No. 41539)
                                          Craig T. Merritt (VSB No. 20281)
                                          MERRITTHILL, PLLC
                                          919 E Main Street, Suite 1000
                                          Richmond, VA 23219
                                          T  804-916-1600
                                          bhill@merrittfirm.com
                                          cmerritt@merrittfirm.com

                                          Aderson B. Francois
                                          (*pro hac vice to be submitted*)
                                          Civil Rights Clinic,
                                          Georgetown University Law Center
                                          600 New Jersey Avenue NW, Suite 532

Washington DC 200001
T 202-661-6721
aderson.francois@law.georgetown.edu

William R.H. Merrill (*pro hac vice*)
Scarlett Collings (*pro hac vice*)
Michael Adamson (*pro hac vice*)
SUSMAN GODFREY, LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
T 713-653-7865
bmerrill@susmangodfrey.com
scollings@susmangodfrey.com
madamson@susmangodfrey.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of August, 2023, I will electronically file a copy of the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service.

*/s/ R. Braxton Hill, IV*
R. Braxton Hill, IV (VSB No. 41539)
MERRITTHILL, PLLC
919 E Main Street, Suite 1000
Richmond, VA 23219
T  804-916-1600
bhill@merrittfirm.com

*Counsel for Plaintiffs*

3

**JA232**

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: September 26, 2023        /s/ *William R. H. Merrill*
                                    William R. H. Merrill

                                    *Counsel for Plaintiffs-Appellants*